UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GREATER CHAUTAUQUA FEDERAL
CREDIT UNION, individually and on behalf of
all others similarly situated,

BOULEVARD FEDERAL CREDIT UNION,
individually and on behalf of all others similarly
situated,

GREATER NIAGARA FEDERAL CREDIT
UNION, individually and on behalf of all others
similarly situated,

        Plaintiffs,

    - against -

HON. LAWRENCE K. MARKS, in his official
capacity as Chief Administrative Judge of the
Courts,

SHERIFF JAMES B. QUATTRONE, in his
official capacity as Sheriff of Chautauqua
County, New York,

SHERIFF JOHN C. GARCIA, in his official
capacity as Sheriff of Erie County, New York,

SHERIFF MICHAEL J. FILICETTI, in his
official capacity as Sheriff of Niagara County,
New York,

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

        Defendants.

---

Case No.: <u>1:22-cv-02753 (MKV)</u>

**<u>AMENDED CLASS ACTION
COMPLAINT</u>**

**PLAINTIFFS DEMAND TRIAL
BY JURY**

Plaintiffs Greater Chautauqua Federal Credit Union, Boulevard Federal Credit Union, and Greater Niagara Federal Credit Union, by and through their undersigned counsel, Venable LLP, as and for their Class Action Amended Complaint against Defendants Hon. Lawrence K. Marks, Sheriff James B. Quattrone (Chautauqua County Sheriff's Office), Sheriff John C. Garcia (Erie County Sheriff's Office), Sheriff Michael J. Filicetti (Niagara County Sheriff's Office), and Attorney General Letitia James (Office of the Attorney General for the State of New York), allege as follows:

## PRELIMINARY STATEMENT

1.      Since 1981, New York State Civil Practice Law and Rules ("CPLR") 5004 has provided that post-judgment debts accrue interest at a rate of nine percent per annum.  This rate applied to all post-judgment debts regardless of whether they were consumer debts or were other debts.

2.      The purpose of post-judgment interest is to compensate the holder of the judgment for the delay and expense in obtaining payment and to encourage prompt payment by the judgment debtor.  The animating principle is that one who a court has adjudged to owe money to another should not profit by delaying payment.  Conversely, one who a court has adjudged to be owed money by another should not be forced to bear the burden and cost of delay in payment upon that judgment, as inflation and expenses whittle away at what is rightfully owed.

3.      In June 2021, the New York State Legislature passed S.B. 5724A, 244th Leg. Sess., c. 831 (N.Y. 2021) (hereafter, the "Amendment" or "S.5724A"), which the Governor signed into law on December 31, 2021, creating an effective date of April 30, 2022.  The

Amendment lowers the statutory rate of interest accrued by judgments arising from consumer debt from nine percent to two percent per annum.

4.      The Amendment changes the statutory interest both on a go-forward basis and retroactively to the date of the original entry of judgment.  In other words, the Amendment dictates that the interest on any outstanding consumer judgments that has been accruing interest at a rate of nine percent per annum must be recalculated using the new rate of two percent per annum.  Additionally, judgment creditors, like Plaintiffs, at their own expense, must file amended executions with the sheriff, or other enforcement officer, containing the recalculated interest amount within 60 days of April 30, 2022 (*i.e.*, by June 29, 2022).

5.      Despite the Amendment's mandate for swift action by judgment creditors, implementing sheriffs, and court officials, the Amendment provides virtually no guidance on how to apply a retroactive recalculation or on the consequences of a failure to issue an amended execution.  Indeed, even throughout the legislative process, there was widespread confusion among not only judgment creditors and their representatives regarding the proper method of applying the retroactive recalculation, but also among the Amendment's supporters.  As a result of this deficient and vague language, judgment creditors and sheriffs across the State face substantial uncertainty as to how to comply.

