```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  3/31/2023
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GREATER CHAUTAUQUA FEDERAL CREDIT
UNION, individually and on behalf of all others
similarly situated, BOULEVARD FEDERAL
CREDIT UNION, individually and on behalf of all
others similarly situated, GREATER NIAGARA
FEDERAL CREDIT UNION, individually and on
behalf of all others similarly situated,

                                    Plaintiffs,

                    -against-

HON. LAWRENCE K. MARKS, in his official
capacity as Chief Administrative Judge of the Courts,
SHERIFF JAMES B. QUATTRONE, in his official
capacity as Sheriff of Chautauqua County, New
York, SHERIFF JOHN C. GARCIA, in his official
capacity as Sheriff of Erie County, New York,
SHERIFF MICHAEL J. FILICETTI, in his official
capacity as Sheriff of Niagara County, New York,
and LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

                                    Defendants.

1:22-cv-2753 (MKV)

**OPINION AND ORDER
DENYING INTERVENTION
AND RESOLVING
MOTIONS TO DISMISS**

MARY KAY VYSKOCIL, United States District Judge:

New York recently enacted a law which reduces the default interest rate applicable to
money judgments for consumer debts from nine percent to two percent (the "Act").  The Act
applies both prospectively and retroactively.  That is, it applies not only to interest that accrues
after the Act's effective date, but also to unpaid interest which had accrued before the effective
date.  Plaintiffs are three credit unions that hold a significant number of uncollected judgments.
They have sued on behalf of a putative class of judgment creditors, alleging that the *retroactive*
application of the Act violates the Takings Clause and the Due Process Clause of the United
States Constitution by depriving them of their accrued post-judgment interest without just

compensation or due process.  They seek a judgment declaring the Act unconstitutional as applied to them and enjoining its enforcement.  The named defendants are Chief Administrative Judge Lawrence K. Marks, Attorney General Letitia James, and three county sheriffs (collectively, the "Defendants").

Now before the Court is a motion to intervene on behalf of a debtor and legal services organization, as well as various motions to dismiss, premised on lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, and failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6).

## FACTUAL BACKGROUND[1]

This matter involves post-judgment interest previously accrued on money judgments under New York law.  In New York State court proceedings, a judgment is entered and

---

[1] The Court draws its facts from those stated in the Amended Complaint [ECF No. 47] ("AC"), as well as "in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).  Matters of which judicial notice may be taken include legislative history and judicial opinions and orders.  *See Oneida Indian Nation v. New York*, 691 F.2d 1070, 1086 (2d Cir. 1982) ("When there is no dispute as to the authenticity of . . . materials and judicial notice is limited to law, legislative facts, or factual matters that are incontrovertible, such notice is admissible."); *Zherka v. Garland*, 593 F. Supp. 3d 73, 75 n.3 (S.D.N.Y. 2022) ("The Court . . . takes judicial notice of court documents and legislative histories, which is permissible on a Rule 12(b)(6) motion.").  The Court accepts "all uncontroverted facts in the complaint . . . as true, and draw[s] all reasonable inference in favor of the [plaintiffs]."  *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016).

In addition, in deciding whether there is subject matter jurisdiction, the Court relies on affidavits submitted by the parties in connection with Defendants' motions to dismiss and Plaintiffs' prior motion for a preliminary injunction.  *See Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015) (stating that a court may rely on evidence outside the complaint when deciding a motion under Rule 12(b)(1)).  This includes: the Declaration of Lawrence K. Marks [ECF No. 44] ("Marks Decl."); and the Declaration of Mark S. Grube [ECF No. 82] ("Grube Decl."), filed in support of the Motion by Defendant Letitia James to Intervene and to Dismiss the Amended Complaint.

However, these affidavits cannot be relied upon in evaluating a motion to dismiss pursuant to Rule 12(b)(6).  *See Pro. Staff Cong./CUNY v. Rodriguez*, No. 20-cv-5060, 2020 WL 9809986, at *1 (S.D.N.Y. Nov. 9, 2020).  This point bears emphasizing, as Plaintiffs improperly rely in their briefing on their own sworn declarations submitted in connection with their preliminary injunction motion.  Had the Plaintiffs wanted such information considered, they should have pled as much in their Amended Complaint.

enforceable when it has been signed and filed by the clerk of the court.  C.P.L.R. § 5016(a); Siegel, *New York Practice* § 485.  The judgment establishes a total sum owed by the debtor to the creditor.  In addition to the principal, the judgment may include pre-judgment interest as well as various fees and costs.  C.P.L.R. §§ 5002, 8401.  New York also provides by statute that money judgments shall bear interest from the date they are entered.  C.P.L.R. § 5003.  The post-judgment interest is meant to compensate the judgment holder for the delay and expense in obtaining payment and to encourage prompt payment by the judgment debtor.  *See MCI Worldcom Network Servs., Inc. v. Pelcrete Constr., Inc.*, No. 04-cv-7378, 2006 WL 1388490, at *3 (S.D.N.Y. May 8, 2006).

The post-judgment interest rate is set by Section 5004 of New York's Civil Practice Law and Rules ("C.P.L.R.").  In 1981, the New York Legislature increased the default interest rate from six percent to nine percent to reflect the fact that the average rate for a one-year United States Treasury bill had recently increased to over 14 percent.  *See* C.P.L.R. § 5004; *see also* Senate Introducer's Mem. in Support, Bill Jacket, N.Y. Leg. 2021-2022 Reg. Sess. ch 831 ("Sponsor Memo") at 3.  That average rate fell to below two percent from 2000 to 2020, spurring numerous senate proposals to reduce the default rate.[2]  Sponsor Memo at 3.  Until recently, however, the nine percent default rate for post-judgment interest remained unchanged.  AC ¶ 33.

---

[2] *See, e.g.*, S. 1532, 228th Sess. (2005) (proposing that post-judgment interest be set in the "same manner as provided in [a provision] of the tax law"); S. 4227, 230th Sess. (2007) (same as last); S. 3562, 230th Sess. (2007) (proposing to set the post-judgment interest rate at "the one-year United States treasury bill rate plus three per centum"); S. 4589, 234th Sess. (2011) (same as last); A. 9765/S. 3751, 234th Sess. (2011) (same as last); A. 5706, 234th Sess. (2011) (proposing that post-judgment interest shall be "calculated at a rate equal to the weekly average one year constant maturity treasury yield," but shall "[i]n no event . . . exceed nine per centum per annum"); S. 3114, 236th Sess. (2013) (same as last); S. 5207 238th Sess. (2015) (same as last); A. 6965/S. 4755, 240th Sess. (2017) (same as last); A. 7146/S. 9043, 242d Sess. (2019) (same as last); A. 10479/S. 7946, 243d Sess. (2020) (proposing that the post-judgment interest rate shall be "the one-year constant maturity treasury yield," but shall "[i]n no event . . . exceed three per centum per annum").

