UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREATER CHAUTAUQUA FEDERAL CREGIT UNION, *et al.* | |
| Plaintiffs, | |
| - against - | Case No.: 1:22-cv-02753 (MKV) |
| SHERIFF JAMES B. QUATTRONE, in his official capacity as Sheriff of Chautauqua County, New York, *et al.* | |
| Defendants. | |

**PLAINTIFFS' PRETRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Kan M. Nawaday
Emily Seiderman West
VENABLE LLP
151 West 42nd Street
New York, NY 10036
Tel: 212.307.5500
Fax: 212.307.5598
KMNawaday@Venable.com
EAWest@Venable.com

Mitchell Y. Mirviss (admitted *pro hac vice*)
Elizabeth C. Rinehart (admitted *pro hac vice*)
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
Tel: 410.244.7400
Fax: 410.244.7742
MYMirviss@Venable.com
LCRinehart@venable.com

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

PROPOSED FINDINGS OF FACT ........................................................................ 1

    A.    Parties 1

    B.    The Act ............................................................................................ 2

    C.    The Judgment Execution Process .......................................... 4

    D.    Plaintiffs' Loan Collection Process ...................................... 6

    E.    Plaintiffs' Expectations Based on the 9% Post-Judgment Interest Rate ............... 7

    F.    The Act's Reduction of Plaintiffs' Post-Judgment Interest ................................. 10

    G.    The Act's Adverse Effect on Plaintiffs and Interference With Their Expectations ................................................................. 12

PROPOSED APPLICABLE LAW ...................................................................... 15

I.    ELEMENTS OF SECTION 1983 CLAIM AND TAKINGS CLAUSE VIOLATION ... 15

    A.    Color of State Law ................................................................. 15

    B.    Deprivation of Constitutional Rights: Plaintiffs' *Penn Central* Claim ................. 16

II.    THE PERMANENT INJUNCTION STANDARD ............................................. 17

PROPOSED APPLICATION OF FACTS TO THE LAW ...................................... 17

I.    PLAINTIFFS ARE ENTITLED TO DECLARATORY RELIEF ON THEIR SECTION 1983 CLAIM ................................................................. 17

    A.    Defendants' Enforcement of the Act Would Be Under Color of State Law. ....... 18

    B.    Defendants' Enforcement of the Act Against Plaintiffs Would Deprive Plaintiffs of their Fifth Amendment Rights Under *Penn Central* ......................... 18

II.    PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION ENJOINING DEFENDANTS FROM VIOLATING FEDERAL LAW AND ENFORCING THE ACT AGAINST PLAINTIFFS ................................................ 36

    A.    Absent Permanent Injunctive Relief, Plaintiffs Will Suffer Irreparable Harm, and There Are No Adequate Remedies Available at Law. ................................. 36

    B.    The Remaining Factors Demand Permanent Injunctive Relief. ......................... 37

CONCLUSION..........................................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1256 Hertel Ave. Assocs., LLC v. Calloway*,
    761 F.3d 252 (2d Cir. 2014)....................................................................................19, 30

*Allen v. Koenigsmann*,
    700 F. Supp. 3d 110 (S.D.N.Y. 2023)...................................................................17

*Ark. Game & Fish Comm'n v. United States*,
    568 U.S. 23 (2012)............................................................................................25

*Armstrong v. United States*,
    364 U.S. 40 (1960)............................................................................................16

*Basank v. Decker*,
    613 F. Supp. 3d 776 (S.D.N.Y. 2020)...................................................................36

*Cahill v. O'Donnell*,
    7 F. Supp. 2d 341 (S.D.N.Y. 1998) ......................................................................16

*Chase Manhattan Bank, N.A. v. State*,
    103 A.D.2d 211 (2d Dep't 1984)..........................................................................32

*Connolly v. Pension Ben. Guar. Corp.*,
    475 U.S. 211 (1986)..........................................................................................29

*Dodge v. Cnty. of Orange*,
    282 F. Supp. 2d 41 (S.D.N.Y. 2003).....................................................................17

*E. Enters. v. Apfel*,
    524 U.S. 498 (1998)..........................................................................................28

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)..........................................................................................17

*Edelman v. Jordan*,
    415 U.S. 651 (1974)..........................................................................................37

*Floyd v. City of New York*,
    959 F. Supp. 2d 691 (S.D.N.Y. 2013)...................................................................36

*Friedenburg v. N.Y. State Dep't of Env't Conservation*,
    3 A.D.3d 86 (2d Dep't 2003) ..............................................................................32

*Giordano v. City of New York,*
    274 F.3d 740 (2d Cir. 2001)............................................................................................15

*Jolly v. Coughlin,*
    76 F.3d 468 (2d Cir. 1996).............................................................................................36

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
    480 U.S. 470 (1987).......................................................................................................31

*Mitchell v. Cuomo,*
    748 F.2d 804 (2d Cir. 1984)...........................................................................................39

*Ognibene v. Parkes,*
    671 F.3d 174 (2d Cir. 2011)...........................................................................................36

*Palazzolo v. Rhode Island,*
    533 U.S. 606 (2001)...............................................................................19, 25, 30, 31

*Penn Central Transp. Co. v. New York City,*
    438 U.S. 104 (1978) ............................................................................ *passim*

*Pennhurst State Sch. & Hosp. v. Halderman,*
    465 U.S. 89 (1984).........................................................................................................37

*Rai v. WB Imico Lexington Fee, LLC,*
    802 F.3d 353 (2d Cir. 2015)...........................................................................................19

*Remauro v. Adams,*
    21-CV-4553 (ARR) (TAM), 2022 WL 1525482 (E.D.N.Y. May 13, 2022)..........................31

*S. Nassau Bldg. Corp. v. Town Bd. of Town of Hempstead,*
    624 F. Supp. 3d 261 (E.D.N.Y. 2022) .............................................................................16

*Sajous v. Decker,*
    2018 WL 2357266 (S.D.N.Y. May 2018) ........................................................................39

*SEC v. Citigroup Glob. Mkts., Inc.,*
    752 F.3d 285 (2d Cir. 2014)................................................................................17, 36, 37

*Statharos v. New York City Taxi & Limousine Comm'n,*
    198 F.3d 317 (2d Cir. 1999)...........................................................................................36

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency,*
    535 U.S. 302 (2002)..............................................................................................17, 32

*United States v. Classic,*
    313 U.S. 299 (1941).......................................................................................................15

*West v. Atkins*,
   487 U.S. 42 (1998) ...................................................................................15, 16

*Yancey v. United States*,
   915 F.2d 1534 (Fed. Cir. 1990) ...............................................................32

**Statutes AND Court Rules**

42 U.S.C. § 1983 ............................................................................................ *passim*

42 U.S.C. § 1988 ...........................................................................................15, 39

CPLR § 105(f) ......................................................................................................3

CPLR § 5004 .....................................................................................................3, 5

CPLR §§ 5230–34 ..........................................................................................18, 37

CPLR §§ 5230–5231 ...........................................................................................4

CPLR §§ 5230-5234 .............................................................................................2

CPLR § 5230(b) ...................................................................................................4

CPLR § 5231(k) ...................................................................................................5

CPLR § 9702(1) ...................................................................................................4

**Other Authorities**

S.B. 5724A, 244th Leg. Sess., c. 831 (N.Y. 2021) .........................................1

Siegel, *New York Practice* § 411 ....................................................................19

Pursuant to the Trial Scheduling Order (ECF 206) and Rule 7.B.v. of this Court's Individual Rules of Practice in Civil Cases, Plaintiffs Greater Chautauqua Federal Credit Union ("Greater Chautauqua"), Boulevard Federal Credit Union ("Boulevard"), and Greater Niagara Federal Credit Union ("Greater Niagara") (together, "Plaintiffs") respectfully submit the following Proposed Findings of Fact and Conclusions of Law.

## INTRODUCTION

At trial, the preponderance of the evidence will show that S.B. 5724A, 244th Leg. Sess., c. 831 (N.Y. 2021) (the "Act") constitutes a taking and violates Plaintiffs' Fifth Amendment rights. The evidence will conclusively demonstrate that: (1) Plaintiffs reasonably expected their post-judgment interest—a vested and constitutionally protected property interest—to not retroactively disappear by first-of-its-kind legislation; (2) the character of the Act resembles a physical taking and unfairly singles out Plaintiffs; and (3) if the preliminary injunction is lifted, the Act will have a significant, adverse economic impact on Plaintiffs. Plaintiffs are therefore entitled to declaratory and injunctive relief striking down and barring the enforcement of the unconstitutional Act as applied to them.

## PROPOSED FINDINGS OF FACT

### A.    Parties

1.    Plaintiffs are each New York-based federal credit unions, which are not-for-profit financial cooperatives owned by their members. *See* Joint Stipulations of Fact or Law ("JS") ¶¶ 8, 9.

2.    Plaintiffs are small credit unions. At the end of 2024, Greater Chautauqua had 30 employees, Greater Niagara had 14, and Boulevard had 9 employees. Direct Testimony of Kelly

J. Haaksma ("Haaksma Aff.") ¶ 9; Direct Testimony of Janelle Zasucha ("Zasucha Aff.") ¶ 9; Direct Testimony of Jennifer Heim ("Heim Aff.") ¶ 9.

3.     Plaintiffs serve rural communities, including those that are considered low-income. Haaksma Aff. ¶¶ 10–11; Zasucha Aff. ¶ 12.  Plaintiffs' members are individuals who live, work, worship, or attend school in Chautauqua, Niagara, and Erie Counties.  JS ¶ 11.

4.     Plaintiffs currently hold consumer debt judgments arising from loans that were reduced to judgment either on the merits or by default.  JS ¶ 12.

