USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/26/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GREATER CHAUTAUQUA FEDERAL
CREDIT UNION, *individually and on behalf
of all others similarly situated*, BOULEVARD
FEDERAL CREDIT UNION, *individually
and on behalf of all others similarly situated*,
GREATER NIAGARA FEDERAL CREDIT
UNION, *individually and on behalf of all
others similarly situated*,

                Plaintiffs,

        -against-

SHERIFF JAMES B. QUATTRONE, *in his
official capacity as Sheriff of Chautauqua
County, New York*, SHERIFF JOHN C.
GARCIA, *in his official capacity as Sheriff of
Erie County, New York*, SHERIFF MICHAEL
J. FILICETTI, *in his official capacity as
Sheriff of Niagara County, New York*, and
LETITIA JAMES, *in her official capacity as
Attorney General of the State of New York*,

                Defendants.

1:22-cv-02753 (MKV)

**AMENDED FINDINGS
OF FACT AND
CONCLUSIONS OF LAW
GRANTING JUDGMENT
FOR DEFENDANTS
AFTER BENCH TRIAL**

MARY KAY VYSKOCIL, United States District Judge:

       Plaintiffs Greater Chautauqua Federal Credit Union ("Greater Chautauqua"), Boulevard

Federal Credit Union ("Boulevard"), and Greater Niagara Federal Credit Union ("Greater

Niagara"), (collectively, "Plaintiffs"), bring this action asserting that the retroactive application of

the Fair Consumer Judgment Interest Act, N.Y. Leg. 2021-2022 Reg. Sess., S.5724A § 1, A6474A

(the "Act"), which reduced the default statutory post-judgment interest rate on state-court

judgments involving consumer debts from nine percent to two percent, is unconstitutional. [ECF

No. 47, Amended Complaint ¶¶ 43–44]. Plaintiffs bring this action against Attorney General

Letitia James, (the "Attorney General") and James B. Quattrone (the Sheriff of Chautauqua

1

County), John C. Garcia (the Sheriff of Erie County), and Michael J. Filicetti (the Sheriff of Niagara County) (the "Sheriff Defendants"), (collectively, "Defendants").[1]

As refined during the case, *see* MTD Op. at *16 n. 18; *see also* ECF No. 236, Plaintiffs allege an *as-applied* regulatory taking claim. Plaintiffs seek: (1) a declaration that the Act is unconstitutional as-applied to them; (2) a permanent injunction enjoining Defendants from enforcing the Act against them with respect to judgments entered before the Act's effective date; and (3) an award of reasonable attorney fees, costs, and expenses. *See* ECF No. 236.

## LEGAL STANDARD

Federal Rule of Civil Procedure 52(a) provides, in relevant part, that a court conducting a bench trial "must find the facts specifically and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1); *see also Pinovi v. FDD Enterprises, Inc.*, No. 13-CV-2800, 2015 WL 4126872, at *1 (S.D.N.Y. July 8, 2015). In a bench trial the Court acts as the finder of fact and therefore "is entitled to make credibility findings about the witnesses and testimony and to draw reasonable inferences from the evidence presented" in reaching its factual findings. *CH Acquisitions 2, LLC v. Aquila Aviation L.P.*, No. 16-CV-2030 (RJS), 2018 WL 2081860, at *1 (S.D.N.Y. Mar. 30, 2018); *see also Rana v. Bismillah Gyro, Inc.*, No. 15-CV-5104, 2017 WL 1390666, at *2 (E.D.N.Y. Apr. 17, 2017) ("Part of the role of the trial court in creating a finding of fact is determining how much weight to afford any given witness's testimony and whether or not witnesses are credible.") (citing *Krist v. Kolombos Rest., Inc.*, 688 F.3d 89, 95 (2d Cir. 2012)).

---

[1] Judge Marks resigned as Chief Administrative Judge in November 2022. The Court dismissed the claims against Judge Marks in an Opinion dated March 31, 2023. [ECF No. 102]. At the request of the Attorney General, [ECF No. 108], the Court directed the Clerk of Court to remove Judge Marks's name and title from the caption following his dismissal from the case, [ECF No. 109], which was completed.

## PROCEDURAL HISTORY

Familiarity with the extensive procedural history of this case, including this Court's previous opinions and orders, is presumed. *See Greater Chautauqua Fed. Credit Union v. Marks*, 600 F. Supp. 3d 405 (S.D.N.Y. 2022) (the Preliminary Injunction Opinion, "PI Op.," [ECF No. 57]); *Greater Chautauqua Fed. Credit Union v. Marks*, No. 22-CV-2753, 2023 WL 2744499 (S.D.N.Y. Mar. 31, 2023) (the Motion to Dismiss Opinion, "MTD Op.," [ECF No. 102]); *Greater Chautauqua Fed. Credit Union v. Quattrone*, No. 22-CV-2753, 2023 WL 6037949 (S.D.N.Y. Sept. 15, 2023) (the Modified Preliminary Injunction Opinion, "MPI Op.," [ECF No. 139]); *Greater Chautauqua Fed. Credit Union v. Quattrone*, No. 1:22-CV-2753, 2025 WL 869729 (S.D.N.Y. Mar. 20, 2025) (the Class Certification Opinion, "Class Cert. Op.," [ECF No. 204]); *Greater Chautauqua Fed. Credit Union v. Quattrone*, No. 1:22-CV-2753, 2025 WL 896047 (S.D.N.Y. Mar. 24, 2025) (the Summary Judgment Opinion, "SJ Op.," [ECF No. 205]).

In advance of the bench trial in this matter, the parties submitted direct testimony of their witnesses by affidavit or declaration and a brief description of who they are in accordance with the Individual Rules of Practice in Civil Cases of this Court. Each party also submitted various pre-trial motions [ECF Nos. 207, 213, 215], pre-trial memorandums of law [ECF Nos. 234, 241, 242, 243], and proposed findings of fact and conclusions of law. [ECF Nos. 235, 237]. The Court held a final pre-trial conference at which time the Court resolved all the parties' pre-trial motions. [ECF No. 276, ("Pre-trial Conf. Tr.")]. The Court held a three-day bench trial, during which witnesses who provided direct testimony were cross examined and the parties offered documentary exhibits. *See* [ECF Nos. 270, 272, 274, ("Trial Tr.")]. Thereafter, the parties submitted post-trial memoranda [ECF Nos. 278, 280, 281] and proposed findings of law and conclusions of law. [ECF Nos. 279, 282, 283].