6.      Regardless of the specific procedures required, the retroactive recalculation, which must be performed from the date of the original entry of judgment, will, when applied to all outstanding judgments related to consumer debt in New York State, eradicate millions of dollars from the balance of judgments lawfully due and owing to judgment creditors.  This loss will have devastating effects on businesses of all sizes, nonprofit credit unions, and individual creditors.

7.      Plaintiffs are holders of consumer judgments, some of which are over 15 years old.  The sum total of the outstanding judgments against consumers held by Plaintiffs, which includes both the original judgment amount and post-judgment interest totals around $3,800,000 and the accrued interest totals at least $1,280,000.

8.      Plaintiffs have vested property rights in the interest that has been accruing on their judgments at the set statutory rate of nine percent per annum.  This right has been recognized by the United States Supreme Court and New York law for more than a century.

9.      Plaintiffs have relied on the nine-percent annual interest rate that has been accruing on their judgments both to offset the cost of obtaining judgments and also to buffer the risk of lending money in the first place.  Plaintiffs reasonably expected that the statutory nine-percent interest rate would be added to their judgments until they were paid in full and further expected that eventually, upon payment, the interest would be available for Plaintiffs' use.

10.      With the Amendment, New York State intends to affirmatively take Plaintiffs' property by invalidating the interest belonging to Plaintiffs.  This taking is for public use, namely, to alleviate consumer debt.  Plaintiffs will not receive any compensation for the property they will lose.

11.      Plaintiffs therefore bring this action under the Takings Clause of the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983.  Defendants' acts, orders, policies, practices, customs, and processes to implement the Amendment will deprive Plaintiffs of their property without just compensation or due process.  In bringing these claims, Plaintiffs seek to represent a class of similarly situated New York judgment holders consisting of all holders of unsatisfied judgments

based on consumer debt, as defined in the Amendment, and entered in New York State courts prior to April 30, 2022.

12.     Contemporaneously with this Amended Complaint, Plaintiffs are requesting a show cause order and preliminary injunction to enjoin the effective date of the Amendment and prevent the irreparable harm that it will inflict on Plaintiffs and all others similarly situated whose property will be confiscated by implementation of the Amendment.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

14.     This Court has personal jurisdiction over Defendants because all Defendants are sued in their official capacities, roles that they perform for and in the State of New York.

15.     "For the purposes of venue in an action under 42 U.S.C. § 1983, defendants who are sued in their official capacity 'reside' where they perform their official duties." *Amaker v. Haponik*, 198 F.R.D. 386, 391 (S.D.N.Y. 2000); *see also* 28 U.S.C. § 1391(b)(1) ("A civil action may be brought in . . . a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located . . . ."). Venue therefore is proper in the Southern District of New York because all Defendants "reside" in the State of New York and Chief Administrative Judge Marks maintains his office at the Office of Court Administration, 25 Beaver Street, New York, NY, 10004. The Office of Court Administration is the loci from which the policies and procedures implementing the Amendment will be issued. The New York Attorney General also maintains an office at 28 Liberty Street, New York, NY, 10005.

## THE PARTIES

*Class Plaintiffs*

16.     Plaintiff Greater Chautauqua Federal Credit Union ("GCFCU") is a credit union (a nonprofit financial cooperative) with approximately 9,600 members and 32 employees, located in Falconer, New York in Chautauqua County.  As of February 28, 2022, Plaintiff GCFCU has approximately 230 outstanding judgments and is owed approximately $1,300,000, which includes at least $390,000 in post-judgment interest.  Some of the outstanding judgments were entered over 17 years ago.

17.     Plaintiff Boulevard Federal Credit Union ("BFCU") is a credit union (a nonprofit financial cooperative) with approximately 3,800 members and 11 employees, located in Amherst, New York in Erie County.  As of February 28, 2022, Plaintiff BFCU has approximately 115 outstanding judgments and is owed approximately $1,500,000, which includes at least $530,000 in post-judgment interest.  Some of the outstanding judgments were entered over 18 years ago.