On December 31, 2021, Governor Kathy Hochul signed into law the Fair Consumer Judgment Interest Act, which amends C.P.L.R. Section 5004 to set the interest rate on state-court judgments involving consumer debts at two percent per annum.[3]  AC ¶ 43; N.Y. Leg. 2021-2022 Reg. Sess., S.5724A § 1, A6474A (the "Act") § 1.  The Act applies to judgments entered after the Act's effective date of April 30, 2022 (the "Effective Date"), and also to interest on the unpaid portions of judgments that were entered prior to the Effective Date.  Act §§ 1, 7.  The Act has no effect on the underlying judgments, and it expressly provides that the two percent rate will not apply to any judgments, or portions of judgments, satisfied prior to the Effective Date. *Id.* § 1(c).

Procedurally, the Act provides that in cases where the interest rate on an outstanding judgment is reduced, "the judgment creditor must issue an amended execution within sixty days of the effective date."  *Id.* § 4(a)-(b).  In so doing, the Act retains prior statutory language authorizing the clerk of "the supreme court, county court or a family court, in the county in which the judgment was first docketed" or the attorney for the judgment creditor, to issue an execution directing the sheriff of one or more counties to satisfy the judgment from the debtor's assets.  *Id.* § 4(b).  It adds that where the reduced two percent interest rate applies, the clerk or attorney "shall be authorized to issue an amended execution to the sheriff."  *Id.*  If a judgment creditor issues an amended execution after the debt has been collected by an enforcement officer, but before it has been remitted to the creditor, the Act requires the enforcement officer to refund to the debtor any excess money collected based on the nine percent interest rate in effect at the time of the original judgment.  *Id.* § 5(k).

---

[3] The Amendment defines "consumer debt" as "any obligation or alleged obligation of any natural person to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family or household purposes, whether or not such obligation has been reduced to judgment, including, but not limited to, a consumer credit transaction."  Act § 1(b).

Plaintiffs Greater Chautauqua Federal Credit Union, Boulevard Federal Credit Union, and Greater Niagara Federal Credit Union collectively hold hundreds of consumers judgments, some of which are over fifteen years old.  AC ¶¶ 7, 16-18.  As of April 21, 2022, Plaintiffs were collectively owed approximately $3.8 million from those judgments, which included about $1.28 million in accrued interest.  AC ¶¶ 7, 16-18.  Plaintiffs have relied on the nine percent interest rate that has been accruing on their judgments both to offset the cost of obtaining judgments and to mitigate the risk of lending.  AC ¶ 9.  "Based on these expectations, Plaintiffs have made decisions about loan criteria and acceptable credit risk," and they have "invested considerable expense and effort to enforce judgments they obtained prior to April 30, 2022."  AC ¶¶ 79-80.

## PROCEDURAL HISTORY

Prior to the Effective Date of the Act, Plaintiffs commenced this action by filing a Complaint against Lawrence K. Marks, then-Chief Administrative Judge of the State of New York ("Judge Marks")[4] and the sheriffs of Chautauqua, Erie, and Niagara counties (the "Sheriff Defendants").[5]  [ECF No. 1] ("Compl.") ¶¶ 19-22.  Plaintiffs sought a judgment enjoining the enforcement of the Act and declaring its retroactive application unconstitutional.  Compl. ¶¶ 62-88.  Plaintiffs also moved for a preliminary injunction to enjoin the Effective Date of the Act, which was statutorily set for April 30, 2022.  [ECF No. 10].

The Court held oral argument on Plaintiffs' Motion for a Preliminary Injunction on April 20, 2022.  [ECF No. 49].[6]  Although she was not named as a defendant, a lawyer for the New

---

[4] Judge Marks resigned as Chief Administrative Judge of the State in November 2022.  There has been no request to substitute him as a party with the Acting Chief Administrative Judge.

[5] The sheriffs of Chautauqua, Erie, and Niagara counties are James B. Quattrone, John C. Garcia, and Michael J. Filicetti, respectively.  AC ¶¶ 20-22.

[6] The Sheriffs filed a timely opposition brief to the motion for a preliminary injunction [ECF No. 33].  However, at the preliminary injunction hearing, the Sheriffs clarified that they did not in fact oppose the issuance of an injunction.  ECF No. 49 (Preliminary Injunction Hearing Transcript) at 40:13-21 ("I would not refuse the injunction.

York State Attorney General Letitia James (the "Attorney General") appeared at the hearing and expressed the intent of the Attorney General to intervene in the event that the case was not resolved on the threshold issues.  ECF No. 49 (Preliminary Injunction Hearing Transcript) at 2:15-21.  The next day, Plaintiffs filed an Amended Complaint, which added the Attorney General as a defendant.  [ECF No. 47].  The Attorney General then filed a letter arguing that she was not a proper party to the suit and that, in any event, Plaintiffs' motion for a preliminary injunction should be denied because they had failed to demonstrate a likelihood of success on the merits.  [ECF No. 53].

On April 28, 2022, the Court granted the preliminary injunction with respect to the Sheriff Defendants, after concluding that Plaintiffs have standing to sue those defendants and that, on balance, the factors considered in evaluating a preliminary injunction weighed in Plaintiffs' favor.  [ECF No. 57] ("PI Opinion").  The Court denied the preliminary injunction with respect to Judge Marks, however, concluding that he is not a proper party against whom injunctive relief may be granted.  PI Opinion at 15.  Notably, the Court did not consider whether the Attorney General was a proper defendant because a preliminary injunction had not been sought against her.  PI Opinion at 2 n.1.

After the Court issued its Order, the Western New York Law Center ("WNYLC") and Bartel Miller (together, the "proposed intervenors") filed a motion to intervene for the purpose of modifying the preliminary injunction order.  [ECF Nos. 73-76].  Specifically, they argued that the preliminary injunction should apply only to the three Sheriff Defendants (and no non-party sheriffs) and to the three Plaintiff creditors (and no non-party creditors).  Put differently, they

---

You are correct, that the injunction doesn't necessarily harm us . . . .  [T]o the extent there is an injunction, we're probably the party that walks away the happiest . . . .").

argued that the Act should be in full effect as to those not a party to the suit.  Plaintiffs opposed the motion to intervene [ECF No. 78], and the proposed intervenors replied [ECF No. 91].

The Defendants also made their own motions.  Judge Marks filed a motion to dismiss the claims against him for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), and for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6).  [ECF Nos. 79, 80].  The Attorney General filed a motion for an order: (i) dismissing the claims against her for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1); (ii) granting her leave to intervene to defend the constitutionality of the Act; and (iii) dismissing the Amended Complaint in its entirety pursuant to Rule 12(b)(6) for failure to state a claim.  [ECF Nos. 81-83].  The Sheriff Defendants joined the Attorney General's motion to dismiss for failure to state a claim. [ECF No. 85, 86].  Additionally, an amicus brief in support of the Attorney General's motion was filed by numerous New York legal services organizations, which argued that Plaintiffs have failed to plausibly allege a Takings Clause claim.  [ECF No. 93].