5.     Defendants Sheriff James B. Quattrone for Chautauqua County, Sheriff Michael J. Filicetti for Niagara County, and Sheriff John C. Garcia for Erie County (the "Sheriff Defendants") are the enforcement officers responsible, pursuant to CPLR §§ 5230-5234, for enforcing unpaid judgments in their respective counties. *See* Sheriff Defs.' Answer to Am. Compl. ("Sheriffs' Answer") ¶¶ 20–22, ECF 114.

6.     Defendant Attorney General Letitia James ("State Defendant" or "AG") is the State's chief law enforcement officer, JS ¶ 16.  She is responsible for defending the constitutionality of New York statutes, such as the Act, and she has the authority to enforce the requirements of the Act against holders of consumer debt judgments such as Plaintiffs. *See* AG's Answer to Am. Compl. ("AG's Answer") ¶ 26, ECF 115.

**B.     The Act**

7.     Under New York law, "[e]very money judgment shall bear interest from the date of its entry.  Every order directing the payment of money which has been docketed as a judgment shall bear interest from the date of such docketing."  N.Y. Civ. Prac. Law & Rules ("CPLR") § 5003; JS ¶ 3.

8.      Because judgment holders do not have use of their judgment money until it is paid by the debtor, states, including New York, allow post-judgment interest to accrue until the judgment is fully paid.  JS ¶¶ 41, 42.

9.      From 1981 until April 29, 2022, CPLR § 5004 provided that "[i]nterest shall be at the rate of nine per centum per annum, except where otherwise provided by statute." JS ¶ 4.

10.      In June 2021, the New York State Legislature passed the Act, which Governor Hochul signed into law on December 31, 2021, creating an effective date of April 30, 2022.  JS ¶ 1.

11.      The Act amends CPLR § 5004 and reduces the post-judgment interest rate on state-court judgments arising from consumer debts ("consumer debt judgments") from 9% to 2% annually. JS ¶ 1.

12.      The Act defines "consumer debt" as "any obligation or alleged obligation of any natural person to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family or household purposes, whether or not such obligation has been reduced to judgment, including, but not limited to, a consumer credit transaction, as defined in [CPLR § 105(f)]." JS ¶ 5.

13.      The Act applies the 2% interest rate (1) to consumer debt judgments entered on or after April 30, 2022, and (2) "for interest upon" such judgments "from the date of the entry of judgment on any part of a judgment entered before" the Act's effective date "that is unpaid as of such effective date." JS ¶ 7.

14.      In other words, the Act retroactively imposes a 2% statutory rate on unpaid post-judgment interest that, until April 30, 2022, had already accrued at 9%.

15.      Until the Act, the New York statutory post-judgment interest rate had never been changed on a retroactive basis.  *See* Op. & Order Denying Intervention & Resolving Mots. to

Dismiss ("MTD Op.") 23–24 ("A retroactive reduction of assets by the New York Legislature, which targets a discrete class of creditors and erases from their books assets on which they have relied, is seemingly without precedent . . . ."); Direct Testimony of Todd J. Zywicki ("Zywicki Aff.") ¶ 19.

16.     Pursuant to the operative preliminary injunction entered by this Court on September 15, 2023, the Act is in effect statewide, except as applied to the three Plaintiffs with respect to their post-judgment interest that accrued prior to April 30, 2022.  ECF Nos. 57, 61, 139; JS ¶ 7.

### C.     The Judgment Execution Process

17.     When a judgment holder is awarded a money judgment, either on the merits or by default, the judgment holder prepares a draft of the judgment for the court clerk to sign and enter. The fact of entry is recorded in the judgment book. *See* CPLR § 9702(1); JS ¶ 17.

18.     At any time before a judgment is satisfied, an income execution (*i.e.*, a garnishment) may be issued "from the supreme court, county court or a family court, in the county in which the judgment was first docketed, by the clerk of the court or the attorney for the judgment creditor as officer of the court, to the sheriffs of one or more counties of the state, directing each of them to satisfy the judgment or order out of the real and personal property of the judgment debtor or obligor and the debts due to [the judgment creditor]."  CPLR § 5230(b); JS ¶ 18.

19.     The income execution specifies the amount due on the judgment, which includes post-judgment interest. JS ¶ 19.

20.     The enforcement officers (here, Sheriffs) for income executions are responsible, under CPLR §§ 5230–5231, for ensuring that judgment executions are served on debtors, that the interest on judgments is calculated in accordance with the legal rate, that payments are applied to outstanding balances, and that payments are remitted to judgment creditors.   JS ¶ 20.

21.     Interest on money judgments is typically calculated using a declining balance method, which means that as the principal amount decreases, the interest is recalculated. JS ¶ 25.

22.     The Sheriffs collect the payments and deliver them to the judgment creditors after subtracting applicable "lawful fees and expenses." CPLR § 5231(k); JS ¶ 26.

23.     Once a judgment is satisfied, the Sheriffs return the execution to the creditor as satisfied. JS ¶ 27.

24.     The Act provides that, "if the applicable interest rate changes pursuant to [CPLR § 5004] while an execution is ongoing, the judgment creditor shall issue an amended execution within sixty days of the effective date of [the Act]." Act § 4(a); JS ¶ 28.

25.     Consumer debt judgment creditors, such as Plaintiffs, pay to the judgment enforcement officers fees and expenses associated with issuing amended income executions with judgment enforcement officers. JS ¶ 21.

26.     Consumer debt judgment creditors or their attorneys, such as Plaintiffs and their collections attorney, pay a fee to enforcement officers to initiate income executions.  JS ¶ 21.

27.     As seen on Greater Chautauqua's disbursement spreadsheet, which reflects costs for which Greater Chautauqua reimburses its collections attorney, Greater Chautauqua has paid various amounts, ranging from $65 to $71.25, per amended execution.  PX-66 (listing "Execution-amended" under "Disb Desc" (Column G)).

28.     As seen on Boulevard's disbursement spreadsheet, which reflects costs for which Boulevard reimburses its collections attorney, Boulevard has paid $49 per amended execution. PX-65 (listing "Execution-amended" under "Disb Desc" (Column G)).

29.     As seen on Greater Niagara's disbursement spreadsheet, which reflects costs for which Greater Chautauqua reimburses its collections attorney, Greater Chautauqua has paid $49 per amended execution.  PX-67 (listing "Execution-amended" under "Disb Desc" (Column G)).

30.     Fees to initiate income executions cover "first-stage" service, during which the enforcement officers attempt to serve debtors with the amended income executions, and if the debtor does not pay within 20 days, consumer debt judgment creditors or their attorneys may also pay fees for "second-stage" service, during which the enforcement officers attempt to send a garnishment to the debtor's employer.  JS ¶ 23.

31.     If the debtor makes payments on a judgment, the judgment creditor is reimbursed for the fees and expenses paid to enforcement officers, provided that the debtor pays enough to cover those costs and fees. The debtor's payments are first attributed to the fee paid by the judgment creditor for the income execution fee(s) paid to enforcement officers; payments are subsequently attributed to interest and principal. JS ¶ 24.

### D.     Plaintiffs' Loan Collection Process

32.     Plaintiffs generate revenue through, among other things, interest on loans (*e.g.*, consumer credit) provided to members. JS ¶ 29.

33.     Plaintiffs each have policies that include criteria for determining whether a delinquent loan should be "charged off." JS ¶ 36; PX-21 (Greater Chautauqua); PX-47 (Boulevard); PX-64 (Greater Niagara).

34.     To "charge off" a loan means that Plaintiffs have determined, based on the relevant policies, that the loan should be categorized as a non-earning asset. Plaintiffs pursue recovery on charged-off loans by sending the loans to their collections attorney for civil litigation and hope to collect on those loans. JS ¶ 37.

6

35.    When Plaintiffs determine that the expected recovery on charged-off loans is sufficiently high, Plaintiffs will pursue recovery on those loans and will pay their collections attorney to do so.  Haaksma Aff. ¶¶ 32, 34, 52; Zasucha Aff. ¶¶ 30, 31, 33; Heim Aff. ¶¶ 29, 44; PX-108 ¶¶ 34, 40, 44 (AG's Responses to Plaintiffs Rule 56.1 Statement ("AG's 56.1 Resps."), ECF 199.

36.    Plaintiffs each retain William Ilecki, of Ilecki Law, LLP, as their collections attorney.  JS ¶ 38.

37.    If Mr. Ilecki obtains a judgment on a loan referred to him by Plaintiffs, Mr. Ilecki retains 25% of any payments made towards the judgment principal and interest as a legal fee. JS ¶ 39.

38.    Regardless of whether Mr. Ilecki successfully collects on judgments, Plaintiffs incur collection costs, other than legal fees, including reimbursements to Mr. Ilecki for expenses when attempting to collect (*e.g.*, court costs, filing fees, and service of process). JS ¶ 40. PX-65–67 (Plaintiffs' spreadsheets reflecting costs for which they reimburse Mr. Ilecki).

**E.    Plaintiffs' Expectations Based on the 9% Post-Judgment Interest Rate**

39.    Post-judgment interest is a source of revenue for Plaintiffs. JS ¶ 43.

40.    For small credit unions like Plaintiffs, every bit of revenue is important.  Haaksma Aff. ¶ 36; Zasucha Aff. ¶ 30; Heim Aff. ¶ 37.

41.    Plaintiffs rely on revenue, including post-judgment interest, to offset expenses and/or gross losses.  Haaksma Aff. ¶¶ 29, 35, 48–49; Zasucha Aff. ¶¶ 27, 33; Heim ¶ 36; Zywicki

Aff. ¶ 19; PX-107 ¶ 22 (Sheriff Defendants' Responses to Plaintiffs' Rule 56.1 Statement ("Sheriffs' 56.1 Resps."), ECF 195).