Having presided over a bench trial in this action, the Court now issues the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a). For the reasons set forth below, the Court finds that Plaintiffs have failed to meet their burden of proof with respect to their asserted regulatory takings claim. Accordingly, the Court directs entry of judgment for Defendants.

## FINDINGS OF FACT[2]

### I.    The Act

In June 2021, the New York State Legislature passed the Act, which Governor Hochul signed into law on December 31, 2021, creating an effective date of April 30, 2022. Joint Stip. ¶ 1. The Act reduces the default post-judgment interest rate applicable to state-court judgments arising from consumer debts from nine percent to two percent annually. Joint Stip. ¶ 1. The Act amends New York Civil Practice Law & Rules Section 5004. Joint Stip. ¶ 2. Under New York law, "[e]very money judgment shall bear interest from the date of its entry. Every order directing the payment of money which has been docketed as a judgment shall bear interest from the date of such docketing." Joint Stip. ¶ 3. From 1981 until April 29, 2022, Section 5004 of the New York Civil Practice Law & Rules provided that "[i]nterest shall be at the rate of nine per centum per annum, except where otherwise provided by statute." Joint Stip. ¶ 4.

The Act adds a definition of "consumer debt" to Section 5004 and lowers the interest rate on judgments arising from consumer debt from nine percent to two percent annually. Joint Stip. ¶ 5. The Act defines "consumer debt" as "any obligation or alleged obligation of any natural person to pay money arising out of a transaction in which the money, property, insurance or services

---

[2] The Court's factual findings are taken from the Joint Statement of Stipulated Facts and Law [ECF No. 236–1, ("Joint Stip.")], the Supplemental Joint Statement of Stipulated Facts and Law [ECF No. 254, ("Supp. Joint Stip.")], the trial transcript, witness affidavits, Plaintiffs' exhibits ("PX"), Defendants' exhibits ("DX"), and the parties' deposition designations. To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

which are the subject of the transaction are primarily for personal, family or household purposes, whether or not such obligation has been reduced to judgment, including, but not limited to, a consumer credit transaction, as defined in [CPLR § 105(f)]." Joint Stip. ¶ 6. The Act applies the two percent interest rate (1) to consumer debt judgments entered on or after its effective date, and (2) "for interest upon" such judgments "from the date of the entry of judgment on any part of a judgment entered before" the Act's effective date "that is unpaid as of such effective date." Joint Stip. ¶ 7 (quoting N.Y. C.P.L.R. § 5004(a)). The Act is in effect statewide on judgments entered prior to April 30, 2022, except as applied to the three Plaintiffs pursuant to the modified preliminary injunction entered by this Court on September 15, 2023. Joint Stip. ¶ 7 (citing ECF Nos. 57, 61, 139).

## II.    The Parties

Plaintiffs are New York-based federal credit unions. Joint. Stip. ¶ 8. Credit unions, including Plaintiffs, are not-for-profit financial cooperatives and are owned by their members. Joint Stip. ¶ 9. Plaintiffs currently hold consumer debt judgments arising from loans that were reduced to judgment either on the merits or by default. Joint Stip. ¶ 12. The Sheriff Defendants are the enforcement officers responsible for enforcing unpaid judgments. Joint Stip. ¶ 15. The Attorney General is the chief law enforcement officer of the State of New York. Joint Stip. ¶ 16.

## III.    The Judgment Execution Process

When a judgment holder is awarded a money judgment, the judgment holder prepares a draft of the judgment for the court clerk to sign and enter. Joint Stip. ¶ 17. Any time before a judgment is satisfied, an income execution may be issued. Joint Stip. ¶ 18. The income execution specifies the amount due on the judgment including the post-judgment interest. Joint Stip. ¶ 19. The enforcement officers for income executions are responsible, under CPLR §§ 5230-5231, for ensuring that judgment executions are served on debtors, that the interest on judgments is

calculated in accordance with the legal rate, that payments are applied to outstanding balances, and that payments are remitted to judgment creditors.  Joint Stip. ¶ 20; Supp. Joint Stip. ¶¶ 3–4.

Consumer debt judgment creditors or their attorneys, pay a fee to enforcement officers to initiate income executions and to amend income executions.  Joint Stip. ¶¶ 21–22.  That fee to initiate income executions covers "first-stage" service, during which the enforcement officers attempt to serve debtors with the amended income executions, and if the debtor does not pay within 20 days, consumer debt judgment creditors or their attorneys may also pay fees for "second-stage" service, during which the enforcement officers attempt to send a garnishment to the debtor's employer.  Joint Stip. ¶ 23.  For those amended income executions that Greater Chautauqua or its attorney(s) have issued, Greater Chautauqua has typically paid, up front, within a range of $65–$71.25, per amended execution, and any future amended executions issued by Greater Chautauqua would be subject to the same up-front fees and costs.  Supp. Joint Stip. ¶ 8; *see also* Trial Tr. 75:9–20.  For those amended income executions that Boulevard or its attorney(s) have issued, Boulevard has typically paid, up front, $49 per amended execution, and any future amended executions issued by Boulevard would be subject to the same up-front fees and costs.  Supp. Joint Stip. ¶ 9; *see also* Trial Tr. 121:6–23, 124:16–125:7.  For those amended income executions that Greater Niagara or its attorney(s) have issued, Greater Niagara has typically paid, up front, $49 per amended execution, and any future amended executions issued by Greater Niagara would be subject to the same up-front fees and costs.  Supp. Joint Stip. ¶ 10; Trial Tr. 188:7–21.