18.     Plaintiff Greater Niagara Federal Credit Union ("GNFCU") is a credit union (a nonprofit financial cooperative) with approximately 8,000 members, and 14 employees, located in Niagara Falls, New York in Niagara County.  As of February 28, 2022, Plaintiff GNFCU has over 100 outstanding judgments and is owed over $1,000,000, which includes at least $360,000 in post-judgment interest.  Some of the outstanding judgments were entered over 15 years ago.

*Defendants*

19.     Defendant the Honorable Lawrence K. Marks is Chief Administrative Judge for the New York State Unified Court System.  As Chief Administrative Judge, he is an officer for the State of New York.  As part of his official duties, Judge Marks ensures and promulgates policies and management procedures to enforcement agents and clerks throughout the State of

New York, including policies and procedures concerning the entering and execution of judgments.

20.      Defendant James B. Quattrone is the Sheriff of Chautauqua County, New York. As Sheriff, he is a government official.  As part of his official duties, Defendant Quattrone ensures that judgment executions are served on debtors, that the interest on judgments is calculated in accordance with the legal rate, that payments are applied to outstanding balances, and that payments are remitted to judgment creditors.

21.      Defendant John C. Garcia is Sheriff of Erie County, New York.  As Sheriff, he is a government official.  As part of his official duties, Defendant Garcia ensures that judgment executions are served on debtors, that the interest on judgments is calculated in accordance with the legal rate, that payments are applied to outstanding balances, and that payments are remitted to judgment creditors.

22.      Defendant Michael J. Filicetti is Sheriff of Niagara County, New York.  As Sheriff, he is a government official.  As part of his official duties, Defendant Filicetti ensures that judgment executions are served on debtors, that the interest on judgments is calculated in accordance with the legal rate, that payments are applied to outstanding balances, and that payments are remitted to judgment creditors.

23.      Defendant Letitia James is the New York Attorney General.  The Attorney General is charged with enforcing the laws of the State of New York generally and defending the constitutionality of state statutes.  More specifically, however, the Attorney General is a proper party because she has a connection with the enforcement of the unconstitutional Amendment through Articles 22-A and 29-H of the New York General Business Law.  *See In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 372-73 (2d Cir. 2005) ("So long as there is such a

connection [with enforcing compliance with the act], it is not necessary that the officer's enforcement duties be noted in the act.").

24.     Under Article 29-H of the New York General Business Law, for example, "[t]he attorney general or the district attorney of any county may bring an action in the name of the people of the state to restrain or prevent any violation of this article or any continuance of any such violation."  N.Y. Gen. Bus. Law § 602(2).  Thus, the Attorney General can sue to prevent violations of Article 29-H as set forth in New York General Business Law § 601, which prohibits certain debt collection practices, including the knowing collection of any "collection fee, attorney's fee, court cost or expense unless such charges are justly due and legally chargeable against the debtor."  *Id.* § 601(2).

25.     Similarly, the Attorney General has the right to file enforcement actions related to deceptive business practices.  For example, under Article 22-A of the New York General Business Law:

> a)  Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.
>
> b)  Whenever the attorney general shall believe from evidence satisfactory to him that any person, firm, corporation or association or agent or employee thereof has engaged in or is about to engage in any of the acts or practices stated to be unlawful he may bring an action in the name and on behalf of the people of the state of New York to enjoin such unlawful acts or practices and to obtain restitution of any moneys or property obtained directly or indirectly by any such unlawful acts or practices.

N.Y. Gen. Bus. Law § 349.

26.     The Attorney General thus has a duty to enforce the requirements of the Amendment should any Plaintiff or Class Member not comply with its terms.

27.     Should Plaintiffs and proposed Class Members fail to comply with the terms of the Amendment, even inadvertently, it is possible that they could be subject to an enforcement

action by the Attorney General under New York General Business Law §§ 349 and 602.  For example, if a creditor were to collect interest at more than 2%, it potentially could be subject to an enforcement action for violating Sections 601(2) and/or (8) of the New York General Business Law.  Similarly, it could, at least potentially, also be subject to enforcement actions for misleading consumers about the amount owed on a judgment in violation of Section 349.  Plaintiffs do not agree that these actions do violate these statutes or that an action against them under these statutes would be justified, but the potential for such an action to be brought against them is real and concrete.