Plaintiffs filed an omnibus opposition.  [ECF No. 95] ("Opp.").  Replies were filed by the Attorney General [ECF No. 96] and Judge Marks [ECF No. 99].

## LEGAL STANDARD

### I.    Rule 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a claim must be dismissed for lack of subject matter jurisdiction "when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  A district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inference in favor of the party asserting jurisdiction."  *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).  However, "where jurisdictional facts are placed in dispute, the court has the power and

obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (alteration and internal quotation marks omitted).

## II.      Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff alleges facts that allow "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The Court must accept as true all well-pleaded factual allegations in the complaint, and 'draw . . . all inferences in the plaintiff's favor.'" *Goonan v. Fed. Reserve Bank of N.Y.*, 916 F. Supp. 2d 470, 478 (S.D.N.Y. 2013) (alteration in original) (quoting *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## <u>DISCUSSION</u>

Before the Court is a motion to intervene, motions to dismiss for lack of subject matter jurisdiction, and motions to dismiss for failure to state a claim. In addressing these issues, the Court is not bound by any conclusions reached in its preliminary injunction opinion, which was briefed and decided on a compressed timeline, before the Amended Complaint was filed, and

which, by its nature, was merely "tentative." *Goodheart Clothing Co. v. Laura Goodman Enters., Inc.*, 962 F.2d 268, 274 (2d Cir. 1992).[7]

## I.      Intervention

WNYLC, a legal services organization, and Bartel Miller, a judgment debtor, filed a motion for intervention as a matter of right under Rule 24(a)(2) or, alternatively, permissive intervention under Rule 24(b).  The proposed intervenors seek only to modify the preliminary injunction order, so as to limit its scope to only those who are a party to the suit.  Plaintiffs opposed that motion, arguing that the proposed intervenors must first establish Article III standing, which they cannot do, and that, in any event, the motion to intervene fails on the merits.

### A.      *Article III Standing*

As a preliminary matter, Plaintiffs argue that there can be no intervention without Article III standing.  In support of this argument, Plaintiffs cite *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017), which held that "an intervenor must meet the requirements of Article III if the intervenor wishes to pursue relief not requested by a plaintiff." *Id.* at 1648.  This holding followed from the general principle that "[f]or all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." *Id.* at 1651.  The Supreme Court explained that this principle applied, as relevant to the facts of that case, to actions "in which both the plaintiff and the intervenor seek separate money judgments in their own names." *Id.*

---

[7] The Court further notes that the Attorney General was not a party at the time of briefing on the preliminary injunction motion, and that the remaining defendants principally addressed the imminent irreparable harm issue and the threshold jurisdictional issues rather than providing a full presentation on the merits.  *See* ECF Nos. 33, 43. As a result, the Court addressed Plaintiffs' "likelihood of success on the merits" without the benefit of adversarial briefing.  Moreover, as previously noted, the remaining defendants ultimately advised that they did not oppose entry of a preliminary injunction.  ECF No. 49 (Preliminary Injunction Hearing Transcript) at 40:13-21.

Central to the *Town of Chester* analysis is the underlying assumption that standing must be established only for litigants who seek affirmative relief and move to intervene *as plaintiffs*. The Supreme Court intimated a similar premise in *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), in which it observed that an intervenor-defendant had no need to demonstrate its standing before the trial court because its role in that case did not entail "invoking a [federal] court's jurisdiction." *Id.* at 1951. Relying on these recent Supreme Court cases, then-Judge Jackson concluded that litigants who "are seeking to intervene *as defendants*, and are not invoking the Court's jurisdiction . . . are not required to demonstrate that they have Article III standing." *Env't Integrity Project v. Wheeler*, No. 20-cv-1734, 2021 WL 6844257, at *2 (D.D.C. Jan. 27, 2021).

Here, the Proposed Intervenors seek to intervene as defendants. ECF Nos. 74 ("Proposed Order to Show Cause"); 76 ("Intervenor Br.") at 1. They do not seek relief different than that sought by any party with standing; in fact, they do not seek any traditional relief at all: they request no money judgment, no declaratory judgment, and no injunction. They merely seek to *modify* the outstanding preliminary injunction order issued by this Court to limit relief to these Plaintiffs and to named defendants.[8] This is not the sort of additional "relief" discussed in *Town of Chester* for which independent standing must exist. As such, the proposed intervenors need not establish Article III standing.[9]

---

[8] The proposed intervenors note only in passing that Plaintiffs have brought this case as a putative class action, on behalf of others similarly situated. ECF No. 91 ("Intervenor Reply Br.") at 10; *see also* AC ¶¶ 11, 59. No motion to certify a class has yet been made.

[9] It also bears noting that while Plaintiffs cite *Town of Chester* for the proposition that an intervenor who seeks unique relief must always meet the requirements of Article III standing, that case clearly applies only to instances of intervention as of right—*not* permissive intervention. *See* 137 S. Ct. at 1648 (explaining that the question at issue in the case was whether a litigant must "possess Article III standing in order to intervene of right"). As a result, "it is unclear whether a permissive intervenor in this circuit must demonstrate standing to seek relief that is different than the relief sought by the named parties." *Cross Sound Cable Co. v. Long Island Lighting Co.*, No. 21-cv-2771, 2022 WL 247996, at *9 (E.D.N.Y. Jan. 27, 2022). The Court has no occasion to resolve that question in this case.

**B.      Intervention**

A non-party moving to intervene in an action "bears the burden of demonstrating that it meets the requirements for intervention." *Bldg. & Realty Inst. of Westchester & Putnam Ctys., Inc. v. New York*, No. 19-cv-11285, 2020 WL 5667181, at *2 (S.D.N.Y. Sept. 23, 2020).   To satisfy the burden, a would-be intervenor must: "(1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *See Floyd v. City of New York*, 770 F.3d 1051, 1057 (2d Cir. 2014).  These same factors apply "whether the claim for intervention is 'of right' . . . or 'permissive.'" *R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 240 (2d Cir. 2006) (citations omitted).  "Failure to satisfy *any one* of these four requirements is a sufficient ground to deny the application." *Id.* at 241 (alterations adopted).

Both of the proposed intervenors here falter at the first step.[10]  In determining whether a motion to intervene is timely, courts generally consider the following factors: "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness." *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994).  While these factors are generally considered in turn, the Court focuses on the unusual circumstances of the pending motion, which encapsulates other factors.

---

[10] The Court need not decide whether the proposed intervenors could satisfy the other three factors, which, at least for WNYLC, is questionable.