42.     Because Plaintiffs rely on every bit of revenue, they invest resources to obtain judgments and collect post-judgment interest; in 2021 alone, Greater Chautauqua spent approximately $20,000 in costs and legal fees to recovery on consumer debts referred to Mr. Ilecki. Haaksma Aff. ¶ 42; PX-108 ¶ 34 (AG's 56.1 Resps.).  That same year, Boulevard also spent approximately $20,000 in such collection costs. Heim Aff. ¶ 44. PX-108 ¶ 40 (AG' 56.1 Resps.). That same year, Greater Niagara spent approximately $30,000 in such collection costs. P aff; PX-108 ¶ 44 (AG' 56.1 Resps.).  Revenue from recoveries related to consumer debt judgments, which necessarily includes post-judgment interest, is reflected in the Plaintiffs' ledgers and quarterly statements submitted to the National Credit Union Association.  Haaksma Aff. ¶¶ 32–33; Zasucha Aff. ¶¶ 30–31; Heim Aff. ¶¶ 32–33.

43.     Plaintiffs determine whether it makes economic sense to spend these collection costs by balancing those costs against expected recoveries. Haaksma Aff. ¶¶ 35, 48–49; Heim Aff. ¶ 36; *see* PX-68 (Greater Chautauqua General Ledger Account Inquiry showing quarterly credits and debits associated with collection expenses and recoveries); PX-72 (Boulevard General Ledger Account Inquiry showing same); PX-44 (Greater Niagara Collections Expenses Ledger showing credits and debits associated with collection expenses); PX-90 (Greater Niagara Charged Off Loan Interest Ledger showing interest payments received).

44.     Expected recovery includes post-judgment interest (accrued at the prevailing statutory interest rate). Zywicki Aff. ¶ 18.

45.     Plaintiffs also rely on revenue, including post-judgment interest, to buffer the risk of lending.  Haaksma Aff. ¶ 35; Heim Aff. ¶ 36; Zywicki Aff. ¶¶ 19–21.

46.     When issuing loans, Plaintiffs use risk-based assessments and lending programs. PX-108 ¶ 17 (AG's 56.1 Resps.); PX-48 (Greater Chautauqua Lending Policies and Procedure Manual); PX-51 (Boulevard Lending Policy Guidelines); PX-64 (Greater Niagara's Lending and Collection Policies); Haaksma Aff. ¶¶ 13, 37; Heim Aff. ¶ 38; Zywicki Aff. ¶¶ 20–21.

47.     In assigning interest rates on loans, Plaintiffs use a tiered pricing structure based on a borrower's credit risk. Haaksma Aff. ¶ 15. Plaintiffs are more likely to issue higher loan amounts or lower interest rates to borrowers who are relatively unlikely to default.  Haaksma Aff. ¶¶ 18, 57; Heim Aff. ¶¶ 14, 17.  For borrowers who are more likely to default, Plaintiffs set loan terms to offset that risk (*e.g.*, assigning higher interest rates).  Haaksma Aff. ¶¶ 18, 57; Heim Aff. ¶¶ 14, 17.

48.     This is typical of other lenders in the consumer finance industry, who treat post-judgment interest as a revenue stream for their balance sheets.  Zywicki Aff. ¶ 19.  To maintain a positive balance sheet, lenders must forecast expected recovery on loans, including expected recovery of post-judgment interest. *Id* ¶ 17.

49.     Credit unions forecast expected recovery, even though they are not-for-profit entities, because they need a positive balance sheet to function and serve their members.  *Id.*; PX-107 ¶¶ 15, 21 (Sheriffs' 56.1 Resps.).

50.     Expected recovery informs the risk of loss when lenders undertake business decisions, such as extending loans and attempting to collect on delinquent loans.  Zywicki Aff. ¶¶ 19–22.  For example, when lenders forecast a relatively high expected recovery, the risk of loss is relatively low, and lenders will therefore be more likely to extend credit and charge lower interest rates on loans.  *Id* ¶ 20.  Conversely, when lenders forecast a relatively low expected recovery, the

risk of loss is relatively high, and lenders will more likely extend less credit and charge higher interest rates on loans. *Id* ¶ 21.

51.    Judgment creditors such as Plaintiffs would ordinarily not be expected to explicitly list post-judgment interest as a standalone item in business records or loan terms. Zywicki Aff. ¶ 19. This is because smaller lenders like credit unions often do not itemize each individual revenue stream, and lenders in New York would not need to do so because the statutory post-judgment interest rate had been static for over 40 years and had never changed on a retroactive basis. *Id.*; Haaksma Aff. ¶ 34; Zasucha Aff. ¶ 35.

52.    In addition to Plaintiffs' accounting for post-judgment interest as a type of income, expected recovery of post-judgment interest can be inferred from the fact Plaintiffs have altered, and/or will alter, loan terms and business practices in response to laws that materially impact expected recovery (*e.g.*, the Act). Zywicki Aff. ¶ 19.

53.    Plaintiffs expected that, for their consumer debt judgments entered before April 30, 2022, post-judgment interest would continue accruing at 9% (the statutory rate in place since 1981). Haaksma Aff. ¶ 37; Zasucha Aff. ¶ 35; Heim Aff. ¶¶ 37; *see* JS ¶ 4. Plaintiffs also expected that the rate would not change retroactively because, until the Act, no statutory post-judgment interest had ever changed on a retroactive basis. Haaksma Aff. ¶ 37; Zasucha Aff. ¶ 35; Heim Aff. ¶¶ 37. Zywicki Aff. ¶ 19.

54.    Therefore, Plaintiffs' expected income from post-judgment interest, which affects their total interest income and overall profitability, was based on the post-judgment interest rate of 9%.

F.    **The Act's Reduction of Plaintiffs' Post-Judgment Interest**

55.     As of March 31, 2022, approximately one month before the Act's effective date, Plaintiffs were each owed accrued and unpaid post-judgment interest on consumer debt judgments:

     a.    Greater Chautauqua was owed $394,198.84 in unpaid post-judgment interest;

     b.    Greater Niagara was owed $363,074.74 in unpaid post-judgment interest; and

     c.    Boulevard was owed $531,570.80 in unpaid post-judgment interest.

JS ¶¶ 44, 50, 56; PX-102.

56.     If the Act takes effect as to Plaintiffs' post-judgment interest that remained unpaid as of April 30, 2022—and had already accrued at 9%—Plaintiffs' post-judgment interest will reduce as if it accrued at only a 2% rate. *See* JS ¶¶ 1, 7. As a result, Plaintiffs will lose 77.77% of their unpaid accrued post-judgment interest, and the present value of their consumer debt judgments will drop instantly. Zywicki Aff. ¶ 35.

57.     Specifically, the unpaid accrued post-judgment interest owed to Plaintiffs will decrease by approximately 78% as follows:

     a.    Greater Chautauqua's unpaid accrued post-judgment interest will drop by $307,475.00;

     b.    Greater Niagara's unpaid accrued post-judgment interest will drop by $283,198.00; and

     c.    Boulevard's unpaid accrued post-judgment interest will drop by $ 414,625.00.

Haaksma Aff. ¶ 45; Zasucha Aff. ¶ 43.

58.     Many of Plaintiffs' judgments, which were pending as of March 31, 2022, remain pending and not fully paid:

     a.    As of August 2023, Greater Chautauqua was owed $411,325.98 in unpaid post-judgment interest on 214 consumer debt judgments entered before the Act's

effective date, and as of April 8, 2025, Greater Chautauqua was owed $357,564.68 in unpaid post-judgment interest on 175 consumer debt judgments entered before the Act's effective date;

b.   As of August 2023, Greater Niagara was owed approximately $323,995 in unpaid post-judgment interest on 101 consumer debt judgments entered prior to April 30, 2022, the effective date of the Act and As of April 8, 2025, Greater Niagara was owed approximately $215,653 in unpaid post-judgment interest on 78 consumer debt judgments entered prior to April 30, 2022, the effective date of the Act;

c.   As of August 2023, Boulevard was owed $496,933.56 in unpaid post-judgment interest on 101 consumer debt judgments entered prior to April 30, 2022, the effective date of the Act.  As of April 8, 2025, Boulevard was owed $432,780.01 in unpaid post-judgment interest on 74 consumer debt.

Haaksma Aff. ¶ 46; Zasucha Aff. ¶¶ 44, 45; Heim Aff. ¶ 47.

59.    While some of the post-judgment interest currently owed to Plaintiffs accrued at 2% prospectively (*i.e.*, interest that accrued from April 30, 2022 and on), the current amount of post-judgment interest owed shows that a significant portion remains unpaid on judgments entered before April 30, 2022, which necessarily includes interest accrued prior the Act's effective date. Haaksma Aff. ¶ 46; Heim Aff. ¶ 47.

**G.    The Act's Adverse Effect on Plaintiffs and Interference With Their Expectations**

60.     If the Act takes effect as to Plaintiffs, roughly 78% of Plaintiffs' recoverable post-judgment interest will disappear. This necessarily reduces Plaintiffs' expected recovery from outstanding judgments. Zywicki Aff. ¶¶ 35–37.