When the consumer debt holder makes a payment, the debtor's payments are first attributed to the fees paid by the judgment creditor for the income execution fee(s) paid to enforcement officers.  Joint Stip. ¶ 24; Supp. Joint Stip. ¶ 7.  Once those fees are paid-off, any further payments made by the debtor are subsequently attributed to interest and then principal.  Joint Stip. ¶ 24; Supp. Joint Stip. ¶ 7.  The Sheriffs collect the payments and deliver them to the judgment creditors

after subtracting applicable lawful fees and expenses. Joint Stip. ¶ 26.  The Act provides that, "if the applicable interest rate changes pursuant to [CPLR § 5004] while an execution is ongoing, the judgment creditor shall issue an amended execution within sixty days of the effective date of [the Act]." Joint Stip. ¶ 28; Supp. Joint Stip. ¶ 6.

## IV.    The Plaintiffs' Loan Collection Process

Plaintiffs generate revenue through, among other things, interest on loans provided to members.  Joint Stip. ¶ 29.  Plaintiffs extend credit, including home mortgage loans, automobile loans, and credit cards, to individuals.  Joint Stip. ¶ 30.  When consumers fall behind on their loan payments, Plaintiffs attempt to collect the amounts owed through a "progressive" series of internal steps before pursuing civil litigation.  Joint Stip. ¶¶ 31–34.  When a delinquency cannot be resolved, Plaintiffs may refer the delinquent loan to William Ilecki, Esq., and his law firm for collection and potential legal action.  Joint Stip. ¶¶ 35, 38.  Plaintiffs may refer smaller delinquent loans to a collection agency.  Joint Stip. ¶ 37.  Specifically, Greater Chautauqua's usual practice is to refer delinquent loans of approximately $1,000 or more to Mr. Ilecki.  Trial Tr. 35:23–25– 36:1.  Similarly, Greater Niagara's general standard is to refer delinquent loans greater than $5,000 to Mr. Ilecki once all internal avenues of collection have been explored.  *See* Trial Tr. 161:15–25. Boulevard follows internal guidelines to determine whether to offer its members a loan modification or to charge-off the loan and refer the loan to Mr. Ilecki, but Boulevard does not contemplate the cost of referring the loan, the likelihood of obtaining the judgment or the likelihood of obtaining post-judgment interest.  Trial Tr. 109:11–18, 111:2–10.  Additionally, if Boulevard did decide to offer its member a loan modification and the loan remained delinquent for a period of six months, then the loan is sent to either a collections agent or to Mr. Ilecki.  Trial Tr. 109:19–22.

The "Delinquency Control & Collections Procedures" of Greater Chautauqua outline the procedures for its collection process, and it does not mention the statutorily-set post-judgment interest rate nor does it contemplate the cost of initiating civil litigation in deciding whether to refer delinquent loans to Mr. Ilecki. *See* PX–22. Additionally, according to the corporate representative for Greater Chautauqua, Greater Chautauqua had never done a cost-benefit analysis on whether it is "worth it" to refer a loan to Mr. Ilecki for enforcement. Trial. Tr. 73:5–8. Similarly, the internal guidelines of Boulevard for determining whether to offer a loan modification and whether to charge-off a loan, which both happen prior to initiating civil litigation, do not mention the potential cost of referring the loan to Mr. Ilecki, the likelihood of obtaining a judgment, or the likelihood of obtaining post-judgment interest. *See* Trial Tr. 109:11–18, 111:2–10; PX–47. The policy statement of Greater Niagara with respect to the collection process does not mention post-judgment interest rate, nor does it contemplate the cost of initiating civil litigation. *See* PX–3.

If Mr. Ilecki obtains a judgment on a loan referred to him by Plaintiffs, he retains as a legal fee 25% of any payments made towards the judgment principal and interest. Joint Stip. ¶ 39. Regardless of whether Mr. Ilecki successfully collects on judgments, Plaintiffs incur some collection costs, including reimbursements to Mr. Ilecki for expenses when attempting to collect (*e.g.*, court costs, filing fees, and service of process). Joint Stip. ¶ 40; *see also* PX–6; PX–65; PX–66; PX–67; Trial Tr. 71:8-21; Haaksma ¶ 27, Zasucha Aff ¶¶ 24, 25; Heim Aff ¶ 26. Plaintiffs are responsible for paying these costs "[r]egardless of whether Mr. Ilecki successfully collects on judgments." Joint Stip. ¶ 40; Haaksma Aff. ¶¶ 29, 41; Zasucha Aff. ¶¶ 27, 39; Heim Aff. ¶ 26. Greater Niagara paid over $53,000 between 2007 and 2021 in disbursements related to pending consumer debt judgments, *see* Zasucha Aff ¶ 40 (citing PX–67), Great Chautauqua had paid over $111,000 between 2005 and 2021 in disbursements associated with consumer debt judgments, *see*

8

Haaksma Aff. ¶ 42 (citing PX–66), and Boulevard paid over $50,900 between 2003 and 2021 in disbursements associated with pending consumer debt judgments.  *See* Heim Aff. ¶ 43 (citing PX–65).

## V.    The Economic Impact of The Act on Plaintiffs

Judgment holders do not have use of their judgment money until it is paid by the debtor. Joint Stip. ¶ 41.  In recognition of this fact, states, including New York, allow post-judgment interest to accrue until the judgment is fully paid.  Joint Stip. ¶ 42.  For Plaintiffs, post-judgment interest is a source of revenue.  Joint Stip. ¶ 43.

 As of March 31, 2022, approximately one month before the Act's effective date, Plaintiffs were each owed accrued and unpaid post-judgment interest on consumer debt judgments. Specifically, as of March 31, 2022, Greater Chautauqua was owed $394,198.84 in unpaid post-judgment interest, Greater Niagara was owed $363,074.74 in unpaid post-judgment interest, and Boulevard was owed $531,570.80 in unpaid post-judgment interest.  Joint Stip. ¶¶ 44, 50, 56; PX-102.  The parties stipulated that as of April 8, 2025, Greater Chautauqua was owed $357,564.68, Greater Niagara was owed $215,653.49, and Boulevard was owed $432,780.01 in post-judgment interest.  Joint. Stip. ¶¶ 48, 54, 60.  The amount of post-judgment interest owed to Plaintiffs has decreased because some of the judgments that were pending have been satisfied.  *See* ECF No. 285 ¶ 52 (citing PX-93–95, PX-104) ("some of the judgments that were pending as of March 2022 have been satisfied.").  Additionally, Plaintiffs' concede, in their post-trial filings, that the April 8, 2025 estimates utilized at trial were all slightly inflate.  *See* ECF No. 283 ¶¶ 53–55.  Plaintiffs now assert that as of April 8, 2025, Greater Chautauqua was owed approximately $321,070.19; Greater

Niagara was owed $215,000.29; and Boulevard was owed $419,717.53 in post-judgment interest. ECF No. 283 ¶¶ 53–55.