28.     The Attorney General has demonstrated a willingness to bring enforcement actions against creditors for violations of consumer debt laws, including in recent months.  To name only one example, on March 22, 2022, the Attorney General sent letters to the largest credit card companies and debt collectors operating in New York to warn them of new state regulations under the Consumer Credit Fairness Act of 2021.  *See* Press Release, New York Attorney General's Office, Attorney General James Warns Debt Collectors of New State Regulations Banning Lawsuits on Old Debts (Mar. 29, 2022), *available at* https://ag.ny.gov/press-release/2022/attorney-general-james-warns-debt-collectors-new-state-regulations-banning.[1]  Like the Amendment, the Consumer Credit Fairness Act effects changes to the New York Civil Practice Law and Rules; among other things, it bars creditors from suing or threatening to sue debtors for debt older than three years and expands the disclosure requirement for debt collectors proceeding in state court.

29.     In a press release titled, "Attorney General James Warns Debt Collectors of New State Regulations Banning Lawsuits on Old Debts," the Attorney General stated that "[t]he

Office of the Attorney General (OAG) has brought dozens of enforcement actions and obtained numerous settlements against debt collectors that engaged in improper debt collection tactics" and invited consumers to file complaints with the OAG if they have had experience with these tactics, which include suing and collecting on phantom debts consumers did not actually owe or obtaining default judgments against consumers through untimely lawsuits. *See id.*

## FACTUAL ALLEGATIONS

### A.    Post-Judgment Interest

30.    Since the 1800s, New York law has recognized the right of a judgment holder to receive interest on the unpaid portion of the judgment.  The law also recognizes that the judgment holder has a vested right in the interest that has accrued on judgment debts.

31.    Under New York law, "[e]very money judgment shall bear interest from the date of its entry.  Every order directing the payment of money which has been docketed as a judgment shall bear interest from the date of such docketing."  CPLR 5003.

32.    Prior to 1981, the statutory interest on unpaid judgments was, at various times, either six percent per annum or "the legal rate," which, in 1969, for example, was 7.5 percent per annum.  *See Jamaica Sav. Bank v. Giacomantonio*, 59 Misc. 2d 704, 705, 300 N.Y.S.2d 218, 219 (Sup. Ct. 1969).

33.    In 1981, the New York State Legislature amended CPLR 5004 to increase the rate of interest that accrues on unpaid judgments to nine percent per annum.  Thus, from 1981 through April 29, 2022, "[i]nterest shall be at the rate of nine per centum per annum, except where otherwise provided by statute."  CPLR 5004.

---

[1] The letter is available at the following link: https://ag.ny.gov/sites/default/files/2022.03.23_-_debt_collector_letter_re_reg_f_ccfa.pdf/.

34.     The interest that accrues on judgments serves multiple purposes.  Creditors, including Plaintiffs, rely on the current post-judgment interest rate of nine percent per annum because the accrued (and accruing) interest incentivizes debtors to repay the outstanding judgment amount before it grows further.

35.     Additionally, certain creditors, including Plaintiffs, rely on interest that accrues on judgments to offset the costs of recovering the debts and the cost of inflation when the judgment debts are not paid immediately.  If creditors are unable to rely on sufficient interest to offset the cost of recovering judgment debts, the lending industry will be forced to raise interest rates on loans and reduce the number of loans offered to higher-risk borrowers.  The result will be that credit will become less available to borrowers.

36.     Finally, in reliance on the nine percent per annum rate, some businesses have purchased loans, accounts, and judgments.  The purchase price for these obligations directly correlates with the rate of interest that has accrued, and will continue to accrue, if the loans, accounts, or judgments remain unpaid.  If that rate is lowered by nearly 80% (*i.e.*, from 9% to 2%) on a retroactive basis, these purchasers unfairly lose a significant portion of their investment.