The proposed intervenors seek to intervene *solely* to modify this Court's preliminary injunction Order issued on April 28, 2022.  However, the motion to intervene was not only filed *after* the preliminary injunction was entered, but also a day after the expiration of the 28-day deadline to move to alter or amend that order pursuant to Rule 59(e).  The proposed intervenors suggest that their tardiness should be excused because "[t]hey are not sophisticated corporate entities represented by a large corporate firm with abundant resources."  ECF No. 91 ("Intervenor Reply Br.") at 5.  But that excuse rings hollow.  WNYLC is a legal services organization that claims to have "actively supported and worked to enact" the Act.  Intervenor Br. at 4.  This action, and the issues it frames, was no surprise.  And to the extent that the proposed intervenors did not discover until the preliminary injunction hearing that no party would adequately represent them in opposing that motion (as they contend), they could have filed a letter with the Court (as did the Attorney General) in the days after the hearing—*before* the Court ruled on the motion.

In short, the proposed intervenors had reasonable notice of the proceedings and delayed unreasonably in filing their motion intervene, to the point that any intervention would prejudice Plaintiffs, who would be forced to relitigate issues already decided.  There is no prejudice to the proposed intervenors since there are other parties who share their interest—and indeed go further than intervenors propose to do—in defending the Act.  Their motion to intervene is therefore denied.

## II.    Subject Matter Jurisdiction[11]

Under the Eleventh Amendment of the United States Constitution, a State is immune from suit in federal court by its citizens or by citizens of other States.  *See Lapides v. Bd. of*

---

[11] In reviewing a motion to dismiss, the Court must first address grounds that challenge its subject matter jurisdiction because, absent authority to adjudicate, the Court lacks a legal basis to grant any relief, or even consider the action

*Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 616 (2002).  In granting this immunity, the Eleventh

Amendment "effectively places suits by private parties against states outside the ambit of Article

III of the Constitution."  *In re Charter Oak Assocs.*, 361 F.3d 760, 765 (2d Cir. 2004).

However, "[t]he doctrine of *Ex parte Young* is a limited exception to the general principle

of sovereign immunity."  *W. Mohegan Tribe & Nation v. Orange Cnty.*, 395 F.3d 18, 21 (2d Cir.

2004).[12]  That doctrine provides that "the Eleventh Amendment does not prevent federal courts

from granting prospective injunctive relief to prevent a continuing violation of federal law."

*Green v. Mansour*, 474 U.S. 64, 68 (1985).  However, "the state officer against whom a suit is

brought 'must have some connection with the enforcement of the act' that is in continued

violation of federal law."  *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 372-73 (2d

Cir. 2005) (quoting *Ex parte Young*, 209 U.S. 123, 154 (1908)).  Courts have generally held that

this "connection" requirement encompasses "both a particular duty to enforce the statute in

question *and* a demonstrated willingness to exercise that duty."  *Kelly v. New York State Civ.*

*Serv. Comm'n*, No. 14-cv-716, 2015 WL 861744, at *3 (S.D.N.Y. Jan. 26, 2015) (emphasis

added).[13]

Judge Marks and the Attorney General each argues that the action must be dismissed as it

relates to him or her because neither one has a connection to the Act and each is thus protected

---

[12] The general principal of sovereign immunity also is not applicable where Congress has abrogated a state's sovereign immunity or that immunity has been waived by the state.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984).  However, "New York has not waived its immunity for damages claims brought under 42 U.S.C. § 1983, nor has Congress abrogated it in enacting § 1983."  *Thomas v. Martin-Gibbons*, 857 F. App'x 36, 37 (2d Cir. 2021) (citations omitted).

[13] This "willingness" requirement seemingly stems from the reference in *Ex parte Young* to officers who "are clothed with some duty in regard to the enforcement of the laws of the state, and *who threaten and are about to commence proceedings*, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act."  209 U.S at 156.  While the Second Circuit has not considered whether to adopt the "willingness" requirement,

by the doctrine of sovereign immunity.  The Court will consider in turn the arguments from Judge Marks and the Attorney General.

### A. *Judge Marks*

Judge Marks has no connection to the Act, which does not vest him with any duty or responsibility to implement its provisions.  This latter point is not fatal, as "it is not necessary that the officer's enforcement duties be noted in the act," *In re Dairy Mart*, 411 F.3d at 373, so long as the officer has the power to enforce the Act through some other means.  Here, Plaintiffs do not allege that Judge Marks has any such power.  They merely recite his general job description and allege that he "ensures and promulgates policies and management procedures to enforcement agents and clerks throughout the State of New York."  AC ¶ 19.  Judge Marks has filed an affidavit stating in no uncertain terms that he has "neither responsibility for, nor the authority over, implementation or enforcement of the Act."  ECF No. 44 ("Marks Decl.") ¶ 6. Rather, his responsibility is "[t]o supervise the administration and operation of the unified court system."  Marks Decl. ¶ 2 (quoting N.Y. Const. art. VI, § 28(b)).  The power to supervise the Court system is not the same as the power to enforce the Act.  Moreover, Judge Marks attests that the clerks and the Sheriffs are *not* under his "administrative control or direction with respect to these matters," and that "computing interest upon judgments is a responsibility vested in court clerks as dictated by the Legislature via statute, not the Chief Administrator of the Courts." Marks Decl. ¶ 10.

---

each Circuit that has considered the requirement has found it to exist.  *See Texas All. for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022); *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021); *281 Care Comm. v. Arneson*, 766 F.3d 774, 797 (8th Cir. 2014).

Moreover, Plaintiffs do not dispute that Judge Marks has not demonstrated *a willingness* to enforce the Act, which is an independent and necessary factor under *Ex parte Young*. *See Kelly*, No. 14-cv-716, 2015 WL 861744, at *3. The Court therefore concludes that Judge Marks is not a proper party and that the action against him must be dismissed. Additionally, for the same reasons that Judge Marks is protected from suit by sovereign immunity, the Court concludes that he is not a proper party because Plaintiffs lack Article III standing to sue him. Specifically, Plaintiffs allege an injury from the threatened enforcement of the Act, but they fail to sufficiently allege that any such injury is traceable to Judge Marks or could be redressed by any order the Court might issue against him.

## B.   *The Attorney General*

Unlike Judge Marks, the Attorney General has the general authority to enforce the laws of New York, and the express authority to enforce New York's debt collection statutes. In particular, New York General Business Law ("GBL") Section 601 prohibits the knowing collection or attempted collection of any "collection fee, attorney's fee, court cost or expense unless such charges are justly due and legally chargeable against the debtor." Additionally, GBL Section 602 provides that "[t]he attorney general . . . may bring an action in the name of the people of the state to restrain or prevent any violation of this article." Thus, the Attorney General plainly has the power to enforce the Act by suing any creditor who fails to follow its terms, including those who collect or attempt to collect interest at a nine percent rate.