61.     To offset the lower expected recovery of post-judgment interest going forward, Plaintiffs can try to increase income from other sources. *Id.* ¶ 21. For example, they can set terms and conditions on new consumer loans, such as higher interest rates, and they can extend fewer loans to high-risk borrowers. *Id.*

62.     But for loans already entered into—*i.e.*, those underlying the consumer debt judgments at issue—Plaintiffs cannot go back in time to undo the loan terms. *Id.* ¶¶ 27–28. And because Plaintiffs did not expect the statutory post-judgment interest to change retroactively as it had never changed before, Plaintiffs inaccurately priced the risk of loss on those loans—even if their pricing was rational at the time. *Id.* ¶¶ 38–39.

63.     To make up for this unexpected loss, it would be economically reasonable for Plaintiffs to change their practices. *Id.* ¶ 23.

64.     Plaintiffs have already begun to do so given the threat of the Act. For example, since the Act took effect, Greater Chautauqua has referred fewer delinquent loans to its collections attorney. Haaksma Aff. ¶ 52. Between January 2022 and January 2024, Greater Chautauqua referred to Mr. Ilecki only about 10 out of 60 charged-off loans. *Id.* In calendar year 2023, Greater Chautauqua referred only one charged-off loan to its collections attorney out of 43 loans that were charged off that year, and in calendar year 2024, Greater Chautauqua referred 0 out of 34 charged-off loans. *Id.*

65.     This is the expected economic consequence of an Act that reduces Plaintiffs' recoverable post-judgment interest, as Greater Chautauqua is concerned that the cost of collection may outweigh the benefit of recovery. *Id.*; Zywicki Aff. ¶ 28.

66.     Greater Chautauqua is also securing fewer consumer debt judgments since the Act took effect. In 2021, Mr. Ilecki secured 16 consumer debt judgments on Greater Chautauqua's behalf, and in 2022, he secured 39 such judgments. Haaksma Aff. ¶ 53. But for all of 2023—the first full year after the Act took effect—Mr. Ilecki secured only five consumer debt judgments on Greater Chautauqua's behalf . *Id.*; PX-83 (sorting "Jmt Date" (Column G) to entries in 2023 only).

67.     Similarly, Greater Niagara has adopted a new underwriting policy, in part due to the Act, that would increase interest rates on loans for members with lower credit scores. Zasucha Aff. ¶ 53. This is another economically predictable response, as lenders can be expected to raise interest rates and be less willing to extend credit to high-risk borrowers when the expected recovery has decreased. Zywicki Aff. ¶ 40.

68.     These are just the changed practices that have begun to form thus far; additional changes will continue to appear if the Act takes effect as to Plaintiffs. Zywicki Aff. ¶ 31. Those additional changes will also occur gradually due to lags in the transmission of information about the new post-judgment interest rate to borrowers, as well as lags in Plaintiffs' adjustments to account for their 78% loss in recoverable interest already owed to them. *Id.* ¶ 34. Indeed, Plaintiffs are still analyzing and considering how they might adjust to the Act. *Id.*

69.     But even before each Plaintiff can completely assess the Act's impact, some have already estimated the significance of future lost income. Greater Chautauqua estimates that it will lose almost $10,000 per year as a result of the Act, which it considers to be significant for its business. Haaksma Aff. ¶¶ 34, 50, 56. Likewise, Greater Niagara determined that it will have to

increase rates make up for income lost due to the Act—especially because any recovered post-judgment interest is significant for a credit union of its size. Zasucha Aff. ¶ 53.

70.    In any event, the need for Plaintiffs to change their practices shows that Plaintiffs had based their prior practices on the prior 9% post-judgment interest rate. Zywicki Aff. ¶ 33.

71.    Plaintiffs seek (i) a declaration that the Act's retroactive application violates their Fifth Amendment rights; (ii) a permanent injunction barring Defendants from enforcing the Act against them on a retroactive basis; and (iii) reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988..

## PROPOSED APPLICABLE LAW

## I.    ELEMENTS OF SECTION 1983 CLAIM AND TAKINGS CLAUSE VIOLATION

72.    To prevail in a Section 1983 action, Plaintiffs must show that Defendants have enforced, or will enforce, the Act (i) under color of state law; and (ii) in a manner that deprives Plaintiffs of a constitutional right, privilege, or immunity—here, Plaintiffs' Fifth Amendment rights under the Takings Clause. *See Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001); 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .").

### A.    Color of State Law

73.    To act under color of state law means that a defendant has exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1998) (quoting *United States v. Classic*,

313 U.S. 299, 326 (1941)); *see id.* 49–50 ("It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State.").  "A public employee acts under color of state law for § 1983 purposes 'while acting in his official capacity or while exercising his responsibilities pursuant to state law.'"  *Cahill v. O'Donnell*, 7 F. Supp. 2d 341, 348 (S.D.N.Y. 1998) (quoting *West,* 487 U.S. at 50).

      **B.**    **Deprivation of Constitutional Rights: Plaintiffs' *Penn Central* Claim**

    74.    Absent declaratory and permanent injunctive relief, Defendants will deprive Plaintiffs of their Fifth Amendment rights.  The Takings Clause of the Fifth Amendment provides that no person's "private property [shall] be taken for public use, without just compensation."  U.S. Const. amend. V.  The Takings Clause was designed to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

    75.    As a threshold matter, Plaintiffs must first establish that they have a "constitutionally protected property interest" in their private property at issue.  *See S. Nassau Bldg. Corp. v. Town Bd. of Town of Hempstead*, 624 F. Supp. 3d 261, 276 (E.D.N.Y. 2022) (citation omitted).

    76.    Then, to prove a regulatory taking under *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978), Plaintiffs must show that the balance of relevant factors weighs in favor of a taking.  Three factors of "particular significance" are: (1) "the extent to which the regulation has interfered with distinct investment-backed expectations"; (2) the extent to which the "character of the governmental action" resembles a physical taking (the "character factor"); and (3) "the economic impact of the regulation on the claimant."  *Id.* at 124.

77.     These factors are meant to serve as "guideposts" and are not a "mathematically precise" formula.  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 326 n.23 (2002) (citation omitted); see MTD Op. at 26 ("[T]he three Penn Central factors are mere examples of the types of circumstances which should be considered in a regulatory takings analysis, which 'is characterized by essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances.'") (citing *Tahoe-Sierra*, 535 U.S. at 322).

## II.    THE PERMANENT INJUNCTION STANDARD

78.     To obtain permanent injunctive relief, a plaintiff must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *SEC v. Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 296 (2d Cir. 2014) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)); *see Allen v. Koenigsmann*, 700 F. Supp. 3d 110, 140–41 (S.D.N.Y. 2023) (characterizing "first element of the permanent injunction analysis [as] irreparable harm and actual success on the merits"); *see also Dodge v. Cnty. of Orange*, 282 F. Supp. 2d 41, 71 (S.D.N.Y. 2003) ("[T]he standard for a permanent injunction is essentially the same as for a preliminary injunction, except that the plaintiff must actually succeed on the merits.").

## <u>PROPOSED APPLICATION OF FACTS TO THE LAW</u>

## I.   PLAINTIFFS ARE ENTITLED TO DECLARATORY RELIEF ON THEIR SECTION 1983 CLAIM.

79.     The evidence at trial will show, by a preponderance of the evidence, that the Act violates Plaintiffs' Fifth Amendment rights under the Takings Clause and that the Court should

17

enter a declaratory judgment in Plaintiffs' favor and declare the Act's retroactive application unconstitutional as applied to Plaintiffs.

### A. Defendants' Enforcement of the Act Would Be Under Color of State Law.

80. Under the first element of Section 1983, there can be no dispute that Defendants, if allowed to enforce the Act against Plaintiffs on a retroactive basis, would be doing so under color of New York law. The State Defendant is the chief State law enforcement officer, is responsible for defending the constitutionality of New York statutes such as the Act, and has the authority to enforce the requirements of the Act against consumer debt judgment holders such as Plaintiffs. JS ¶ 16; AG's Answer ¶ 23.

81. Likewise, the Sheriff Defendants are the enforcement officers responsible, pursuant to CPLR §§ 5230–34, for enforcing unpaid judgments in their respective New York counties, as well as ensuring that judgment executions are served on debtors, the interest on judgments is calculated in accordance with the legal rate, payments are applied to outstanding balances, and payments are remitted to judgment creditors like Plaintiffs. JS ¶¶ 15, 20.

82. There is no question that Defendants—each public employees acting in, and sued in, their official capacities, would be purporting to exercise their State law responsibilities if they enforced the Act retroactively against Plaintiffs. That suffices for action under color of State law.

### B. Defendants' Enforcement of the Act Against Plaintiffs Would Deprive Plaintiffs of their Fifth Amendment Rights Under *Penn Central*.

#### 1. Plaintiffs' Have a Constitutionally Protected, Vested Property Interest in Their Accrued Post-Judgment Interest.

83. It is undisputed that Plaintiffs are owed post-judgment interest that has accrued on their consumer debt judgments. JS ¶¶ 44, 50, 56. And as this Court has correctly ruled, the right

to post-judgment interest—once accrued—is a vested property interest subject to the Takings Clause.  *See* MTD Op. 17–18.

84.     The right to post-judgment interest belongs solely to the judgment holder and vests once the judgment is obtained.  *See Rai v. WB Imico Lexington Fee, LLC*, 802 F.3d 353, 369 (2d Cir. 2015) ("'[I]nterest follows principal' and therefore is the 'property of the owner of the principal.'") (quoting *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 165, 172 (1998)); *see also* MTD Op. 18 ("[U]nder New York law, 'interest attaches uniformly to all money obligations once reduced to verdict or judgment' and 'runs on the judgment until it is satisfied.' Siegel, *New York Practice* § 411. Plaintiffs' property right in the accrued (but uncollected) post-judgment interest thus exists to the same degree as their right in the underlying judgment.") (alteration omitted).