Furthermore, while the aforementioned amounts represent the total estimated post-judgment interest owed to Plaintiffs, which accrued at nine percent prior to the Act's effective date, Plaintiffs conceded at trial that while they hope to recover all of this post-judgment interest it is often unrealistic to expect to collect all of the post-judgment interest that they are owed.  *See* Trial Tr. 39:2–7, 40:7–12 (Haaksma, the representative for Greater Chautauqua, confirmed that at her deposition she testified that with respect to collecting post-judgment interest it is "[s]ometimes [] a little bit of a prayer and hope, but it is obviously our goal and objective to recoup the funds"); 127:9–21, 128:15–129:2 (Heim, the representative for Boulevard, testified that Boulevard "hope[s] to recover as much of it as we can," but admitted it has never recovered every penny of post-judgment interest); 169:3–10, 177:2–15 (Zasucha, the corporate representative for Greater Niagara, testified  that that is "probably not" realistic to expect that Greater Niagara will recovered all of the accrued unpaid post-judgment interest as of April 2025).

**VI.    Plaintiffs' Expectations**

Plaintiffs did not expect that the judgment interest rate would be reduced and assumed that it would continue at the same rate because the nine percent interest rate had been in place for over 40 years.  *See* Zasucha Aff. ¶ 35 ("Neither I nor Greater Niagara ever expected that the judgment interest rate would be reduced and reduced retroactively.  The judgment interest rate of 9% had been in place for over 40 years"); Heim Aff. ¶ 38 ("Neither I nor Boulevard ever expected that the judgment interest rate would be reduced and reduced retroactively.  The judgment interest rate of 9% had been in place for over 40 years."); Haaksma ¶ 37 ("Neither I nor Greater Chautauqua ever

expected that the judgment interest rate would be reduced and reduced retroactively.  The judgment interest of 9% had been in place for over 40 years").

Greater Chautauqua, Greater Niagara, and Boulevard did not refer to the post-judgment statutory interest rate in any business plans or strategic planning documents.  *See* Trial Tr. 66:21–24; 188:4–6; 114:20–116:22.  Neither Haaksma, Zasucha, nor Heim ever discussed the statutorily-set nine percent post-judgment interest rate with their credit unions' board of directors prior to 2022.  *See* Trial Tr. 65:12–17; 187:25–118:3.  Furthermore, neither Greater Niagara nor Boulevard based any financial projections or estimates on the continuation of the nine-percent post-judgment interest rate.  *See* Trial Tr. 187:19–24; 114:20–116:22.  The various manuals, policies and procedure that outline lending criteria for Greater Chautauqua, Greater Niagara, and Boulevard do not refer to the statutory post-judgment interest rate as a factor that the credit unions consider when evaluating risk and determining whether to approve or deny a loan application.  *See, e.g.,* Trial Tr. 20:16–23, 21:16–23, 17:11–15; PX–48; Trial Tr. 151:15–16, 152:2–8, 155:10–12; Trial Tr. 104:17–19, 105:14–17; PX–46.

## CONCLUSIONS OF LAW

The Fifth Amendment, applicable to the states through the Fourteenth Amendment, *see Chicago, B. & Q. R. Co. v. Chicago,* 166 U.S. 226, 238–39 (1897), provides in part, "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend. V.  The Supreme Court has recognized two types of takings—physical and regulatory.  *See Buffalo Teachers Federation v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006) (collecting cases).

A physical taking "occur[s] when the government physically takes possession of an interest in property for some public purpose."  *Id.* (citation omitted); *see also Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321 (2002) ("Its plain language requires the payment of compensation whenever the government acquires private property for a public purpose,

11

whether the acquisition is the result of a condemnation proceeding or a physical appropriation."). A regulatory taking occurs when, instead of taking physical possession, "the government acts in a regulatory capacity" to affect the use or value of the impacted property. *Buffalo Teachers Fed'n*, 464 F.3d at 374; *see also Lewis v. City of New York*, 762 F. Supp. 3d 290, 304 (S.D.N.Y. 2025) (quoting *Elmsford Apartment Associates, LLC v. Cuomo*, 469 F. Supp. 3d 148, 162–63 (S.D.N.Y. 2020)) ("By contrast, '[g]overnment action that does not entail a physical occupation, but merely affects the use and value of private property" is considered under the framework of regulatory takings."). "A regulatory taking can be either categorical or non-categorical. *See Elmsford Apartment Associates, LLC*, 469 F. Supp. 3d at 162–63 (citing *Huntleigh USA Corp. v. United States,* 525 F.3d 1370, 1378 n. 2 (Fed. Cir. 2008)).

A categorical regulatory taking occurs in "the extraordinary circumstance when no productive or economically beneficial use of land is permitted." *Tahoe–Sierra Pres. Council, Inc.*, 535 U.S. at 330 (emphasis in original). A non-categorical regulatory taking, like the claim alleged here, involves "[a]nything less than a complete elimination of value, or a total loss." *Elmsford Apartment Associates, LLC*, 469 F. Supp. 3d at 165. Non-categorical regulatory taking claims are evaluated pursuant to the test set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). *See Tahoe–Sierra Pres. Council*, 535 U.S. at 321. The *Penn Central* analysis involves evaluating a set of "complex [] factors including [1] the regulation's economic effect on the [property owner], [2] the extent to which the regulation interferes with reasonable investment-backed expectations, and [3] the character of the government action." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (citing *Penn Central*, 438 U.S. at 124). In addition to the three particularly significant factors outlines above, a court should also examine and weigh "all the relevant circumstances." *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 322.