**B.     The Process of Executing Judgments**

37.     Once a money judgment is awarded, either on the merits, or via default, the judgment holder prepares a draft of the judgment for the clerk to sign and enter.  The fact of entry is recorded in the judgment book. CPLR 9702(1).

38.     If the judgment is not immediately satisfied, the attorney for the judgment holder typically issues an execution to the enforcement officers in the State (*i.e.*, the sheriffs or marshals) of one or more counties in the State directing them to satisfy the judgment out of the

real or personal property of the judgment debtor.  CPLR 5230(b).  The clerk of the supreme, county, or family court where the judgment was docketed may also issue the execution.  *Id.*

39.      The execution specifies the amount due on the judgment.  The enforcement officers are charged with enforcing any unpaid judgments against a debtor's property.

40.      Importantly, for these purposes, the enforcement officers are charged with calculating the interest that accrues on the unpaid portions of the judgment. The enforcement officers typically calculate this interest amount using a declining balance method.  Under this method, interest is periodically recalculated based on the existing principal balance of the debt.

41.      The enforcement officers also collect the payments and deliver the payments to the creditors, after subtracting applicable "lawful fees and expenses."  CPLR 5231(k).

42.      Once a judgment is satisfied, the enforcement officer returns the execution to the creditor as satisfied, the creditor directs that the account be closed, and a satisfaction of judgment is filed.

### C.      The Amendment

43.      On December 31, 2021, Governor Hochul signed into law Senate Bill 5724A. The Amendment goes into effect 120 days from December 31, 2021, which is April 30, 2022.

44.      The Amendment adds a definition of "consumer debt" to CPLR 5004 and lowers the interest rate on judgments arising from consumer debt from nine percent per annum to two percent per annum.  "Consumer debt" is defined as "any obligation or alleged obligation of any natural person to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family or household purposes, whether or not such obligation has been reduced to judgment, including, but not limited to, a consumer credit transaction."  S.5724A § 1.   The Amendment provides no

further explanation on the transactions that qualify as those "primarily for personal, family or household purposes."

45.     The stated purpose of the Amendment is to provide assistance to debtors by relieving them of their obligation to pay interest at nine percent per annum, purportedly as necessitated by hardships caused by the COVID-19 pandemic. The Amendment has no temporal limitation. It applies not only prospectively (stating that the two percent rate applies to all judgments arising from consumer debt "entered on or after the effective date") but also retroactively (stating that that the two percent rate applies "from the date of the entry of judgment on any part of a judgment entered before the effective date" if the judgment remains unpaid).

46.     The Amendment requires that all creditors with judgments entered prior to the effective date file an "amended execution" with the enforcement officers within 60 days of April 30, 2022 (*i.e.*, June 29, 2022).  The Amendment provides no guidance as to what constitutes an amended execution.  Nor does it state whether an amended execution can be accepted after June 29, 2022.

47.     Once the amended execution is delivered to the enforcement officers, they must serve the amended execution on the debtor within 45 days.  S.5724A § 5(d).  As stated above, the enforcement officers are also responsible for recalculating the accrued interest and balances owed.  However, the Amendment provides virtually no guidance to the enforcement officers on how to do the recalculation, thereby likely resulting in confusion with, and inconsistent application of, the Amendment across the State.  At the very least, the Amendment will impose a significant administrative burden on the enforcement officers.

48.     The Amendment does not require creditors to refund interest that has been collected prior to the effective date.  The enforcement officers, however, must refund any money collected (but not yet remitted to the creditor) in excess of the judgment amount after the judgment amount has been recalculated based on the interest rate of two percent.  *Id.* § 5(k).

49.     As to the Plaintiffs only, the Amendment will affect approximately 450 outstanding judgments with a total estimated amount of approximately $3,800,000, including the original judgment amount and post-judgment interest.  Statewide, these figures are many orders of magnitude greater.  The reduction in accrued post-judgment interest will reduce the value of judgments statewide by tens of millions of dollars.