The Attorney General brushes this authority aside and argues that she is not a proper party because she "played no role in introducing, passing, or enacting the Act, and she has no responsibility for the implementation or enforcement of the Act *by the statute's plain terms*." ECF No. 83 ("AG Br.") at 9 (emphasis added). But the passing of the Act is irrelevant, and the responsibilities bestowed by its plain language are not exclusive; it is the power (whatever its

source) to enforce the Act that matters.[14]  *See Dairy Mart*, 411 F.3d at 373.  The Attorney

General does not deny that she possesses such power or that she has demonstrated a willingness

to exert it.  *See* AC ¶¶ 28-29 (citing examples in which the Attorney General has publicly

demonstrated a willingness to bring enforcement actions against creditors for violations of

consumer debt laws).  Indeed, the motion by the Attorney General to intervene in this case to

defend the statute is evidence of her willingness to enforce the Act.  As a result, the Attorney

General falls under the *Ex parte Young* exception and is a proper party to this suit.[15]

## III.    Failure to State a Claim

Plaintiffs allege, under 42 U.S.C. § 1983,[16] that the Act's retroactive application violates

the Takings Clause and the Due Process Clause of the United States Constitution.[17]  Plaintiffs do

not argue that there are no set of circumstances in which the Act could be validly applied—*i.e.*,

they do not bring a facial challenge to the Act's constitutionality.  Rather, they argue only that

the Act is unconstitutional *as it applies to them*.[18]  The Attorney General, now joined by the

---

[14] The Attorney General relies on the Supreme Court's decision in *Whole Woman's Health v. Jackson*, __ U.S. __, 142 S. Ct. 522 (2021), for the proposition that a party cannot maintain a claim in federal court against a state Attorney General absent the existence of "any enforcement authority the attorney general possesses in connection with [the challenged statute] that a federal court might enjoin him [or her] from exercising."  AG Br. at 10 (alteration in original) (quoting *Whole Woman's Health*, 142 S. Ct. at 534).  But that Supreme Court case operated under the assumption that the Attorney General has no enforcement authority; here, she clearly does.

[15] Because the Court determines that the Attorney General was properly named as a defendant, it need not engage in the circuitous exercise of considering whether the Attorney General (having asked to be out as a party defendant) should be permitted to intervene in the action.

[16] Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes."  *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).  To state a claim under Section 1983, Plaintiffs must establish both that the defendants "deprived [them] of a right 'secured by the Constitution or laws of the United States'" and "that they did so 'under the color of state law.'"  *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999)).

[17] While Plaintiffs allege that the Act provides unclear guidance on what constitutes a consumer debt (*see* AC ¶ 44) and further allege that the Act gives little guidance on how the recalculation of interest should be performed, *see, e.g.*, AC ¶ 51, Plaintiffs do not challenge the Act as unconstitutionally vague.  *See* AC ¶¶ 69-94, and Prayer for Relief at 21-22.  The Attorney General notes as much in her opening brief, *see* AG Br. at 22 n.13, and Plaintiffs do not dispute that characterization of their claims.

[18] While the Amended Complaint does not expressly state whether Plaintiffs bring a facial or as-applied constitutional challenge, Plaintiffs clarify in their omnibus opposition brief that they are bringing an as-applied

16

Sheriff Defendants, contends that Plaintiffs have failed to state a cognizable constitutional claim and that, as a result, the Amended Complaint must be dismissed.

## A. *The Takings Clause Claim*

The Fifth Amendment, applicable to the States through the Fourteenth Amendment, *see Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 238-39 (1987), provides that "private property" shall not "be taken for public use, without just compensation." The classic example of a taking by the government is when land has been occupied or otherwise seized. But not all cases are so simple, and the question of what constitutes a "taking" has long been a much debated and vexing issue. The question ultimately comes down to whether the government action qualifies as either a physical taking or a regulatory taking. As a threshold matter, however, the Court must confirm that there is a protected property interest at stake.

### 1. *Constitutionally Protected Property Interest*

The Attorney General argues that Plaintiffs' takings claim must fail because they have not plausibly alleged that the Act impairs any vested property rights that they hold. In so doing, the Attorney General concedes—as she must—that Plaintiffs have a property interest in the underlying money judgments. AG Br. at 14. But the Attorney General argues that Plaintiffs' interest in the underlying judgments is not at issue here, since the Act does not disturb the right to collect the amounts embodied in the judgments themselves, nor does it affect the right to retain payments previously collected. The Attorney General contends that Plaintiffs have no

---

challenge. Opp. at 20. Whether a class can be certified in light of the as-applied challenge has not been addressed by the parties, but is an issue which must be resolved in subsequent motion practice.

constitutionally protected property right to the post-judgment interest, which is all that is affected by the Act.

This argument is based on a faulty premise.  Plaintiffs' property right in the judgment is not separate from their right to the post-judgment interest; rather, the two rights are interconnected.  This relationship is well established under New York law, which has long held that "interest follows the principal, as the shadow does the substance," *Havender v. Brodbeck*, 83 Misc. 9, 144 N.Y.S. 418, 419 (1st Dep't 1913), and that "interest . . . therefore is the property of the owner of the principal." *Rai v. WB Imico Lexington Fee, LLC*, 802 F.3d 353, 369 (2d Cir. 2015) (internal quotation marks omitted) (citing New York case law).  Critically, this relationship exists even before the interest has been collected because, under New York law, "[i]nterest attaches uniformly to all money obligations once reduced to verdict or judgment" and "runs on the judgment until it is satisfied."  Siegel, *New York Practice* § 411.  Plaintiffs' property right in the accrued (but uncollected) post-judgment interest thus exists to the same degree as their right in the underlying judgment.

Having found that Plaintiffs have a protected property interest, the issue on the motion to dismiss is whether the retroactive reduction of that interest for the benefit of a select category of judgment debtors plausibly constitutes either a physical or a regulatory taking.

### 2. *Physical Taking*

Physical takings "occur when the government physically takes possession of an interest in property for some public purpose."  *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006).  These sorts of takings are often easy to detect.  "Examples of physical takings include using eminent domain to condemn property; taking possession of property without taking title to it; and occupying property by, for example, building a dam that causes recurring flooding."  *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 550 (2d Cir.

2023) (citations omitted).  This case does not fit that typical mold because the government has not taken physical possession of any property interest.  But that does not end the analysis.

Plaintiffs argue that the Act nonetheless constitutes a physical taking by comparing it to *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003), a Supreme Court case that also does not fit the typical physical takings mold.  In *Brown*, the Supreme Court considered the issue of whether the Takings Clause bars the appropriation of interest earned on client funds held in trust by attorneys.  Only a few years earlier, the Court had concluded that the interest earned on such accounts "is the 'private property' of the owner of the principal," *Phillips v. Washington Legal Found.*, 524 U.S. 156, 172 (1998), but did not decide whether the state's transfer of that interest to charitable entities that provide legal services for the poor constituted a taking.  In *Brown*, the Court addressed the taking issue and concluded that the transfer of interest "to a different owner for a legitimate public use . . . could be a *per se* taking requiring the payment of 'just compensation' to the client."  538 U.S. at 240.[19]

*Brown* shares obvious (and important) similarities to this case.  In both cases, a party lost interest belonging to it for the benefit of a separate party.  In both cases, assets were erased from the books.  And, in both cases, this redistribution was done (purportedly) for the public good.  But despite these similarities, the two cases are not perfectly aligned.  In *Brown*, the client's interest had been earned, it was sitting in a deposit account, and it was then transferred to a legal services charity.  A tangible thing was taken from one and given to another.  Here, there is no money.  The interest at issue has accrued, but it has not been collected by the judgment creditors.