85.     Therefore, Plaintiffs have a vested, constitutionally "protected property interest" at risk of governmental interference.  *See* MTD Op. 18.

## 2.     The Act Frustrates Plaintiffs' Reasonable Investment-Backed Expectations.

86.     The evidence adduced at trial, including the testimony of each of the named Plaintiff representatives—Kelly Haaksma (Greater Chautauqua), Jennifer Heim (Boulevard), and Janelle Zaschusa (Greater Niagara)—will make plain that the Act's retroactive application to the Plaintiff credit unions will frustrate their reasonable investment-backed expectations.

87.     A primary factor under *Penn Central* "is the extent to which the regulatory action 'has upset plaintiff's investment-backed economic expectations by altering its rights as to a constitutionally protected property interest.'" *South Nassau*, 624 F. Supp. at 276 (quoting *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 266 (2d Cir. 2014)) (alteration omitted); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (noting that investment-backed expectations must be "reasonable").  Of the three traditional *Penn Central* factors, this factor is

"particularly" relevant, *Penn Central*, 438 U.S. at 124, and tests whether the regulatory action interferes with property that Plaintiff acquired "in reliance on a state of affairs that did not include the challenged regulatory regime." *South Nassau*, 624 F. Supp. at 276.  At trial, the evidence will conclusively show that the Act frustrates Plaintiffs' reasonable investment-backed expectations because (1) Plaintiffs had investment-backed expectations concerning their post-judgment interest—already-accrued at 9%; (2) those expectations were reasonable; and (3) the Act upsets those expectations.

> **i.    Plaintiffs had investment-backed expectations concerning their post-judgment interest and the 9% post-judgment interest rate.**

88.    When ruling that Plaintiffs sufficiently alleged a regulatory takings claim, the Court highlighted the allegations that, if proven, would evidence Plaintiffs' investment-backed expectations: "Plaintiffs allege that they have relied on the statutory nine-percent annual interest that has been accruing on their judgments to make "decisions about loan criteria and acceptable credit risk," [Am. Compl.] ¶ 79 "to offset the cost of obtaining judgments," and "to buffer the risk of lending money in the first place," [*id.*] ¶ 9; *see also* [*id.*] ¶¶ 35-36. Plaintiffs also allege that, based on the expectation that interest would accrue at a rate of nine percent, they 'invested considerable expense and effort to enforce judgments they obtained prior to April 30, 2022.' *Id.* ¶ 80." As will be demonstrated at trial, Plaintiffs have proven these allegations.

89.    It is undisputed that post-judgment interest is a source of Plaintiffs' revenue. JS ¶ 43.  Plaintiffs are not mammoth financial institutions; they are small credit unions who serve low-income communities in upstate New York.  Haaksma Aff. ¶¶ 9–10; Heim Aff. ¶¶ 10–11. Every bit of revenue is important to them.  For example, as Greater Chautauqua's representative attests, "underlying the criteria we have in place is the expectation that we will receive a certain amount of income each year (of which the recovery of post-judgment interest is necessarily a part).

*If the income goes down by even a small amount, that money would have to be made up in other ways.*" Haaksma Aff. ¶ 36 (emphasis added); *see also generally* Zasucha and Heim Affs.  So, when they are owed accrued post-judgment interest, they expend significant resources to obtain judgments and collect as much as they can.   Haaksma Aff. ¶¶ 51 (explaining that Greater Chautauqua considers post-judgment interest "in deciding whether to invest resources into obtaining a judgment in the first place. If the interest rate is only two percent, however, Greater Chautauqua is much less likely to expend the time and effort to secure and collect a judgment, especially on smaller amounts. That means Greater Chautauqua is more likely to write those debts off as a loss that the credit union will have to absorb.").

90.     Indeed, in 2021 alone, Plaintiffs each spent tens of thousands of dollars in costs and legal fees to recover on consumer debts referred to their collections attorney.  *See supra*; PX-108 ¶¶ 34, 40, 44 (AG's 56.1 Resps.).  And Greater Chautauqua, for example, between 2022 and 2024, paid over $45,000 in disbursements to recover on such debts.  Haaksma Aff. ¶ 42.

91.     To determine whether it is worthwhile to obtain a judgment and spend these collection costs, Plaintiffs balance the costs against expected recoveries.  Haaksma Aff. ¶¶ 35, 48–49; *see also supra*. And they account for this cost-benefit analysis explicitly in their financial documents.  *See* PX-68 (Greater Chautauqua General Ledger Account Inquiry showing quarterly credits and debits associated with collection expenses and recoveries); PX-72 (Boulevard General Ledger Account Inquiry showing same); PX-44 (Greater Niagara Collections Expenses Ledger showing credits and debits associated with collection expenses); PX-90 (Greater Niagara Charged Off Loan Interest Ledger showing interest payments received).  If the recovery is sufficiently high, the recovery will offset the collection costs and provide a revenue stream to Plaintiffs.  *E.g.*, Haaksma Aff. ¶¶ 29, 35, 48–49; Zywicki Aff. ¶ 19; PX-107 ¶ 22 (Sheriffs' 56.1 Resps.); *see also*

*supra*. Post-judgment interest is baked into that expected recovery, and therefore informs Plaintiffs' decisions of how much to invest in that recovery. *E.g.*, Haaksma Aff. ¶ 36; Zywicki Aff. ¶ 18,

92.    Not only do Plaintiffs use post-judgment interest recovery to offset the cost of obtaining and collecting on judgments, but Plaintiffs also use it to buffer the risk of lending in the first instance. *E.g.*, Haaksma Aff. ¶ 35; *see supra*. Every loan is a risk. No lender can guarantee that borrowers will pay back, which is why Plaintiffs use-risk based lending programs and assessments when issuing loans. *See* PX-48 (Greater Chautauqua Lending Policies and Procedure Manual); PX-51 (Boulevard Lending Policy Guidelines); PX-64 (Greater Niagara's Lending and Collection Policies); PX-108 ¶ 17 (AG's 56.1 Resps.); Zywicki Aff. ¶¶ 20–21.

93.    For example, Plaintiffs use a tiered pricing structure to assign interest rates on loans based on a borrower's credit risk (*i.e.*, the probability that the borrower will pay back the loan). *E.g.*, Haaksma Aff. ¶ 15; *see also supra*. When there is a lower risk that a borrower will default, Plaintiffs are more likely to issue a higher loan amount to that borrower or offer lower interest rates. *E.g.*, Haaksma Aff. ¶¶ 18, 57; Zywicki Aff. ¶ 21; *see supra*. Conversely, when there is a greater risk that a borrower will default, Plaintiffs will set loan terms to compensate for that risk, such as assigning higher interest rates, so that it still makes economic sense for Plaintiffs to issue the riskier loan. Haaksma Aff. ¶¶ 18, 57; Zywicki Aff. ¶ 20; *see supra*. Put another way, Plaintiffs' risk assessments analyze expected recovery versus expected loss. Zywicki Aff. ¶ 17. This is customary lending behavior, as all lenders, including credit unions, must accurately price the risk of loss to maintain a positive balance sheet. *Id.* ¶¶ 17, 19; PX-107 ¶¶ 15, 21 (Sheriffs' 56.1 Resps.). Accordingly, when Plaintiffs forecast expected recovery on a loan or a judgment, they factor in

recovery of interest, including post-judgment interest, accrued at a certain rate. *E.g.*, Haaksma Aff. ¶ 34, 46, 48–49, 52; Zywicki Aff. ¶¶ 20, 21; *see supra*.

94.    Here, the statutory post-judgment interest rate had remained at 9% since 1981. JS ¶ 4; Zywicki Aff. ¶ 19.  Plaintiffs expected that their post-judgment interest, for judgments already entered and stemming from loans with terms already agreed upon, to continue accruing at 9%. *E.g.*, Haaksma Aff. ¶¶ 34, 37; *see supra*.  Indeed, Plaintiffs consider recoveries of that accrued post-judgment interest—which the parties agree is owed to Plaintiffs (JS ¶¶ 44, 50, 56)— in making decisions about budgeting for income and determining loan loss or credit loss allowances. *E.g.*, Haaksma Aff. ¶¶ 34, 37; *see supra*; *see also* MTD Op. 23.  All of this evidence supports Plaintiffs' investment-backed expectations.  MTD Op. 23.

95.    Moreover, it is clear that Plaintiffs had investment-backed expectations based on the 9% post-judgment interest rate because Plaintiffs have already begun to change their practices since the Act took effect.  For example, Greater Chautauqua is sending fewer loans to its collections attorney, who secured two consumer debt judgments in 2023, compared to 39 in 2022. Haaksma Aff. ¶ 52.  Between January 2022 and January 2024, Greater Chautauqua referred to Mr. Ilecki only about 10 out of 60 charged-off loans.  *Id.*  In calendar year 2023, Greater Chautauqua referred only one charged-off loan to its collections attorney out of 43 loans that were charged off that year, and in calendar year 2024, Greater Chautauqua referred 0 out of 34 charged-off loans. *Id.*

96.    This is the economically predictable result of a dramatically lower post-judgment interest rate; because the expected recovery on those loans is lower, it is less worthwhile for Greater Chautauqua to expend resources to attempt to collect.  Ms. Haaksma confirmed the same in her direct testimony stating that Greater Chautauqua considers post-judgment interest "in

deciding whether to invest resources into obtaining a judgment in the first place."  Haaksma Aff. ¶ 51; *see also* PX-68 (Greater Chautauqua Account Inquiry tracking collection expenses versus recoveries).  To be sure, post-judgment interest accrued after the Act's effective date is not subject to Plaintiffs' challenge in this case, but Greater Chautauqua's response to the 2% interest rate going forward indicates how Greater Chautauqua would have conducted its collection practices in the past (*i.e.*, if the prevailing interest were 2% instead of 9%).  *See* Zywicki Aff., *supra*.  And the problem with the Act's retroactivity, as discussed further *infra*, is that Greater Chautauqua already assessed risk and expended resources to collect on pre-Act judgments—based on the expectation that interest already accrued would not suddenly disappear due to unprecedented legislation.  *E.g.*, Haaksma Aff. ¶ 34, 37, 46, 48–49, 52; Zywicki Aff., *supra*.