The weighing of these factors aims to "identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). There is no "mathematically precise" formula to employ when weighing these factors. *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 326 n.23. And "[p]laintiffs bear a 'heavy burden' to establish this type of taking." *Remauro v. Adams*, No. 21-CV-4553, 2022 WL 1525482, at *6 (E.D.N.Y. May 13, 2022) (quoting *Buffalo Teachers Fed'n*, 464 F.3d at 375); *see also Meriden Tr. & Safe Deposit Co. v. F.D.I.C.*, 62 F.3d 449, 455 (2d Cir. 1995) (describing the burden placed upon a party asserting a regulatory taking as "heavy").

## I. First *Penn Central* Factor: Economic Impact of the Act on the Value of Plaintiffs' Property[3]

"[O]ur test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987). Plaintiffs argue that in comparing the value that has been taken from the property with the value that remains, the Court should find that before the Act took effect, Plaintiffs' post-judgment interest accrued at nine percent and if the Act applies retroactively to Plaintiffs, that same property will reduce as if it had accrued at only two percent. Plaintiffs contend that this amounts to a 77.77% decrease in the value of Plaintiff's accrued post-judgment

---

[3] As a threshold matter, at the motion to dismiss stage, the Court concluded that Plaintiffs have a constitutionally protected property interest in the post-judgment interest that has accrued but that has not yet been collected. *See* MTD Op. at *10 ("Plaintiffs' property right in the accrued (but uncollected) post-judgment interest thus exists to the same degree as their right in the underlying judgment."). Defendants attempt to re-litigate this issue now and re-assert that Plaintiffs do not have a constitutionally protected property interest at issue. *See, e.g.,* ECF No. 282 ¶ 4 ("Plaintiffs' claim fails because they have not established that they have a vested property interest in accrued, but uncollected, post-judgment interest."), ECF No. 270 ¶¶ 73, 74. The law of the case doctrine "counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Jackson v. New York State*, 523 F. App'x. 67, 69 (2d Cir. 2013) (summary order). The Court finds no reason here to revisit this prior decision and concludes, as it has previously, that Plaintiffs have a property right in the post-judgment interest that has accrued but that has not yet been collected.

interest because the Act will retroactively reduce the already accrued, but uncollected, post-judgment interest owed to Plaintiffs by seven-ninths.  *See, e.g.,* ECF No. 280 at 21.  Defendants principally argue that this 77.77% figure proposed by Plaintiffs does not accurately depict the reality of the economic impact on Plaintiffs because it does not consider the reality that Plaintiffs have "no realistic prospect of recovering all of the accrued post-judgment interest" that they are owed and that the reduction is negligible compared to their total assets.  ECF No. 234 at 15; *see also* ECF No. 281 at 4–15.

As the Court explained at the motion to dismiss stage, it is well settled that "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993). Thus, the first factor under *Penn Central* generally weighs against finding a taking unless the property owner demonstrates that the regulation challenged "effectively prevented [the plaintiff] from making *any economic use of his property*."  *Sherman v. Town of Chester*, 752 F.3d 554, 565 (2d Cir. 2014) (emphasis added).  Here, even accepting Plaintiffs' 77.77% reduction in accrued but uncollected post-judgment interest as the proper valuation of economic impact on Plaintiffs' property, the evidence adduced at trial shows that "[w]hile the restrictions undoubtedly had a negative economic impact on Plaintiffs' businesses," *Everest Foods Inc. v. Cuomo*, 585 F. Supp. 3d 425, 444 (S.D.N.Y. 2022), the regulation is a "mere diminution in the value of the property" and is insufficient to find that this factor weighs in favor of a taking.  *Concrete Pipe & Prods.*, 508 U.S. at 645 (explaining that the Court need not even resolve the parties' dispute with respect to the proper numerator and denominator for the value calculation because even assuming Plaintiff's

higher valuation was correct a mere reduction in the value of property "however serious, is insufficient to demonstrate a taking").[4]

This conclusion is further supported by the numerous cases that have concluded similar, and even greater, reductions in property value did not weigh in favor of finding a regulatory taking. *See*, *e.g.*, *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 384 (1926) (approximately 75% diminution in value); *Hadacheck v. Sebastian,* 239 U.S. 394, 405 (1915) (92.5% diminution); *Park Ave. Tower Assocs. v. City of New York,* 746 F.2d 135, 139-40 (2d Cir. 1984) (collecting cases rejecting taking claims where property value diminished from 75 to 90%); *Bldg. & Realty Inst. of Westchester & Putnam Ctys., Inc. v. New York,* No. 19-CV-11285, 2021 WL 4198332, at *23 (S.D.N.Y. Sept. 14, 2021), *aff'd*, No. 21-2448, 2024 WL 1061142 (2d Cir. Mar. 12, 2024) (collecting cases that declined to find a regulatory taking with reductions in property value of 75%, 92.5%, 83%, 81%, 92%, 95%). This factor weighs against finding that the Act amounts to a regulatory taking because even assuming Plaintiffs' valuation is correct, the reduction caused by the Act only amounts to a diminution in the value of Plaintiffs' property.

## II.    Second *Penn Central* Factor: The Extent to Which the Act Interferes with Plaintiffs' Reasonable Investment-Backed Expectations

The second *Penn Central* factor evaluates the extent to which the regulation interferes with Plaintiffs' reasonable investment-backed expectations. *See Palazzolo*, 533 U.S. at 617. "The purpose of the investment-backed expectation requirement is to limit recovery to owners who

---

[4] Furthermore, the Court easily reached this conclusion without even factoring in the fact that Plaintiffs conceded at trial that while they hope to recoup all of the post-judgment interest that they are owed it is not realistic that they will be able to recover it all. *See* Trial Tr. 39:2–7, 40:7–12 (Greater Chautauqua described collection efforts as "[s]ometimes [] a little bit of a prayer and hope"); 127:9–21, 128:15–129:2 (Boulevard "hope[s] to recover as much of it as we can," but conceded that it has never recovered every penny of post-judgment interest); 169:3–10, 177:2–15 (Greater Niagara testified that it is "probably not" realistic to expect to recover all of the accrued unpaid post-judgment interest).

could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996). "[T]he critical time for considering investment-backed expectations is the time a property is acquired, not the time the challenged regulation is enacted." *Meriden Tr. & Safe Deposit Co.*, 62 F.3d at 454. "[T]he reasonableness of these expectations will of course vary based on the state of the law when the property was purchased, among other things." *Cmty. Hous. Improvement Program v. City of New York*, 492 F. Supp. 3d 33, 46–47 (E.D.N.Y. 2020), *aff'd*, 59 F.4th 540 (2d Cir. 2023), and *aff'd sub nom. 74 Pinehurst LLC v. New York*, 59 F.4th 557 (2d Cir. 2023).