50.     In addition to stripping judgment creditors of their property and creating an onerous administrative burden for judgment holders and the enforcement agencies, the Amendment includes a number of provisions that are confusing and ambiguous, making compliance within the Amendment's timelines extremely difficult, at best.  For example, the Amendment requires creditors to file amended executions in 60 days, and notes that the clerks "may" also file such executions but does not explain (1) what happens if the creditors do not comply, or (2) under what circumstances the clerks must or should issue amended executions.

51.     The Amendment also provides no guidance on how the new interest calculations should be performed retroactively.  Post-judgment interest is calculated using a declining balance method, meaning that as the principal amount decreases, the interest is recalculated.  The Amendment does not explain how to do this calculation "retroactively."  Should the interest be recalculated solely based on the amount of time that the judgment has been owed?  Or should the calculation take into account when payments were made and recalculate the interest as if, when each payment was made, the interest rate was two percent?

52.     Typically, post judgment interest is calculated by multiplying the total outstanding judgment by the interest rate.  The resulting number is divided by 365, the result of which represents the interest that accrues per day.  This number is then multiplied by the number of days the interest accrued.  If a payment is made, reducing the principal, this process is repeated with the new principal.

53.     For example, if a judgment for $1000 has been pending for 10 years and accruing interest at nine percent, and no payments have been made, the total accrued interest is $900. Retroactively applying a two percent interest rate reduces the accrued interest to $200.

54.     If, however, one payment of $100 was made on the judgment after six months, the total interest accrued after 10 years would be $45 for the first six months and $807.97 for the remaining nine years and six months (based on a new principal of $945), for a total of $852.97.

55.     Because the Amendment does not explain how to recalculate the interest, it also does not explain how to treat situations where the interest was recalculated based on payments. Taking the second scenario above as an example, should the two percent rate be applied to the period prior to the first payment or only to the period after, during which no payments were made?  If the two percent is applied prior to the first payment, the accrued interest is $10 for the first period and $168.80 for the second period (based on a new principal balance of $910), for a total of $172.90.  By contrast, if the two percent rate only applies after the first payment, the first six months would still accrue $45 in interest (at the nine percent rate) and then $179.55 of interest will accrue on the new principal of $945 after the payment at the two percent rate, for a total of $224.55 in accrued interest.  As the number of payments increases, the effect of how the interest is recalculated is amplified.

56.     In addition to destroying millions of dollars in the vested property rights of judgment creditors, the Amendment will provide a windfall to those judgment debtors who have failed to pay judgments timely, rewarding them for their delay, which in many cases has persisted for years.  Debtors who previously settled their obligations and paid accrued nine percent interest as required by law will effectively lose out for their compliance with their lawful obligations.

57.     Finally, given the uncertainty in how to recalculate the interest, New York is likely to see a massive influx of consumer complaints and litigation accusing judgment holders of miscalculating the reduction of accrued interest.

## CLASS ALLEGATIONS

58.     Should the Amendment go into effect, all holders of unpaid judgments arising from consumer debt, as defined in the Amendment, entered in New York prior to April 30, 2022 will be required to recalculate the accrued interest and will lose the difference between that accrued interest and the recalculated interest.

59.     Plaintiffs bring this action on behalf of a class of similarly situated judgment holders, defined as: all holders of unpaid judgments arising from consumer debt, as defined in the Amendment, entered in New York prior to April 30, 2022.

60.     Plaintiffs are members of the proposed class.  Fed. R. Civ. P. 23(a).

61.     Plaintiffs have standing to pursue this action, as the Amendment will constitute an unconstitutional taking of their property without just compensation and a violation of Plaintiffs' right to due process.

62.     Plaintiffs' claims are likewise typical of those of the proposed class.  Fed. R. Civ. P. 23(a)(3).

63.     Plaintiffs will fairly and adequately represent the interests of the class.  Fed. R. Civ. P. 23(a)(4).

64.     The number of proposed class members is well over a hundred.  As such, joinder is impracticable.  Fed. R. Civ. P. 23(a)(3).