---

[19] The Court offered little analysis of the issue, however, as its holding turned on its separate conclusion that no just compensation was required because the client's pecuniary loss was zero (since the funds at issue were small amounts held for short periods and could not generate interest unless pooled with other funds in the relevant account).  *See Brown*, 538 U.S. at 240.

As a result, there is nothing to take and (in most instances) nothing to transfer.[20]  Rather, the previously accrued interest has been reduced, retroactively, by operation of law.  So, while *Brown* may have straddled the physical takings line, this case falls on the outer bounds.

### 3. *Regulatory Taking*

A regulatory taking occurs where, even absent a direct physical appropriation, governmental regulation of private property "goes too far" and is "tantamount to a direct appropriation or ouster."  *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005) (internal quotation marks omitted).  Such a taking can be either categorical *or* non-categorical.

Categorical regulatory takings arise under "narrow" circumstances when "regulations . . . completely deprive an owner of *all* economically beneficial us[e] of [its] property."  *Id*. at 538 (internal quotation marks omitted).  That is not this case.  The retroactive reduction in post-judgment interest from nine percent to two percent allows Plaintiffs to retain *some* economic benefits from their property—regardless of whether the property is characterized as the judgment, the post-judgment interest, or both.[21]  So, even assuming that categorical takings may apply to property other than real property,[22] the less-than-total deprivation here precludes a finding of a facially plausible takings claim.

---

[20] As discussed below, *see infra* at 25, there are certain instances in which the Act does require that collected funds be transferred from the enforcement officers (who had collected the post-judgment interest but not yet paid it over to the judgment creditor) back to the judgment debtors (from whom the interest was collected).

[21] One might reasonably assume that Plaintiffs' property interest has been reduced by one hundred percent, as the seven percent of interest previously belonging to Plaintiffs has now been entirely wiped out.  But whatever the appeal of such reasoning, it appears to be foreclosed by Supreme Court precedent.  *See Concrete Pipe & Prods. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 644 (1993) ("To the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question.").

[22] The Supreme Court's "total takings" jurisprudence, and the application of it by the Circuits, has repeatedly highlighted that it applies to deprivations of "land."  *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1016 (1992) ("[C]ategorical treatment [is] appropriate [] where regulation denies all economically beneficial or productive use of land."); *Horne v. Dep't of Agric.*, 576 U.S. 351, 360-362 (2015) (*Lucas* distinguishes between real and personal property); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 330 (2002) ("The categorical rule that we applied in *Lucas* states that compensation is required when a regulation deprives an owner

Non-categorical regulatory takings, on the other hand, are those involving anything less than a total loss of value, and are evaluated pursuant to the test set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). The *Penn Central* analysis involves a "complex of factors including [1] the regulation's economic effect on the [property owner], [2] the extent to which the regulation interferes with reasonable investment-backed expectations, and [3] the character of the government action." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (citing *Penn Central*, 438 U.S. at 124). There is no "mathematically precise" formula for weighing these factors, which serve more as "guideposts." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 326 n.23 (2002) (internal quotation marks omitted). The Court thus takes a holistic approach to its analysis, which, with all things considered, weighs against dismissal.

First, viewed in isolation and from a traditional framework, the economic impact of the Act may not reflect a regulatory taking. It is well settled that "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993). For that reason, this first factor generally has been found to weigh in favor of the property owner only when the regulation at issue "effectively prevented [the plaintiff] from making *any economic use* of his property." *Sherman v. Town of Chester*, 752 F.3d 554, 565 (2d Cir. 2014) (emphasis added). This is a high bar.[23] Indeed, the Supreme Court has held that regulations that reduce the value of property by

---

of 'all economically beneficial uses' of his land"); *Md. Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 364 n.4 (4th Cir. 2020) ("[T]he *per se* regulatory taking in *Lucas* applies only to real property"); *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1151 (Fed. Cir. 2014) ("The Supreme Court has mainly applied the categorical test to regulatory takings of real property."); *1206 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 264 (2d Cir. 2014) ("The cases in which the Supreme Court has applied *Lucas'* total takings rule have involved real property.").

[23] It bears noting that this first *Penn Central* factor has evolved in such a way as to weigh against the interest of the property owner in the vast majority of cases. After all, the *Penn Central* analysis becomes necessary only if a court first determines that there is no categorical regulatory taking; that is, if a court first finds that the regulation does not "completely deprive an owner of *all* economically beneficial us[e] of [its] property." *Lingle*, 544 U.S. at 538. There

as much as 75 to 90 percent do not effect a taking.  *See Concrete Pipe*, 508 U.S. at 646 (collecting cases).

To determine the economic impact of a government action, courts generally begin by identifying the property interest being impacted.  Put differently, to compare the value that the property has lost with the value held before the government action, courts consider the "unit of property whose value is to furnish the denominator of the fraction."  *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987) (internal quotation marks omitted).  "For example, an ordinance prohibiting construction on the curtilage of a single-family dwelling does not cause a regulatory taking, because courts focus 'on the nature of the interference with rights in the parcel as a whole,' including the portions of the property not subject to restrictions."  *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 165 (S.D.N.Y. 2020) (quoting *Keystone*, 480 U.S. at 497).

Here, Plaintiffs contend that the value of their property has been diminished by roughly eighty percent, since the post-judgment interest rate has been reduced from nine to two percent.  In so doing, Plaintiffs assume that the proper denominator of the fraction is the amount of post-judgment interest alone.  The Attorney General, by contrast, notes that Plaintiffs may still reap the full benefit of the underlying judgments, suggesting that the relevant unit of property is the judgment *plus* the post-judgment interest.  Measured against that denominator, the Act would diminish Plaintiffs' property value by closer to thirty percent.  (The math is in the margin.)[24]

_____

is only a sliver of difference between a regulation which deprives the property owner of all economic use of its property and one which, as necessary to satisfy the first *Penn Central* factor, "effectively prevented [the property owner] from making any economic use of [its] property."  *Sherman*, 752 F.3d at 565.  And yet in some cases even that sliver has seemingly melted away, rendering the outcome of the first *Penn Central* factor a *fait accompli*.  *See, e.g., Everest Foods Inc. v. Cuomo*, 585 F. Supp. 3d 425, 444 (S.D.N.Y. 2022) (finding that the first factor "weighs against finding a taking" because "[w]hile the restrictions undoubtedly had a negative economic impact on Plaintiffs' businesses, Plaintiffs admittedly were not denied all economic use of their property").