97.     Another example of Plaintiffs' adjustments is Greater Niagara's new underwriting policy, which increases interest rates for higher risk borrowers.   The Act is one reason for the new policy, and this is again unsurprising given standard economic principles.  *See* Zasucha Aff., *supra*; Zywicki Aff., *supra*.  If the preliminary injunction is lifted and Greater Chautauqua's pre-Act accrued interest vanishes, Greater Niagara will have to make up for the loss in some way, and charging higher interest rates is one way to do so.  *See* Zasucha Aff., *supra*; Zywicki Aff., *supra*.

98.     These changed practices are just examples of what is to come, and it is particularly striking that they have occurred already given that Plaintiffs still retain the benefit of the preliminary injunction.  Zywicki Aff., *supra*.  Additional changes will gradually unfold over time as Plaintiffs continue to assess how to respond to the Act and due to the information time lag for borrowers to learn of the new post-judgment interest rate and adjust their debt payments accordingly.  *E.g.*, Haaksma Aff. ¶ 60; Zywicki Aff. ¶ 38.

99.     In any event, if Plaintiffs did not rely on the 9% rate, there would be no need for

them to adjust their practices following the new 2% rate.  Yet they have already begun to do so

and can be expected to continue.  The natural conclusion is that Plaintiffs made multiple business

decisions, and had investment-backed expectations, in reliance on the prior 9% rate in place since

1981.

### ii.     Plaintiffs' investment-backed expectations were reasonable.

100.     The reasonableness of a plaintiff's investment-backed expectations is "a matter

often informed by the law in force in the State in which the property is located."  *Ark. Game &*

*Fish Comm'n v. United States*, 568 U.S. 23, 38 (2012); *see also id.* at 39 ("Also relevant to the

takings inquiry is the degree to which the invasion is intended or is the foreseeable result of

authorized government action"); *Palazzolo*, 533 U.S. at 633 (O'Connor, J., concurring) ("[T]he

regulatory regime in place at the time the claimant acquires the property at issue helps to shape the

reasonableness of those expectations.").

101.     Until the Act, the 9% post-judgment interest rate was static for over 40 years, and

no statutory post-judgment interest rate had ever been changed on a retroactive basis.  JS ¶ 4; MTD

Op. 23.  Plaintiffs expected that their post-judgment interest would continue accruing at 9% and

not vanish after it already accrued.  *E.g.*, Haaksma Aff. ¶ 37; *see supra*.  A reasonable lender in

Plaintiffs' shoes would have done the same, *see* Zwyicki Aff., *supra*, and Plaintiffs did nothing

more than justifiably rely on the "law in force."  *Ark. Game & Fish Comm'n*, 568 U.S. at 38.

102.     As this Court has correctly explained:

> Plaintiffs made business decisions and investments based on the expectation
> that interest which had vested and accrued at the statutorily established rate
> of nine percent, but which had not yet been collected, could be relied upon
> as a stable asset. **These expectations were clearly reasonable**. A
> retroactive reduction of assets by the New York Legislature, which targets
> a discrete class of creditors and erases from their books assets on which they

have relied, is seemingly **without precedent and, as a result, is not easily predictable**.

\* \* \*

[Plaintiffs] challenge only the retroactive reduction in accrued interest, which was **unforeseeable and which disturbed their reasonable investment-backed expectations**.

MTD Op. 23–24 (emphasis added).

103. In other words, Plaintiffs did not foresee, and could not have reasonably foreseen, that their accrued post-judgment interest would disappear due to novel legislation. Indeed, none of the Plaintiffs ever expected that the statutory rate would be reduced retroactively. *E.g.*, Haaksma Aff. ¶ 37; Zywicki Aff. ¶ 38. Plaintiffs should not lose their vested property for failing to foresee the "unforeseeable," MTD Op. 24, and Plaintiffs' expectations were reasonable as a matter of law.

### iii. The Act thwarted Plaintiffs' investment-backed expectations.

104. There is no dispute that the Act's retroactive application will reduce Plaintiffs' expected recovery on outstanding judgments. Zywicki Aff. ¶¶ 32, 37. That is because the Act slashes their recoverable, pre-Act post-judgment interest—which already accrued and is owed to them—by nearly 78%.

105. Necessarily, Plaintiffs are locked into the decisions and expenditures they already made based on the prior 9% rate, and Plaintiffs could not have reasonably foreseen the unprecedented, retroactive Act. Blindsided by the Act, Plaintiffs were unable to accurately price the risk of loss when making the above collection and lending decisions based on the 9% post-judgment interest rate. Even if Plaintiffs' risk assessments were rational at the time they were conducted, the Act retroactively renders those assessments as miscalculated. *See* Zywicki Aff., *supra*. That is, through no fault of Plaintiffs, every lending or collection assessment would have

underestimated expected loss and overestimated expected recovery. *Id.* And for money already invested in collections—based on expected recovery given a 9% post-judgment interest rate—will have turned out to be overspent. *Id.* That money is gone, and Plaintiffs cannot get it back.

106.    Moreover, if the injunction is lifted, borrowers who owe Plaintiffs post-judgment interest accrued before the Act would be disincentivized to make payments. *Id.* The new 2% rate is lower than prevailing interest rates on consumer credit, and rational borrowers could simply deposit their money in an F.D.I.C. savings account, earning interest at over a 4% rate, instead of paying back post-judgment interest. *Id.* For the same reason, debtors would be less likely to negotiate settlements with Plaintiffs' collection attorney. Although the 9% post-judgment interest rate is a useful bargaining tool to induce payment, the Act would destroy that tool and cause debtors to be less eager to pay. *Id.*; *see also, e.g.*, Haaksma Aff. ¶¶ 30, 54. If Plaintiffs knew that the post-judgment interest rate would retroactively plummet to 2%, Plaintiffs may not have even deemed it worthwhile to obtain a judgment against such a borrower in the first instance.

107.    The bottom line is that Plaintiffs expected their post-judgment interest to accrue at 9% when they made decisions to invest to obtain their judgments, and they certainly did not expect their interest to disappear after it already accrued. By retroactively slashing Plaintiffs' vested property, in a way that no law had ever before, the Act plainly upsets Plaintiffs expectations. As this Court correctly concluded previously, the Act's "retroactive reduction in accrued interest [] was unforeseeable [and] "disturbed [Plaintiffs'] reasonable investment-backed expectations." MTD Op. 24.

### 3.    The Character of the Retroactive Act Resembles a Physical Taking and Unfairly Singles Out Plaintiffs.

108.    Under the character factor, "a taking may more readily be found when the interference with property can be characterized as a physical invasion by government, than when

27

interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124. The character factor also weighs in favor of taking when the challenged regulation singles out plaintiffs from among the broader public or when the regulation is enforced retroactively. *See, e.g.*, *Sherman*, 752 F.3d at 565–66 (explaining that, because the government had "singled out [plaintiff's] development," the challenged action was "unfair, unreasonable," and effected a taking under the character factor); *E. Enters. v. Apfel*, 524 U.S. 498, 537 (1998) (explaining character factor weighed in favor of taking because challenged legislative action was "based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused . . . [and plaintiff] cannot be forced to bear the expense of lifetime health benefits for miners based on its activities decades before those benefits were promised"). The character factor points clearly in favor of a taking, as the retroactive Act resembles a physical taking and unfairly singles out Plaintiffs.

### i. The Act resembles a physical taking.

109. As this Court has aptly articulated, "a court would only consider this factor if it had already concluded that no physical taking had occurred," but "if there was ever a regulatory taking claim in which the interference with property might resemble a physical invasion, this appears to be it." MTD Op. 25. Indeed, the Act reaches into Plaintiffs' assets—on which Plaintiffs relied as discussed *supra*—and simply erases nearly 78% of the post-judgment interest accrued before the Act and already owed to them. This invasion is exactly what the character factor guards against. *See* MTD Op. 25 (comparing physical taking with the taking here: "It is the difference between a creditor being paid a hundred dollars and returning thirty, and a creditor who is owed a hundred dollars now being entitled to payment of only seventy. To the creditor, who suffers a thirty percent

loss, the result is the same. So, while the Act may not constitute a physical taking, that is more a matter of form than substance."); *see also Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 225 (1986) (ruling character of governmental action did not weigh in favor of taking because "under the Act, the Government *does not physically invade* or permanently appropriate any of the employer's assets for its own use.") (emphasis added).