As an initial matter, the Court finds that Plaintiffs' expectation that their accrued, but uncollected post-judgment interest would not be retroactively reduced was reasonable. All three of the corporate representatives for Plaintiffs attested that they did not expect that the judgment interest rate would be reduced, let alone reduced retroactively, because the nine percent rate had been in place for over 40 years. *See* Zasucha Aff. ¶ 35 ("Neither I nor Greater Niagara ever expected that the judgment interest rate would be reduced and reduced retroactively. The judgment interest rate of 9% had been in place for over 40 years"); Trial Tr. 187:13–24; Heim Aff. ¶ 38 ("Neither I nor Boulevard ever expected that the judgment interest rate would be reduced and reduced retroactively. The judgment interest rate of 9% had been in place for over 40 years."); Haaksma Aff. ¶ 37 ("Neither I nor Greater Chautauqua ever expected that the judgment interest rate would be reduced and reduced retroactively. The judgment interest rate of 9% had been in place for over 40 years."); *see also* Zywicki Aff. ¶ 38 ("it was reasonable for Plaintiffs to expect the interest rate to remain in place because a law that had not changed in over 40 years was a stable part of the lending environment"). Here, the statutory interest rate applicable to Plaintiffs' post-judgment interest had been set at nine percent since 1981. Joint Stip. ¶ 4. While legislative standards are subject to change at any time and thus may not always serve as a basis for a

reasonable expectation, *see, e.g., 74 Pinehurst LLC*, 59 F.4th at 568 (finding plaintiffs' expectations that rates would track in a certain way or would remain static "given the multiple past amendments" was unreasonable), here, the rate remained static since 1981 and the retroactive reduction was completely unforeseeable, making Plaintiffs' expectation reasonable. *See, e.g., Meriden Tr. & Safe Deposit Co.*, 62 F.3d at 454 ("a paradigmatic regulatory taking occurs when a change in the law results in the immediate impairment of property rights, leaving the property owner no options to avoid the loss"). Plaintiffs' expectation that the nine percent statutory interest rate would not be reduced, let alone reduced retroactively, was reasonable in light of the statutory interest rate being set at nine percent since 1981 with no intervening adjustments.

However, the Court is not convinced that Plaintiffs' reasonable expectation that the interest rate would not be reduced from nine percent was an investment-backed expectation. To survive the motion to dismiss, the Court concluded that Plaintiffs had *plausibly* alleged a regulatory taking under *Penn Central* because they had alleged various reasonable investment-backed expectations. MTD Op. at *13. In particular, Plaintiffs alleged that they had relied on the statutorily-set nine-percent interest to make decisions about loan criteria and acceptable credit risk and buffer the risk of lending money in the first place. *Id.* However, the evidence introduced at trial makes clear that Plaintiffs did not, in fact, rely on the statutorily-set nine percent interest rate in making decisions about loan criteria or acceptable credit risk.

The testimony of the representatives for Greater Chautauqua, Greater Niagara, Boulevard demonstrate that in general the nine percent statutory interest rate was not a part of the credit unions' overall business decision-making or strategic plans. For example, Haaksma, Zasucha, and Heim each testified that they have never referred to the nine percent statutory post-judgment interest rate in any business plans or strategic planning documents. *See* Trial Tr. 66:21–24, 188:4–6, 114:20–116:22. Haaksma, Zasucha, and Heim each further testified that prior to 2022 they

never discussed the nine percent post-judgment interest rate with their respective credit unions'
board of directors. *See* Trial Tr. 65:12–17, 187:25–118:3. Additionally, Zasucha and Heim both
testified that neither Greater Niagara nor Boulevard based any financial projections or estimates
on the continuation of the nine-percent rate. *See* Trial Tr. 187:19–24, 114:20–116:22.

Furthermore, the evidence presented at trial demonstrates that Plaintiffs did not make
decisions about loan criteria and risk based on the statutory interest rate. *See* Wilcox Decl. ¶ 83
("Neither the literature on post-judgment interest rates, nor Plaintiffs' internal documents, nor the
testimony of Plaintiffs' executives points to post-judgment interest rates as being an important
factor in consumer lending decisions."). For example, Haaksma testified that Greater Chautauqua
teaches its lending staff to reduce financial risks, but in that training Greater Chautauqua does not
instruct the staff to consider post-judgment interest in any way. Trial Tr. 66:25–67:20; *see also*
PX–48. Greater Chautauqua's manual and its adopted policies and procedures, which are created
specifically to help mitigate the risk of lending, do not refer to the statutory post-judgment interest
rate as a consideration when evaluating a loan application. *See* Trial Tr. 20:16–23, 21:16–23,
17:11–15; PX–48. Similarly, Greater Niagara utilizes a risk-based lending program, and its
lending criteria guidelines do not mention or refer to the statutory post-judgment interest rate. *See*
Trial Tr. 151:15–16, 152:2–8, 155:10–12; *see also* Wilcox Decl. ¶ 86 ("CEO of Greater Niagara
in fact testified that the only determinant of interest rates at her institution was credit score").
Likewise, Boulevard's lending policy, which outlines the risk-based assessment that its staff must
conduct when determining whether to extend a loan, does not consider risks related to the judgment
collection process or contemplate the statutory post-judgment interest as a factor to consider when
evaluating a loan application. *See* Trial Tr. 104:17–19, 105:14–17; PX–46; *see also* Wilcox Decl.
¶ 86 ("Neither the FDIC nor Plaintiffs' own underwriting policies mention the post-judgment
interest rate as a factor when deciding what consumer loan interest rates to offer, whether to make

loans, or how much credit to offer.")  The evidence demonstrates that Plaintiffs did not make decisions about loan criteria, acceptable credit risk, or buffer risk based on the statutorily-set nine percent post-judgment interest rate.