65.     The same questions of law are common to the entire class, namely, whether the Amendment effects an unconstitutional taking without just compensation and a violation of class members' constitutional right to due process.  Fed. R. Civ. P. 23(a)(2).

66.     Prosecuting separate actions is likely to result in inconsistent or varying adjudications because the Amendment is so vague as to make different interpretations likely. Resolution of the merits of this action is likely to be dispositive of the interests of other members, namely, the constitutionality of the Amendment.  *See* Fed. R. Civ. P. 23(b)(1).

67.     A class action is appropriate because the state is acting on grounds that apply generally to the class and therefore final injunctive and declaratory relief is appropriate in this action and will be applicable to the entire proposed class.  Fed. R. Civ. P. 23(b)(2).  Specifically, should the Court grant the injunctive and declaratory relief sought, the members of the proposed class will not be subjected to an unconstitutional taking or a violation of their rights to due process because the Amendment will not be permitted to take effect.  A class action therefore is efficient and will ensure that all members will benefit from any relief granted pursuant to Plaintiffs' claims.

68.     A class action is also appropriate because "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  This is true because the class members do not have a

substantial interest in controlling the litigation, resolving the litigation in a single forum would be more efficient, and there are unlikely to be difficulties in managing a class action, which is limited to injunctive and declaratory relief as to the constitutionality of the Amendment.

## SPECIFIC CLAIMS FOR RELIEF

### COUNT I – FEDERAL TAKINGS CLAUSE
### (Fifth Amendment, United States Constitution; 42 U.S.C. § 1983)

69.     Plaintiffs repeat and reallege each and every allegation of the preceding paragraphs as if fully set forth herein.

70.     The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V.

71.     A physical taking occurs when the government, without just compensation, appropriates all interest in property for some public purpose, depriving an owner of all economically beneficial use.

72.     A regulatory taking occurs when the government, again, without compensating the property owner, either denies the property holder all economic use of the property (a *per se* taking) or so limits the uses of certain property in such a way as to cause substantial economic impact on the property owner and interfere with the property holder's distinct, investment-backed expectations, an analysis that is performed based on the three-factor balancing test in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978).

73.     In all cases, a property holder is entitled to just compensation for the property the government has taken.

74.     Here, the Amendment effects a physical and regulatory taking of Plaintiffs' property without just compensation.

75.     Plaintiffs have a vested property right in the interest that will have accrued on their judgments from the date of entry to April 30, 2022.

76.     By requiring that Plaintiffs recalculate the accrued interest on outstanding judgments and apply the lower rate, the Amendment will cause Defendants to abrogate from Plaintiffs in full the amounts equal to the difference between the interest that has accrued at nine percent per annum and the recalculated interest.

77.     Defendants will take this property on behalf of the State to use for the public, namely, to provide debt relief to consumers, under color of State law.

78.     The amounts that will be taken from the Plaintiffs by the State for this public purpose equal nearly $1,000,000, not including administrative costs and fees.  This represents a substantial sum for Plaintiffs.  The amounts that will be taken from the entire class of judgment-holders is huge, possibly totaling tens of millions of dollars.

79.     Plaintiffs have been expecting the judgments to accrue interest at nine percent per annum, as that had been the rate of interest since 1981.  Based on these expectations, Plaintiffs have made decisions about loan criteria and acceptable credit risk, *i.e.*, who receives loans and at what rate.  By eliminating a substantial portion of the accrued interest, the Amendment will interfere with Plaintiffs' investment-backed expectations.

80.     Plaintiffs also invested considerable expense and effort to enforce judgments they obtained prior to April 30, 2022, based on the reasonable expectation that the judgment interest would be nine percent per annum.

81.     The Amendment is retroactive and will appropriate interest in property that has been accruing since at least 2004.