[24] Plaintiffs allege that they are owed $3.8 million in outstanding judgments, which includes about $1.28 million in accrued interest.  Eighty percent of $1.28 million is roughly 1 million, which is only 27 percent of the $3.8 million.

Any person or business owner could easily understand the significance of a thirty percent loss to assets on the books, and certainly could comprehend the ruin that could result from a loss of nearly eighty percent. But the law is clear. The loss must be near total for this factor to weigh in favor of finding a taking. That is not this case, regardless of how the relevant unit of property is defined. But even assuming the value of Plaintiffs' property has been diminished by thirty percent here as the Attorney General contends (and not eighty, as Plaintiffs contend), that conclusion does not (at least in this case) outweigh the other factors.

The second *Penn Central* factor evaluates the extent to which the regulation interferes with reasonable investment-backed expectations. *See Palazzolo*, 533 U.S. at 617. As to this factor, Plaintiffs allege that they have relied on the statutory nine-percent annual interest that has been accruing on their judgments to make "decisions about loan criteria and acceptable credit risk," AC ¶ 79,[25] "to offset the cost of obtaining judgments," and "to buffer the risk of lending money in the first place," AC ¶ 9; *see also* AC ¶¶ 35-36. Plaintiffs also allege that, based on the expectation that interest would accrue at a rate of nine percent, they "invested considerable expense and effort to enforce judgments they obtained prior to April 30, 2022." AC ¶ 80. Put differently, Plaintiffs made business decisions and investments based on the expectation that interest which had vested and accrued at the statutorily established rate of nine percent, but which had not yet been collected, could be relied upon as a stable asset. These expectations were clearly reasonable. A retroactive reduction of assets by the New York Legislature, which targets

---

(It is true, of course, that interest has continued to accrue since the date that Plaintiffs first provided these figures and that certain judgments may have been satisfied in the interim. But while Plaintiffs' figures might be somewhat stale, it is unlikely that the updated figures would drastically change the analysis.)

[25] To the extent the Attorney General seeks more information on these business decisions, AG Br. at 19-20, that simply underscores the need for discovery and the premature nature of the motion to dismiss, at which stage all reasonable inferences must be drawn in favor of the plaintiffs.

a discrete class of creditors and erases from their books assets on which they have relied, is seemingly without precedent and, as a result, is not easily predictable.

That is not to suggest that the Legislature could never change the post-judgment interest rate going forward. Of course it could. Legislative benchmarks are fluid by nature and, thus, subject to change at any time. *See, e.g., 74 Pinehurst LLC v. New York*, 59 F.4th 557, 568 (2d Cir. 2023) ("[G]iven the multiple past amendments to the [regulation], . . . it would not have been reasonable for these [investors] to expect that the regulated rate [of rent increases] would track a given figure, or that the criteria for decontrol and rate increases would remain static." (internal quotation marks omitted) (third alteration in original)). But Plaintiffs do not challenge the prospective change effectuated by the Act. They do not challenge the Act to the extent it concerns judgments entered after its Effective Date. Nor do they challenge the Act to the extent it reduces the rate at which interest will accrue (going forward) on already-obtained judgments. They challenge only the *retroactive reduction in accrued interest*, which was unforeseeable and which disturbed their reasonable investment-backed expectations. This weighs in favor of finding that Plaintiffs plausibly allege a takings claim insofar as the Act has retroactive effect.

The third *Penn Central* factor, the character of the government action, is unique in several respects and counsels heavily towards finding that the retroactive application of the Act plausibly constitutes a taking without just compensation. Under that factor, "a taking may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124 (internal citations omitted). Application of this factor is unusual. After all, a court would only consider this factor if it had already concluded that no physical taking had occurred. Perhaps

that explains why this factor so often is found to weigh against finding a regulatory taking. But, if there were ever a regulatory taking claim in which the interference with property might resemble a physical invasion, this appears to be it.

Recall the Supreme Court's decision in *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003). There can be little doubt that, in the wake of *Brown*, a *per se* physical taking would have occurred had the Act required Plaintiffs to return a percentage of post-judgment interest that already had been paid to them. After all, the government cannot take property from one and transfer it to another without compensating the initial property owner. But, in some cases, the Act effectively does just that. In giving the Act retroactive application, the Legislature has directed enforcement officers to refund any money collected (but not yet remitted to the creditor) in excess of the newly recalculated debt based on the reduced interest rate of two percent. Act § 5(k). In such cases, the funds are not only tangible, but they are in transit. Such funds may not have been physically taken from the creditors (who had not yet gained possession), but they belonged to the creditors, and they were taken.

In other circumstances, where interest has not yet been collected by an enforcement officer, the Act reduces retroactively the amount of money owed to the judgment creditor, which, in the case at bar, was relied upon as an asset by the judgment creditor in the conduct of its business. AC ¶¶ 9, 35-36, 79-80. That is a different scenario than *Brown*; but the difference is largely illusory. It is the difference between a creditor being paid a hundred dollars and returning thirty, and a creditor who is owed a hundred dollars now being entitled to payment of only seventy. To the creditor, who suffers a thirty percent loss, the result is the same. So, while the Act may not constitute a physical taking, that is more a matter of form than substance. The

nature of the government action thus weighs in favor of finding the Act plausibly within the ambit of the Takings Clause insofar as the Act applies retroactively.

Finally, other unique circumstances of this case militate in favor of characterizing the Act as a regulatory taking. As discussed above, the three *Penn Central* factors are mere examples of the types of circumstances which should be considered in a regulatory takings analysis, which "is characterized by essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances." *Tahoe-Sierra*, 535 U.S. at 322 (internal quotation marks and citations omitted).

The Court deems it relevant to the analysis that the Act does not seek to address a new circumstance (*i.e.*, the disparity between the statutory interest rate and the market rate), but rather one that has existed for decades and for which solutions were routinely proposed. That the nine percent rate remained static for so long appears to have been the result of decades of idleness and inertia within the New York Legislature. The Legislature could have reduced the interest rate prospectively at any point without effecting a taking; and perhaps it should have done so sooner.[26] But now that the Legislature seeks to offer (belated) relief to (select) judgment debtors, it is particularly unfair to target a limited class of judgment creditors, who have done nothing but play by the rules, and who are now being asked to bear the brunt of the blow for this "correction."[27]

This maneuver not only defies general notions of equity and fair play, but it also runs counter to the central purpose underlying the Takings Clause: "to prevent the government from

---

[26] While the post-judgment interest rate was reduced while the market rate was low, the new two percent interest rate may again be out of sync with prevailing market rates in the wake of recent interest-rate hikes.

[27] To creditors (or any person or business) that rely on then-prevailing laws when deciding in which state to do business or in which court to file claims, retroactive changes of this sort can erode confidence in the courts and in the legal system. To the Legislature, that may just be collateral damage; but to the court system (to which trust is key) and to the public, which depends on the integrity of judicial processes, it is no small thing.

forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Palazzolo*, 533 U.S. at 617-18 (internal quotation marks omitted). This problem is compounded by the fact that the Act, when applied retroactively, does not confer a benefit on the public, but rather benefits solely those debtors (within a limited category of cases) who have delayed paying judgments rightfully obtained. For those specific individuals, the Act confers a clear windfall and rewards their delay. For the creditors in consumer cases, however, who have been singled out despite the fact that the prior nine percent interest rate applied to *all* judgments, the Act is not so benevolent.

It is true that not all government actions that single out a particular group (either to their benefit or detriment) constitute a regulatory taking. In *1256 Hertel Avenue Associates, LLC v. Calloway*, 761 F.3d 252 (2d Cir. 2014), for example, the Second Circuit considered a challenge by a judgment lien creditor to a statutory amendment that greatly increased the protections afforded under New York's homestead exemption, which protects the principal resident of a debtor from being used to satisfy the judgment of a creditor up to a statutorily defined maximum value. *1256 Hertel*, 761 F.3d at 255. In concluding that this amendment did not constitute a regulatory taking, the Second Circuit explained that "[l]egislative tinkering of this sort inevitably creates individual winners and losers," and that "it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *Id.* at 265 (internal quotation marks omitted).

But this case is different. *Hertel* concerned a hurdle to the collection of debt; this case concerns the retroactive *reduction* (and, in some cases, the return) of debt. That is not tinkering; it is plausibly a taking.

### B.  *The Due Process Claim*

Plaintiffs also claim that the manner in which the Act retroactively reduces post-judgment interest violates substantive due process.  The Due Process Clause of the Fourteenth Amendment states that no person shall "be deprived of life, liberty, or property, without due process of law."  This prohibition "embodies a substantive component that protects against certain government actions regardless of the fairness of the procedures used to implement them."  *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 217 (2d Cir. 2012) (internal citation omitted).  To succeed on this claim, Plaintiffs must establish that the government action was "arbitrary, conscience-shocking, or oppressive."  *Cunney v. Bd. of Trs. of Village of Grand View, N.Y.*, 660 F.3d 612, 626 (2d Cir. 2011) (internal citation omitted).  In the context of retroactive legislation, the constitutional due process requirement "is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose."  *Pension Benefit Guar. Corp. v. R. A. Gray & Co.*, 467 U.S. 717, 730 (1984).

Plaintiffs allege that the Act violated its substantive due process rights by retroactively reducing its accrued interest.  AC ¶ 89.  This claim mirrors the substance of the allegations for the takings claim, which has survived dismissal at the pleading stage.  "In such circumstances, a substantive due process claim must be dismissed."  *See HARR, LLC v. Town of Northfield*, 423 F. Supp. 3d 54, 65 (D. Vt. 2019) (citing *Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1093 (9th Cir. 2015) ("[Plaintiff's] theory of its due process claim . . . relates to conduct squarely covered by the Takings Clause.  Such an overlapping theory dooms the substantive due process claim.")); *see also Sherman v. Town of Chester*, No. 12-cv-647, 2015 WL 1473430, at *11 (S.D.N.Y. Mar. 31, 2015) ("And even if this conduct were egregious, Plaintiff's [due process] claim would fail because the substance of his allegations mirror his First Amendment

and takings claims, which have already been deemed to survive." (citing *Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 100 (N.D.N.Y. 2013)).

Dismissal of the due process claim is also warranted because it cannot be said that changing the post-judgment interest rate to bring it closer in line to the market rates was "arbitrary, conscience-shocking, or oppressive." *Cunney*, 660 F.3d at 626. The New York Legislature had a rational basis for changing the post-judgment interest rate, which was to "remedy the hardship placed on a significant number of New Yorkers by a statutory judgment interest rate that has long been incommensurate with market interest rates." Sponsor Memo at 2. In particular, the Act was meant to adjust for the fact that in 1981, when the Legislature set the default rate at nine percent, the average rate for a one-year U.S. Treasury bill was over 14 percent, while that rate has remained below two percent for most of the past two decades. N.Y. State Senate Debate on Senate Bill S5724-A, 244th Sess. at 4734 (June 8, 2021) (statement of Kevin Thomas). While the Legislature regarded a reduction in the default rate as a "long-standing need," the financial pressures caused by the COVID-19 pandemic "exacerbated" that need and spurred long-awaited change. Sponsor Memo at 3.

Plaintiffs argue that while the New York Legislature may have had a rational basis for applying the Act prospectively, it had none for doing so retroactively. To that end, Plaintiffs first contend that if the Act was intended only to offer pandemic-related relief, there was no reason to reduce the interest on older judgments, which were entered well before the pandemic began. However, the legislative history suggests that the pandemic was not the *sole* cause of the issue that the Act was meant to address. Rather, the pandemic merely "exacerbated" a problem that long existed. Sponsor Memo at 3.

Plaintiffs next argue that the Act is irrational in that is more likely to hurt judgment debtors, rather than to help them.  Specifically, Plaintiffs claim that if they are forced to absorb the costs of a post hoc interest rate reduction, they will be forced to recoup those costs by reducing services and products, increasing the cost of loans by raising the interest rates charged on loans they extend, and heightening the criteria for offering loans.  While that may be so, it is clear that "whether the legislation is wise or unwise as a matter of policy is a question with which [the Court is] not concerned" where, as here, the "governmental action [was] intended to serve the public good, as the government saw it."  *Sullivan v. Nassau Cnty. Interim Fin. Auth.*, 959 F.3d 54, 69 (2d Cir. 2020) (alteration adopted) (citation omitted).

Finally, Plaintiffs argue that the Act is fundamentally unfair because they have depended on the nine percent interest rate for more than forty years, and they are now being asked to forfeit nearly eighty percent of the interest that has accrued on outstanding judgments.  For the reasons explained above, the Court shares these fairness concerns.  However, this is simply a rehash of Plaintiffs' taking claim which survives dismissal.  Moreover, Plaintiffs cite no case law for the proposition that a law which is rationally related to a legitimate government interest may nonetheless violate due process if it unsettles long-existing expectations.  Accordingly, Plaintiffs' due process claim must be dismissed.

## **CONCLUSION**

For the foregoing reasons, the motion to intervene filed by the Western New York Law Center and Bartel Miller [ECF No. 73] is denied.  The motion to dismiss filed by Judge Marks [ECF No. 79] is granted.  The motion to dismiss filed by the Attorney General [ECF No. 81], joined by the Sheriff Defendants [ECF No. 85], is granted in part and denied in part.  The Attorney General's request for oral argument is denied.  [ECF No. 97].

The Clerk of Court respectfully is requested to close the Motions at ECF Nos. 79, 81, and 85.

**SO ORDERED.**

**Date:   March 31, 2023**
**New York, NY**

_____
**MARY KAY VYSKOCIL**
**United States District Judge**