110.    The undisputed evidence shows that each of the Plaintiffs will have significant property taken from them through the Act's retroactive application.  Greater Chautauqua will lose at least $307,475.00 in unpaid accrued judgment interest, Greater Niagara will lose $ 283,198, and Boulevard will lose $ 414,625.  Haaksma Aff. ¶ 45; Zasucha Aff. ¶ 43; Heim Aff. ¶ 46; *see also* JS ¶¶ 44, 50, 56.  Plaintiffs' Exhibit 102 plainly demonstrates the significant amount vested property rights at issue:

**Plaintiffs' Consumer Debt Judgments Entered Before April 30, 2022 (Balance as of March 31, 2022)**

Summary of Data Presented in PX-93, PX-94 and PX-95

| Credit Union Name | Consumer Debt Judgments TOTAL | Judgment Amount TOTAL | Judgment DATE RANGE | Judgment Payoff TOTAL | Judgment Principal Balance TOTAL | TOTAL Unpaid, Accrued Post-Judgment Interest (Total Judgment Payoff - Total Judgment Principal Balance) |
|---|---|---|---|---|---|---|
| Greater Chautauqua Federal Credit Union (PX-93) | 231 | $ 935,241.21 | 12/13/2005 - 3/24/2022 | $ 1,297,774.23 | $ 903,575.39 | $ 394,198.84 |
| Boulevard Federal Credit Union (PX-94) | 117 | $ 1,016,863.00 | 2/27/2004 - 2/25/2022 | $ 1,502,491.90 | $ 970,921.10 | $ 531,570.80 |
| Greater Niagara Federal Credit Union (PX-95) | 114 | $ 721,397.59 | 1/12/2007 - 12/8/2021 | $ 1,055,428.36 | $ 692,353.62 | $ 363,074.74 |

111.    The Act also directs enforcement officers to "refund [to debtors] any money collected (but not yet remitted to the creditor) in excess of the newly recalculated debt based on the reduced interest rate of two percent."  MTD Op. 25 (citing Act § 5(k)).  As this Court identified, "the government cannot take property from one and transfer it to another without compensating the original property. But in some cases, the Act effectively does just that."  *Id.*  That Plaintiffs' funds "may not have been physically taken from [them] (who had not yet gained possession), but

29

[the funds] belonged to the creditors, and they were taken." *Id.*  The Act's directive in Section 5(k), along with the Act's retroactive reduction of already-accrued post-judgment interest, reveals that the Act's retroactive application strongly resembles a physical taking.

### ii.    The Act's retroactivity unfairly singles out Plaintiffs.

112.    The Act also unfairly singles out Plaintiffs and forces them "alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Palazzolo*, 533 U.S. at 617–18.  The Act does not target all creditors; it singles out a "discrete class of creditors," such as Plaintiffs, who are owed interest on consumer debt judgments lawfully obtained.  MTD Op. 23–24, 27.  On its face, the Act burdens particular creditors—not for the common good—but rather for the benefit of a particular group of private individuals (*i.e.*, debtors who owe money pursuant to lawful consumer debt judgments).  And "[f]or those specific individuals, the Act confers a clear windfall and rewards their delay," erasing debts lawfully owed to Plaintiffs.  *Id.* at 27.  Of course, "legislative tinkering" "inevitably creates individual winners and losers," but here, the Act's retroactive character goes too far, punishing Plaintiffs (despite no wrongdoing) by wiping away their already-accrued post-judgment interest and, in some cases, forcing Plaintiffs to return excess post-judgment interest payments.  MTD Op. 27 (quoting *1256 Hertel Avenue Associates, LLC v. Calloway*, 761 F.3d 252 (2d Cir. 2014)).  That is why the Act here is not "tinkering; it is plausibly a taking." *Id.*

113.    The Act's retroactivity compounds the Act's unfair effect on Plaintiffs.  If the Act applied merely prospectively, the burden of the lower post-judgment interest rate could be distributed evenly throughout the market; lenders, borrowers, and other market participants could adjust accordingly with knowledge of the prevailing post-judgment interest rate. *See* Zywicki Aff., *supra*. But if the Act takes effect to Plaintiffs retroactively, Plaintiffs' risk assessments on

consumer debts and judgments (and corresponding business decisions) will have been miscalculated through no fault of their own.  *Id.*

114.    Any hypothetical, prospective public benefits do nothing to change this unfairness, as the Act, "when applied *retroactively*, does not confer a benefit on the public, but rather benefits solely those debtors (within a limited category of cases) who have delayed paying judgments rightfully obtained"—at the expense of Plaintiffs.  MTD Op. 27 (emphasis added).  That is, "now that the Legislature seeks to offer (belated) relief to (select) judgment debtors, it is particularly unfair to target a limited class of judgment creditors, who have done nothing but play by the rules, and who are now being asked to bear the brunt of the blow for this 'correction.'"  *Id.* at 26.  The Act therefore "defies general notions of equity and fair play" and contravenes "the central purpose underlying the Takings Clause: 'to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'"  *Id.* at 26–27 (quoting *Palazzolo*, 533 U.S. at 617–18).

115.    The character factor therefore weighs in favor of a taking "insofar as the Act applies retroactively."  *Id.* at 25–26.

####    4.    The Act's Adverse Economic Impact on Plaintiffs Will Be Substantial.

116.    Analysis of economic impact begins with a comparison between "the value that the property has lost with the value held before the government action, considering the 'unit of property whose value is to furnish the denominator of the fraction.'"  MTD Op. 22 (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987)) (cleaned up).  To fully assess economic impact, courts in the Second Circuit have also examined economic considerations, other than percentage of lost property, when adjudicating this factor.  *See, e.g.*, *Remauro v. Adams*, 21-CV-4553 (ARR) (TAM), 2022 WL 1525482, at *7 (E.D.N.Y. May 13, 2022) (considering as

"some economic impact" that the challenged government action forced plaintiffs to "fac[e] a loss of employees" and "divert employees from doing other regularly scheduled tasks"). After all, the *Penn Central* test is "characterized by essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances.'" MTD Op. 26 (quoting Tahoe-Sierra, 535 U.S. at 322). The evidence at trial will show that, considering the numerous effects of the Act on Plaintiffs, the Act's adverse economic impact suffices for a taking.

117. The undisputed evidence shows that the Act will wipe away approximately 78% of the post-judgment interest that was already owed to Plaintiffs as of the Act's effective date. JS ¶¶ 7, 44, 50, 56; Zywicki Aff. ¶ 35. There is no "automatic numerical barrier" below which a taking cannot be found, but courts have considered lower and similar percentage-losses as sufficient economic impact to weigh in favor of a taking. *See, e.g.*, *Yancey v. United States*, 915 F.2d 1534, 1541 (Fed. Cir. 1990) ("[W]e do not read these early precedents as creating an automatic numerical barrier preventing compensation, as a matter of law, in cases involving a smaller percentage diminution in value. The Claims Court properly weighed all the relevant considerations, including percentage diminution in value [77%], under the modern *Penn Central* approach and found that the Yanceys suffered severe economic impact."); *Chase Manhattan Bank, N.A. v. State*, 103 A.D.2d 211, 223–24 (2d Dep't 1984) (explaining that takings challenge involving 86% reduction in property value would have "reasonable probability of success"); *Friedenburg v. N.Y. State Dep't of Env't Conservation*, 3 A.D.3d 86, 97 (2d Dep't 2003) (concluding that 92.5% diminution of property value would be "significant reduction" sufficient for economic harm under *Penn Central*).

118. In addition to the 78% reduction in pre-Act post-judgment interest owed to Plaintiffs, Plaintiffs will suffer several other economic harms. First, Plaintiffs will simply lose a significant amount of income. Given the preliminary injunction, not every Plaintiff has analyzed

the full extent of future lost income, but Greater Chautauqua has already estimated that it will lose almost $10,000 per year as a result of the Act.  Haaksma Aff. ¶¶ 34, 50, 56; PX-33.  This is significant to a small, not-for-profit credit union like Greater Chautauqua; its representative testified that "a drop in yearly income of even $10,000 is [] material" to the credit union, and "[i]f [its] income goes down by even a small amount, that money would have to be made up in other ways."  Haaksma Aff. ¶¶ 34, 36.

119.    Second—and underscoring the importance of every bit of income to Plaintiffs—Plaintiffs will be forced to adjust their loan policies.  Greater Niagara has already adopted a new underwriting policy in part due to the Act, and Greater Niagara also determined that it will have to increase rates to make up for lost income if the Act takes effect.  *See supra.*  Again, this is not surprising, as any reasonable lender would be forced to make up for losses in some way, and raising interest rates on loans is one way to compensate for the loss.  *See supra.*

120.    Third, the Act will alter Plaintiffs' collection practices and diminish their collections revenue stream.  As discussed *supra*, in 2021 alone, Plaintiffs each invested tens of thousands of dollars in fees and costs to pursue recoveries on delinquent debts.  Those investments make economic sense when Plaintiffs' collection recoveries are sufficiently high to offset and exceed collection costs, but given the Act' reduction of expected recoveries, Plaintiffs will be forced to lessen, or even forgo, collection efforts that are no longer cost-effective.  *See supra.*  This economic impact has already begun, as Greater Chautauqua is sending fewer delinquent loans to its collections attorney, and its collection attorney is securing fewer judgments overall since the Act took effect.  *See supra.*

121.    Fourth, for money already spent to collect on outstanding pre-Act judgments, Plaintiffs will have no way to recoup that money—even if they would not have spent it if they

knew the post-judgment interest rate would be only 2%. This impact is not something that Plaintiffs could have mitigated because they could not have reasonably foreseen such radical legislation wiping accrued interest off their books. Zywicki Aff. ¶ 38.

122.   Fifth, not only will Plaintiffs recover less from payments attributed to post-judgment interest, but Plaintiffs will also likely receive fewer judgment payments overall. It is standard economics that borrowers will be disincentivized to pay debt with lower interest rates, and the 2% rate lags behind prevailing market rates on consumer credit. *See* Zywicki, *supra*. Rational borrowers would be better off ignoring Plaintiffs' judgments against them and instead investing their money, like in an F.D.I.C. savings account, to earn over a 4% interest. *See* Zywicki, *supra*.