At the motion to dismiss stage, Plaintiffs also alleged that based on the expectation that the post-judgment interest would continue to accrue at the nine percent rate, Plaintiffs invested considerable expense and effort to obtain and enforce judgments.  MTD Op. at *13.  At trial Plaintiffs provided evidence that they did invest economic resources to recover on the delinquent loans which includes post-judgment interest.  *See* Joint Stip. ¶ 40 ("Plaintiffs incur collection costs, other than legal fees, including reimbursements to Mr. Ilecki for expenses when attempting to collect [on judgments] (e.g., court costs, filing fees, and service of process)."); Haaksma Aff. ¶ 39; Zasucha Aff. ¶ 41; Heim Aff. ¶ 44; *see also* PX–66 (Greater Chautauqua disbursement spreadsheet showing costs paid to collections attorney in Column G); PX–67 (Greater Niagara disbursement spreadsheet showing costs paid to collections attorney in Column G); PX–6 and PX–65 (Boulevard disbursement reports showing costs incurred by Boulevard for matters referred to its collections attorney).  These collection costs represent up-front expenses that Plaintiffs incur to pursue and enforce judgments, and these costs are incurred by Plaintiffs regardless of whether Mr. Ilecki successfully collects on the judgments.  *See* Joint Stip. ¶ 40; Trial Tr. 71:8–21; Haaksma Aff. ¶¶ 27, 29, 41; Zasucha Aff. ¶¶ 27, 39; Heim Aff. ¶¶ 24–26.  Specifically, Greater Niagara paid over $53,000 in disbursements between 2007 and 2021 related to pending consumer debt judgments.  *See* Zasucha Aff. ¶ 40; PX–67.  Greater Chautauqua had paid over $111,000 in disbursements between 2005 and 2021 associated with consumer debt judgments.  Haaksma Aff. ¶ 42; PX–66.

Boulevard paid over $50,900 in disbursements between 2003 and 2021 related to pending consumer debt judgments. Heim Aff. ¶ 43; PX–65.

While the corporate representatives for Plaintiffs all included an assertion in their direct testimony that Plaintiffs relied on the nine percent post-judgment interest rate in deciding to invest in collection efforts, *see* Haaksma Aff. ¶ 37 ("Greater Chautauqua reasonably relied on the judgment interest rate . . . in making its decisions on investing in collection efforts on consumer debt judgments."); Zasucha Aff. ¶ 35 ("Greater Niagara reasonably relied on the judgment interest rate . . . in making its decisions on investing in collection efforts on consumer debt judgments."); Heim Aff. ¶ 38 ("Boulevard reasonably relied on the judgment interest rate . . . in making its decisions on investing in collection efforts on consumer debt judgments."). It is striking that each witness used the identical language in their direct testimony. Moreover, the Court found that the testimony of Plaintiffs' representatives at trial lacked credibility at times and accordingly the Court affords this testimony less weight. *See Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012) ("And as trier of fact, the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness.") (internal citations and quotations omitted). For example, while on cross-examination Zasucha frequently evaded answering questions by instead answering questions that were not asked and had to be instructed by the Court to answer the question asked before finally providing a responsive answer. *See, e.g.,* Trial Tr. 169:3–10, 177:2–15. When Heim was asked on cross-examination questions about information contained in her direct testimony and she could not respond, and the Court questioned whether she wrote the affidavit from her own personal knowledge. Heim explained that she did not draft her affidavit, but instead "spoke it" and her attorneys then wrote the affidavit. *See* Trial Tr. 122:25–123:1–17. Although she testified that she reviewed it for accuracy, she also testified that she made zero changes to the draft she reviewed. *See* Trial Tr. 122:25–123:1–17. Overall, in observing the

demeanor and responses of Haaksma, Zasucha, and Heim at trial, and the fact that internal documents do not support the witnesses' assertions, the Court found that some portions of their testimony lack credibility. As such the Court affords less weight to their testimony that they relied on the nine percent post-judgment interest in making decisions about investing in collection efforts less weight.

Furthermore, Haaksma, the corporate representative for Greater Chautauqua, testified that it was Greater Chautauqua's usual practice to refer delinquent loans of approximately $1,000 or more to Mr. Ilecki, Trial Tr. 35:23–25–36:1, and that Greater Chautauqua had never done a cost-benefit analysis on whether it is "worth it" to refer a delinquent loan to Mr. Ilecki for enforcement. Trial. Tr. 73:5–8. Thus, the assertion in Haaksma's direct testimony that Greater Chautauqua relied on the statutory post-judgment interest rate in making decisions on whether to invest the in collection efforts rings hallow. Similarly, Zasucha, the corporate representative for Greater Niagara, testified on cross-examination that the standard practice of Greater Niagara is to refer delinquent loans greater than $5,000 to Mr. Ilecki for collection and possible litigation once all internal avenues of collection have been explored. *See* Trial Tr. 161:15–25. Heim, the corporate representative for Boulevard, testified that the guidelines Boulevard followed for determining whether to offer its members a loan modification or to charge-off the loan and refer the loan to Mr. Ilecki do not contemplate the cost of referring the loan, the likelihood of obtaining the judgment or the likelihood of obtaining post-judgment interest. Trial Tr. 109:11–18, 111:2–10. Additionally, if Boulevard decided to offer its member a loan modification the loan is sent to either a collections agent or to Mr. Ilecki once the loan remained delinquent for a period of six months. Trial Tr. 109:19–22. Therefore, the Court finds these numerical cut-offs and internal protocols which outline the procedures for the collections process, and do not mention the nine percent post-judgment interest rate, are the basis for Plaintiffs' decisions on whether to invest in collection

efforts or not. When considering all the evidence, Plaintiffs have failed to demonstrate that they had reasonable investment-backed expectations in the statutory post-judgment interest rate that were subsequently thwarted by the Act.