82.     The State will not provide compensation for the taking of this property.

83.     If not enjoined or if the Amendment is not adjudged unenforceable, Defendants will cause Plaintiffs to be deprived of the rights guaranteed to them by the Fifth Amendment to the United States Constitution.

84.     In the absence of declaratory and injunctive relief, Plaintiffs will be irreparably harmed and will be subjected to this deprivation of rights guaranteed to them by the United States Constitution.

## COUNT II – DUE PROCESS CLAUSE
### (Fourteenth Amendment, United States Constitution; 42 U.S.C. § 1983

85.     Plaintiffs repeat and reallege each and every allegation of the preceding paragraphs as if fully set forth herein.

86.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides in part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."

87.     Plaintiffs have a legitimate and vested property interest in the interest that has been accruing on their outstanding judgments at nine percent per annum.

88.     Defendants are charged with implementing the Amendment's infringement upon Plaintiffs' property rights and will do so under color of State law.

89.     Should the Amendment become effective, Plaintiffs will lose most (77%) of the interest that has been accruing on their unsatisfied judgments, which they have relied upon in making financial decisions for years.

90.     Despite the Amendment's purported purpose of helping consumers affected by COVID-related hardships, the Amendment is permanent and will reach back over at least 18 years, forcing Plaintiffs to shoulder an unduly harsh and oppressive burden resulting from certain debtors' chronic failure to satisfy their judgment debts.

91.     Additionally, the Amendment requires judgment holders and enforcement officers to recalculate interest and issue amended executions, but it fails to explain how the recalculation should be done and what consequences will result from mistakes and or failures of compliance.

92.     The Amendment will impose an exorbitant burden on Plaintiffs and the members of the proposed class, who will be forced to curtail services to their communities or raise their cost of financing and services to compensate for the substantial economic losses.

93.     The public purpose of the Amendment, ostensibly to benefit consumers, will not be served if Plaintiffs must make lending requirements stricter or increase interest rates to compensate for the loss of accrued interest.  As such, the Amendment is unreasonable and does not serve a rational purpose.

94.     If not enjoined, or if the Amendment is not adjudged unenforceable, Defendants will cause Plaintiffs to be deprived of the rights guaranteed to them by the Fourteenth Amendment to the United States Constitution.

95.     In the absence of declaratory and injunctive relief, Plaintiffs will be irreparably harmed and will be subjected to this deprivation of rights guaranteed to them by the United States Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Honorable Court enter the following relief and judgment against the Defendants:

(a)  schedule an expedited hearing on Plaintiffs' request for a show cause order and preliminary injunction;

(b)  certify a class as defined above and represented by Plaintiffs;

(c)  appoint the undersigned as class counsel;

(d) declare that CPLR 5004 as amended is unconstitutional because it violates the Fifth Amendment to the United States Constitution;

(e) declare that CPLR 5004 as amended is unconstitutional because it violates the Fourteenth Amendment to the United States Constitution;

(f) enjoin Defendants from enforcing or otherwise implementing CPLR 5004 as amended;

(g) award Plaintiffs their reasonable attorney fees, costs, and expenses pursuant to 42 U.S.C. § 1988, and other applicable law; and

(h) any other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Dated:  New York, New York
          April 21, 2022

/s/   *Kan M. Nawaday*

| | |
|---|---|
| Mitchell Y. Mirviss | Kan M. Nawaday |
| (*pro hac vice*) | Emily Seiderman West |
| Elizabeth C. Rinehart | VENABLE LLP |
| (*pro hac vice*) | 1290 Avenue of the Americas |
| VENABLE LLP | New York, NY 10104 |
| 750 E. Pratt Street, Suite 900 | Tel: 212.218.2100 |
| Baltimore, MD 21202 | Fax: 212.218.2200 |
| Tel: 410-244-7400 | KMNawaday@Venable.com |
| Fax: 410-244-7742 | EAWest@Venable.com |
| MYMirviss@Venable.com | |
| LCRinehart@venable.com | |

*Counsel for Plaintiffs Greater Chautauqua Federal Credit Union, et al.*