123.   Sixth, Plaintiffs will incur considerable operations expenses associated with preparing and filing amended income executions. If the Act takes effect as to Plaintiffs' outstanding pre-Act judgments, Plaintiffs will be forced to file amended executions for consumer debt judgments currently in execution. Act § 4. That process will require Plaintiffs to (1) investigate which of its outstanding consumer debt judgments have executions pending, (2) prepare and file amended executions with the Sheriff Defendants for some portion of those judgments, and (3) pay applicable service fees to the Sheriffs, which vary based on execution and range from $49 to $71.25 per amended execution. *See* JS ¶ 21; PX-65–67; Haaksma Aff. ¶ 58–60; *see also supra*.

124.   This is no small number, as Greater Chautauqua has 175 outstanding judgments that were entered prior to April 30, 2022, Greater Niagara has 78, and Boulevard has 74. *See* PX-104. For example, if Greater Chautauqua were forced to file amended executions for 175 judgments at $49 each, Greater Chautauqua would lose $8,575. And that just includes the fee to

initiate the amended execution; Plaintiffs may also be forced to devote time and resources, and possibly consult with their collections attorney, to ensure that the amended execution process operates smoothly. And although debtors' judgment payments would effectively reimburse Plaintiffs for those amended execution fees, (JS ¶ 23) there is no guarantee that debtors will make sufficient payments or any payments at all as discussed above. These are significant losses for small, not-for-profit credit unions like Plaintiffs. Haaksma Aff. ¶¶ 34, 36; *see also supra*.

125. Finally, the full extent of the Act's economic impact of the Act is not yet determinable quantitatively because Plaintiffs are still protected by the preliminary injunction, and there will be time lags for debtor behavior to adjust new post-judgment interest rate and for Plaintiffs to completely assess how they will adjust to the Act. Haaksma Aff. ¶ 60; Zywicki Aff. ¶ 34; *see also supra*. Yet however Plaintiffs choose to respond—whether through charging higher interest rates or extending less credit, among other possibilities—the end result is that Plaintiffs will suffer economic harm and will be less able to serve their members.

126. Ultimately, the preponderance of the evidence will show that Plaintiffs meet the elements of their Section 1983 claim. In enforcing the Act retroactively against Plaintiffs, Defendants would be acting under color of state law and would deprive Plaintiffs of their Fifth Amendment Rights. The Act's retroactive application violates Plaintiffs' Fifth Amendment rights because (1) Plaintiffs have a vested property interest in their accrued post-judgment interest; (2) the Act upsets Plaintiffs' reasonable investment-backed expectations; (3) the Act resembles a physical taking and unfairly singles out Plaintiffs; and (4) Plaintiffs will suffer a significant and adverse economic impact due to the Act. Accordingly, the Court should respectfully declare the Act's retroactive application unconstitutional as applied to Plaintiffs and enter a declaratory judgment in Plaintiffs' favor.

## II.    PLAINTIFFS ARE ENTITLED TO A PERMANENT INJUNCTION ENJOINING DEFENDANTS FROM VIOLATING FEDERAL LAW AND ENFORCING THE ACT AGAINST PLAINTIFFS.

127.    To obtain permanent injunctive relief, a plaintiff must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Citigroup Glob. Mkts.*, 752 F.3d at 296 (citation omitted).  Plaintiffs meet each requirement.

### A.    Absent Permanent Injunctive Relief, Plaintiffs Will Suffer Irreparable Harm, and There Are No Adequate Remedies Available at Law.

128.    The unconstitutional taking of Plaintiffs' property alone suffices for irreparable harm.  *See, e.g.*, *Floyd v. City of New York¸* 959 F. Supp. 2d 691, 696 (S.D.N.Y. 2013) ("It is well-established that a violation of one's constitutional rights constitutes irreparable harm."); *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2011) ("The party requesting permanent injunctive relief must demonstrate [] irreparable harm (here, a constitutional violation) . . . ."); *see also Basank v. Decker*, 613 F. Supp. 3d 776, 788 (S.D.N.Y. 2020) ("In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("The district court [] properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights. In any event, it is the alleged violation of a constitutional right that triggers a finding of irreparable harm.") (emphasis omitted); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary.")

129.    And "when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102–03 (1984) (citing *Edelman v. Jordan*, 415 U.S. 651 (1974)).  This is exactly the case here.

130.    The sole claim to be tried is Plaintiffs' Section 1983 claim against state and New York county officials in their official capacities (*i.e.*, the New York Attorney General (the chief State law enforcement officer) and sheriff enforcement officers, whose responsibility to enforce unpaid judgments in New York counties derives from CPLR §§ 5230–34).  JS ¶ 15.  Plaintiffs seek to enjoin these officials from enforcing the Act retroactively against them because doing so would violate federal law, namely the Takings Clause via 42 U.S.C. § 1983.  As a result, Plaintiffs cannot obtain monetary relief, and a prospective injunction governing Defendants' future conduct is the proper remedy.  The Court correctly reached this conclusion when issuing the initial preliminary injunction in this case.  *See* Op. & Order Granting Prelim. Inj. ("PI Order") 30 (ECF 57) ("It is settled law that a plaintiff suing a state official in his or her official capacity under Section 1983, such as Plaintiffs here, may be entitled to injunctive relief—but not money damages.").

### B.    The Remaining Factors Demand Permanent Injunctive Relief.

131.    On the remaining injunction factors, courts weigh whether a permanent injunction is warranted given "the balance of hardships between the plaintiff and defendant" whether "the public interest would not be disserved by a permanent injunction."  *Citigroup Glob. Mkts.*, 752 F.3d at 296 (2d Cir. 2014) (citation omitted).

132.    In contrast with Plaintiffs' irreparable constitutional injury absent injunctive relief, a permanent injunction would not harm Defendants at all.  A permanent injunction would maintain the status quo that has been in place since the Court issued a modified preliminary injunction on

September 15, 2023 (ECF 139). The scope of the modified preliminary injunction is clear, and neither the State Defendant nor the Sheriff Defendants would experience any adverse impact if the law in place simply remains the same.

133. In fact, the Sheriff Defendants' greatest burden would arise if the preliminary injunction is *lifted*, as they would then be forced to serve up to 327 amended income executions when Plaintiffs initiate such executions on each of their outstanding judgments. PX-104. That total does not include any second-stage service, during which the Sheriff Defendants would have to attempt service on debtors' employers if original service on the debtor is unsuccessful. JS ¶ 23. Tellingly, at the preliminary injunction hearing on April 21, 2022, counsel for the Sheriff Defendants told the Court that "I would not refuse the injunction. You are correct, that the injunction doesn't necessarily harm us . . . to the extent there is an injunction, we're probably the party that walks away the happiest, assuming that we're not eventually liable for millions of dollars in legal fees." Tr. 40:13–21 (ECF 49); *see* PI Order 34 (citing same).

134. Finally, the public interest would not be disserved by a permanent injunction. As discussed *supra*, the Act's retroactive application, which is unconstitutional as-applied to Plaintiffs, benefits a specific group of private debtors who have not repaid borrowed money—not the common good. Of course, "[f]or those specific individuals, the Act confers a clear windfall and rewards their delay" in paying their debts, *see* MTD Op. 27, but the public at large is not served if Plaintiffs' accrued post-judgment interest is slashed on their 327 collective outstanding judgments. For any consumer debtor against whom judgment was entered after the Act's effective date in favor of the Plaintiffs and for any debtor whose payment obligations arise from something other than consumer debt, a permanent injunction would have no effect.

135.    Moreover, even if the Act did benefit the public prospectively, the Act, "when applied *retroactively*, does not confer a benefit on the public, but rather benefits solely those debtors (within a limited category of cases) who have delayed paying judgments rightfully obtained." MTD Op. 27. The Court's reasoning was correct both at the motion to dismiss stage and earlier in the PI Order, when the Court comprehensively explained the issue:

> To be sure, it is a legitimate legislative prerogative to adjust the interest rate applicable to judgments in the state of New York. However, to do so *retroactively*, with respect to interest which has already vested under existing law, raises serious Constitutional concerns. Because the Court concludes that the retroactive application of the Amendment constitutes a taking, the public interest prong tips in favor of the Plaintiffs. "The Second Circuit has concluded that, where a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor." *Sajous v. Decker*, 2018 WL 2357266, at *13 (S.D.N.Y. May 2018) (citing *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984)). Indeed, "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Isr.*, 983 F.3d at 637 (applying public interest factor). For example, the Legislature's claimed goal of alleviating consumer debt is achieved by the *prospective* portion of the Amendment—which the Plaintiffs do not challenge.

PI Order 33–34 (emphasis in original).

## CONCLUSION

Plaintiffs respectfully submit that judgment should be entered in accordance with the preceding Proposed Findings of Fact and Conclusions of Law. Further, on their Section 1983 claim and pursuant to 42 U.S.C. § 1988, Plaintiffs respectfully request an award of reasonable attorney fees and costs, as well as any additional relief that the Court deems just and proper.

Dated: May 9, 2025                                    Respectfully submitted,
      New York, New York

                                             */s/ Kan M. Nawaday*
                                             Kan M. Nawaday

Mitchell Y. Mirviss (admitted *pro hac vice*)                    Emily Seiderman West
Elizabeth C. Rinehart (admitted *pro hac vice*)

39

VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
Tel: 410.244.7400
Fax: 410.244.7742
MYMirviss@Venable.com
LCRinehart@venable.com

VENABLE LLP
151 West 42nd Street
New York, NY 10036
Tel: 212.307.5500
Fax: 212.307.5598
KMNawaday@Venable.com
EAWest@Venable.com

*Counsel for Plaintiffs Greater Chautauqua Federal Credit Union, et al.*