Plaintiffs' representatives further testified that if the post-judgment interest rate is two percent, as opposed to nine percent, Plaintiffs are much less likely to spend the time and money to secure and enforce a judgment. *See* Zasucha Aff. ¶ 49; Heim Aff. ¶ 51; Trial Tr. 94:1–16. However, "the critical time for considering investment-backed expectations is the time a property is acquired, not the time the challenged regulation is enacted." *Meriden Tr. & Safe Deposit Co.*, 62 F.3d at 454. Therefore, although Plaintiffs testify that now they are less likely to invest the time and money in securing and enforcing judgments, there is no evidence in the record to support that prior to this litigation they actually considered the nine percent post-judgment interest rate in making these investment decisions, and thus, there are not valid reasonable investment-backed expectations for purposes of the *Penn Central* analysis. *See, e.g., Community Housing Improvement Program v. City of New York*, 492 F. Supp. 3d 33 (E.D.N.Y. 2020) ("investment-backed expectations depends on when they invested in the property and *what they expected at that time*.") (emphasis added).

At the motion to dismiss stage, accepting as true Plaintiffs' allegations that they made choices about loan criteria and risk, buffered the risk of lending money, and decided to pursue and enforce judgments in reliance on the nine percent statutory interest rate, the Court found that Plaintiffs had plausibly stated a regulatory taking claim under *Penn Central*. However, as detailed above, at trial Plaintiffs had the "heavy burden" of demonstrating theses reasonable investment-backed expectations and they have failed to do so. *See Buffalo Teachers Fed'n*, 464 F.3d at 375 (describing the burden of establishing this type of regulatory taking as a "heavy" one); *see Aghaeepour v. N. Leasing Sys., Inc.*, 763 F. Supp. 3d 580, 589 (S.D.N.Y. 2025) ("It is a basic

principle in our system of law that the person who brings a claim in a dispute bears the burden of proof."). Thus, the second *Penn Central* factor weighs heavily against finding a regulatory taking.

## III.    Third Penn Central Factor: The Character of the Government Action

The third *Penn Central* factor is the character of the government action. In *Penn Central* the Court held that "a taking may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124 (internal citations omitted). The Supreme Court has further "instructed that in analyzing the 'character' of the governmental action, courts should focus on the extent to which a regulation was 'enacted solely for the benefit of private parties' as opposed to a legislative desire to serve 'important public interests.' " *74 Pinehurst LLC*, 59 F.4th at 568 (quoting *Keystone Bituminous Coal Ass'n*, 480 U.S. at 485–86).

At the motion to dismiss stage this Court explained "if there were ever a regulatory taking claim in which the interference with property might resemble a physical invasion, this appears to be it." MTD Op. at *14. The Court reasoned that the Act when applied retroactively, directs "enforcement officers to refund any money collected (but not yet remitted to the creditor) in excess of the newly recalculated debt based on the reduced interest rate of two percent." *Id.* Therefore, the Court concluded that although the funds were not "physically taken from the creditors (who had not yet gained possession), [] they belonged to the creditors, and they were taken." *Id.* Furthermore, the Court considered whether the Act was designed to promote the general welfare, and determined that "when applied retroactively, [it] does not confer a benefit on the public, but rather benefits solely those debtors (within a limited category of cases) who have delayed paying judgments rightfully obtained." MTD Op. at *15. Finally, although the Act applies to a large

23

number of entities, as the Attorney General argues, the Court also already considered that argument and determined that the creditors in consumer cases have in fact been singled out since the "prior nine percent interest rate applied to *all* judgments," but the Act only reduced the statutory post-judgment interest rate in consumer cases.  MTD Op. at *15.  The evidence introduced at trial has not changed the Court's prior analysis and the ultimate legal conclusion.  The character of the government action here weighs in favor of finding a taking.

## IV.    Other Relevant Considerations

Under *Penn Central*, the Supreme Court identified three factors, which the Court analyzed above, as having "particular signification."  *Penn Cent. Transp. Co.*, 438 U.S. at 124.  However, the Supreme Court has made clear that as an *ad hoc* factual inquiry courts can examine all relevant circumstances in evaluating a regulatory taking claim.  *See, e.g., Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 322 ("Our regulatory takings jurisprudence, in contrast, is of more recent vintage and is characterized by essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances.") (internal citations and quotations omitted).

Plaintiffs argue that another relevant consideration here is the additional cost that Plaintiffs will be burdened with because Plaintiffs will be required to file amended executions adjusting the statutory-interest rate for judgments which are currently in execution.  *See* ECF No. 243 at 24.  However, as made clear at trial, Plaintiffs would need to file amended executions, and pay any fees associated with those amended executions, regardless of the outcome of this litigation because Plaintiffs are not challenging the prospective reduction in the post-judgment interest rate.  Thus, regardless of the currently challenged retroactive reduction in post-judgment interest rate, Plaintiffs need to amend the judgment executions to reflect the post-judgment interest rate moving forward.  *See, e.g.,* Trial Tr. 188:7–21 (Zasucha admitting that Greater Niagara would have to file amended executions, and thus pay the fees associated with those amended executions, even if the

24

Act only applied prospectively).[5]  Therefore, this additional consideration put forward by Plaintiffs also does not weigh in favor of finding a taking.

The *Penn Central* analysis is not a "mathematically precise" formula and instead requires a careful *ad hoc* weighing of factors.  *See Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 326 n.23. The Court has carefully weighed the relevant factors, as detailed above, in light of the testimony and evidence presented at trial and finds that Plaintiffs have not carried their heavy burden of demonstrating that the Act constitutes a regulatory taking under *Penn Central*.  *See Meriden Tr. & Safe Deposit Co.*, 62 F.3d at 455.

## CONCLUSION

For the reasons detailed above, judgment is GRANTED in favor of Defendants and the Amended Complaint in this action is DISMISSED. As such, Plaintiffs' request for an injunction is DENIED and the previously entered preliminary injunction [ECF No. 57, 139], is VACATED.

The Clerk of Court is respectfully requested to terminate the motions pending at docket entries 207, 213, 215 and to close this case.

**SO ORDERED.**
**Date:  September 26, 2025**
      **New York, NY**

_____
      **MARY KAY VYSKOCIL**
      **United States District Judge**

---

[5] Additionally, Plaintiffs admitted that any costs and fees Plaintiffs incur with respect to issuing amended executions are reimbursed to Plaintiffs by the judgment debtor.  *See* Joint Stip. ¶ 24.  Thus, regardless of whether the post-judgment interest rate is set a two percent or nine percent, if any payment is received, Plaintiffs will fully recover the costs and fees that they paid up-front.  That is, of course, if Plaintiffs collect on these judgments at all.